**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
A. Cyclone Covey, Esq. (CA SBN 335957)
cyclone@kneuppercovey.com
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Tel: 512-420-8407

*Attorneys for Plaintiff BiT Global Digital Limited*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIT GLOBAL DIGITAL LIMITED,<br><br>Plaintiff,<br><br>vs.<br><br>COINBASE GLOBAL, INC.<br><br>Defendant. | Case No.: 5:24-cv-9019<br><br>**COMPLAINT FOR:**<br><br>(1) Violations of the Sherman Act, 15 U.S.C § 2 (Attempted Monopolization)<br>(2) Violations of the Sherman Act, 15 U.S.C § 2 (Monopolization)<br>(3) Violation of the Lanham Act, 15 U.S.C. § 1125<br>(4) Violation of the Unlawful Prong of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br>(5) Violation of the Unfair, and Fraudulent Prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*<br>(6) Intentional Interference with Prospective Economic Advantage<br>(7) Negligent Interference with Prospective Economic Advantage<br>(8) Trade Libel<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

1.    The cryptocurrency revolution began with a warning about the dangers of centralization—the danger that the more power an institution acquires, and the more of the market it concentrates on its own closed, centralized platform, the more it will use that power to crush its competitors and seize the fruits of their innovation for itself.

2.    This is a tale as old as Silicon Valley. A centralized platform gains more and more users from a first mover advantage. It creates a moat for itself using network effects which lock those users into its platform. And then it starts changing the rules that got it there. After the bait-and-switch, smaller entrepreneurs find themselves the victims of a corporate goliath that sees their innovations merely as a resource to be grabbed by any means possible and absorbed into itself.

3.    This happened with Microsoft when it tried to "cut off Netscape's air supply" by giving away a clone of its browser for free.[1] It happened with Google when it cut deals with mobile companies to shut down the competition for local search. It happened with Facebook when it cut off successful app developers at the knees and forced them out of business the moment they were a competitive threat.[2] And now it is happening with Coinbase.

4.    Like all the centralized tech giants before it, Coinbase gives lip service to the innovation of a decentralized world. But in the case of wrapped Bitcoin, Coinbase viewed it as just another cash grab. It saw a competitor, wBTC, that had something it wanted: an innovative product that released value inherent in Bitcoin and let users utilize that value in bold new ways. And following the playbook of its predecessors, Coinbase decided it would take what it wanted. Once the value in wBTC had been demonstrated, Coinbase changed the rules, delisting wBTC from its platform so that it could no longer be traded on the Coinbase platform—and it did so shortly after launching its own knock-off clone called cbBTC.

---

[1] https://en.wikipedia.org/wiki/United_States_v._Microsoft_Corp
[2] https://www.ftc.gov/system/files/documents/cases/ecf_75-1_ftc_v_facebook_public_redacted_fac.pdf

5.     This lawsuit seeks to right this wrong and give the choice back to consumers. It seeks to prevent another corporate giant from knocking off cryptocurrency applications developed by others one-by-one only to absorb them into itself. And it seeks to put limits on that centralization of power and restore the vision of wrapped Bitcoin to the decentralized innovation it was supposed to be.

**JURISDICTION AND VENUE**

6.     Plaintiff BiT Global Digital Limited ("BiT Global") is a company incorporated in the British Virgin Islands.

7.     Defendant Coinbase Global, Inc. ("Coinbase") is a Delaware corporation.

8.     This Court has jurisdiction because Plaintiff's Sherman antitrust claim arises under federal law. 15 U.S.C. § 1, *et seq.*

9.     This Court also has diversity jurisdiction because there is complete diversity between the parties, and Plaintiff BiT Global Digital Limited has already suffered and will incur substantial damages from lost future revenues and profits. Most significantly, because of the reduction of wBTC's market share and the attack on its reputation BiT Global stands to lose more than $1 billion in its market valuation, especially if Coinbase's conduct continues unabated. Coinbase's own profits from its wrongful conduct are also a proper measure of damage. Further any damages may be trebled. Plaintiff has incurred in excess of the $75,000 federal jurisdictional threshold for damages already, satisfying the minimum requirements for diversity jurisdiction.

10.     This Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367.

11.     This Court has personal jurisdiction over Coinbase because Coinbase is a registered California foreign corporation. Coinbase claims to be a decentralized company with no headquarters, but states on its website that "if you had asked us in [2020], the answer would have been San Francisco."[3] In July 2023 Coinbase leased 40,000 square

---

[3] https://www.coinbase.com/blog/coinbase-is-a-decentralized-company-with-no-headquarters (accessed November 30, 2024).

feet in Mountain View, California,[4] and Coinbase's CEO, Brian Armstrong, lists Coinbase as being "located in the San Francisco Bay Area."[5] Coinbase applies California law in its online user terms of service and requires its users to submit to California as the venue for any arbitrations or court claims.[6]

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Coinbase resides in this judicial district. To the extent Coinbase does not reside in this judicial district then venue is proper under 28 U.S.C. § 1391(b)(3).

## INTRADISTRICT ASSIGNMENT

13.    Defendant Coinbase's headquarters are in Mountain View, located in Santa Clara County, and a substantial part of the events or omissions which give rise to the claim occurred there. Pursuant to Civil L.R. 3-2(e), assignment is appropriate in the San Jose Division.

## NATURE OF THE ACTION

14.    BiT Global and its affiliates are involved in the wrapped Bitcoin product ("wBTC") operation. They manage the minting and redemption of wBTC, which is pegged 1:1 to Bitcoin. It is designed to bring Bitcoin's liquidity to other blockchain ecosystems, such as Ethereum. This allows Bitcoin holders to interact with decentralized finance (DeFi) applications and decentralized exchanges (DEXs) on other blockchain networks without having to sell their Bitcoin.

15.    Coinbase is the largest US-based cryptocurrency exchange.

16.    Coinbase has allowed the trading of wBTC on the Coinbase exchange since at least October 2020.[7]

17.    Coinbase recently launched its own competing product to wBTC, which is known as cbBTC. As explained further below, cbBTC is a different cryptocurrency but it

---

[4] https://therealdeal.com/sanfrancisco/2023/07/17/coinbase-leases-office-space-at-silicon-valley-tech-center/ (accessed November 30, 2024).
[5] https://www.linkedin.com/in/barmstrong (accessed November 30, 2024).
[6] https://www.coinbase.com/legal/user_agreement/united_states (accessed November 30, 2024).
[7] https://www.coinbase.com/blog/wrapped-Bitcoin-wbtc-is-now-available-on-coinbase (accessed December 11, 2024).

purports to offer similar benefits to cryptocurrency token holders that wBTC offers, namely the seamless interaction of Bitcoin on other blockchain networks.

18.    cbBTC is a product that is directly competitive to wBTC.

19.    Coinbase announced its cbBTC product in September 2024.

20.    On November 19, 2024, roughly two months after announcing its cbBTC product, Coinbase announced on the X platform (formerly Twitter) that it would delist the wBTC cryptocurrency, effectively kicking its competitor off of the platform and depriving the market of the ability to trade wBTC. No written decision or reasoning was ever published or given to wBTC, and there is no process for wBTC to appeal against any decision.

21.    Clearly, Coinbase has decided to exclusively promote its own wrapped Bitcoin product (cbBTC) on the Coinbase exchange.

22.    Coinbase's plan to delist wBTC is clearly aimed to force its public cryptocurrency users who wish to use wrapped Bitcoin into using cbBTC, which is predatory and unfair competition that violates both federal and state law.

## FACTUAL ALLEGATIONS

### BACKGROUND

23.    Bitcoin is the most famous cryptocurrency. Bitcoin was designed to allow the simple transfer stores of value (cryptocurrency) between digital wallets. Bitcoin uses a digital ledger, a blockchain, to track all transactions on the network.

24.    Later cryptocurrencies developed after Bitcoin implemented significant improvements in the way digital transactions could be recorded. These improvements include the speed in which transactions are logged and the type of transactions that could be utilized.

25.    Bitcoin remains the most famous and most valuable cryptocurrency even though other cryptocurrency technology has surpassed the Bitcoin in the speed and efficiency in which transactions are added to the blockchain. Those new technologies, including a blockchain network called Ethereum, allowed users to not just use cryptocurrency as a

store of value, but for self-executing "smart contracts" that could decentralize not just currency, but eliminate middlemen from a broad swathe of industries including escrow services and traditional banks.

26.    Bitcoin's design was locked into place. But in 2018, a group of companies realized that Bitcoin's technological constraints could be overcome—and owners of Bitcoin could unlock new value while continuing to possess the underlying asset by "wrapping" Bitcoin into another blockchain network.

27.    In this context a user "wraps" their Bitcoin by depositing their Bitcoin into the digital wallet of a trusted third party, which is known as a custodian. That custodian then issues a token or digital coin on another blockchain network, such as Ethereum. The new digital coin acts as a proxy for the Bitcoin asset. Meanwhile, the custodian holds the Bitcoin in trust for the user.

28.    This process of wrapping Bitcoin is very much akin to the trading of commodities, such as gold and silver. Gold, for example, is an exchange-traded product. In a physically backed gold ETP, a custodian physically holds gold in its vault on behalf of investors. Investors trade the certificates, each of which is physically backed by allocated gold that the custodian holds.

29.    The goal, both for gold and for wrapped Bitcoin, is for the price of the traded item (wrapped Bitcoin or the gold certificate) to very closely mirror the price of the underlying assets.

30.    In cryptocurrency parlance, the process of a user submitting their Bitcoin in exchange for a wBTC token to be used on the Ethereum network is called "minting" a new wBTC token. Similarly, when a wBTC token holder wishes to redeem (or "unwrap") their wBTC for the underlying Bitcoin the holder redeems their token by "burning" it. The token is then effectively burned and the holder then receives their Bitcoin back from the custodian.

31.    BitGo, a current partner of BiT Global, announced its version of wrapped Bitcoin in October 2018, and began issuing wrapped Bitcoins on Ethereum network in January

2019. These wrapped Bitcoins (known as wBTC) were not and are not the only wrapped Bitcoin product in existence.

32.    Over time wBTC became the most popular wrapped Bitcoin product. Since its inception wBTC has grown such that its outstanding tokens represent more than $13 billion worth of all Bitcoin using current exchange rates.

33.    In 2024 BiT Global and its affiliates formed a joint venture relationship with BitGo to manage and operate the wBTC business, and BiT Global Trust Limited would act as the custodian of the underlying Bitcoin of wBTC.

34.    The joint venture arrangement further provided that BitGo and its Singapore subsidiary would hold two of the three custodian keys for the wBTC custodial digital wallets holding the underlying Bitcoins ("Custodial Wallet"). BiT Global Trust Limited holds the third custodian key.

35.    Two keys are required to unlock access to the Custodial Wallet.

36.    Therefore no single party can unilaterally access the Bitcoins that are held as underlying assets for wBTC. BitGo representatives must also participate in any unlocking of the Custodial Wallet.

37.    BiT Global earns a processing fee whenever a user mints or redeems wBTC through authorized merchants.

<u>COINBASE'S wBTC KNOCK-OFF</u>

38.    Coinbase is a centralized cryptocurrency exchange, with a dominant market share in the United States. It allows users to swap cryptocurrencies for the prevailing rates, purchase cryptocurrency with fiat currency (such as the US Dollar or the Euro), or sell cryptocurrency for fiat currency.

39.    Coinbase does this by holding its users' cryptocurrencies in a Coinbase-controlled digital wallet. Users with Coinbase accounts see totals much like a bank shows account totals to its customers, but all of the cryptocurrency is stored in central digital wallets.

40.    Having achieved the network effects that were its goal, it has now embarked on an effort to use that power to replace cryptocurrencies created by others with its own knock-off versions—with Coinbase taking short term-losses to keep profits for itself long-term as its knock-off gains market share. And wBTC is Coinbase's first target.

41.    Coinbase is the largest US-based cryptocurrency exchange based on multiple measures including trading volume, total value of assets, and web traffic. Its market share of the centralized cryptocurrency exchange market by several measures exceeds 60% and by some measures exceeds 75%.[8]

42.    Coinbase's CEO has stated earlier this year that "Bitcoin ETFs are now the second largest commodity ETFs in the U.S. (behind gold), and we [Coinbase] custody around 90% of the ~$37B in Bitcoin ETF assets. We've seen net inflows across our retail & institutional products since the ETFs launched (i.e. no cannibalization)."[9]

43.    Coinbase's size and dominance within the US market is of particular importance to US consumers because other non-US cryptocurrency exchanges, such as Binance, either completely ban US consumers or restrict US consumers' access to many trading features.

44.    Additionally, while the cryptocurrency community recognizes that Coinbase enjoys significant market share in the US market, the traditional concept of market share does not fully portray Coinbase's ability to influence the cryptocurrency market.

45.    In particular, Coinbase's listing decisions have substantial power to affect coin trading volumes, liquidity, and the decisions of other exchanges whether to list coins for trading.

46.    For example in a March 2024 paper, graduate students from Columbia University Business School and University of Chicago, Booth School of Business wrote about the significant market impact that Coinbase has on the cryptocurrency market: "Coinbase listings are associated with an average 236pp increase in total volumes within first 30

---

[8] https://bitcoinke.io/2023/04/coinbase-market-share-in-united-states/; https://u.today/coinbase-market-share-in-us-rises-to-61-despite-sec-lawsuit
[9] https://x.com/brian_armstrong/status/1758531949331927217

days. … thus, …   every dollar captured by Coinbase generates $2.39 dollars of trade volume on other exchanges…. Thus, for both [Binance and Coinbase], a large fraction of the volume increases associated with listings are due to the indirect effects on other exchanges."[10]

47.     On September 12, 2024, Coinbase announced its decision to issue its own version of wrapped Bitcoin, which it named cbBTC.

48.     Coinbase's own website is currently touting its plans to drive wBTC out of the market. It features the tweet below on its website urging users to switch to cbBTC:



49.     The tweet—which Coinbase is re-publishing on its own website—describes cbBTC as "super strategic to Coinbase." And it predicts that cbBTC "[p]asses WBTC in supply within 6 months of launch (unless acquisition falls thru)."[11] On information and

---

[10] Junyi Hu, Anthon Lee Zhang, *Competition in the Cryptocurrency Exchange Market*, March 2024 (available at: https://anthonyleezhang.github.io/pdfs/cryptoexchanges.pdf).
[11] https://www.coinbase.com/cbbtc

belief, the acquisition refers to Coinbase's acquisition of Utopia Labs. Coinbase has transferred the developers from Utopia Labs to its "Base" network to help drive cbBTC as a competitor to wBTC as part of a broader plan to create its own payments infrastructure.[12]

50.    cbBTC will benefit Coinbase in the long run by driving transaction fees on the Coinbase platform, which increase as it gains market share for the product. And in the long term, driving wBTC out of business is a key part of Coinbase's strategic plan to position itself in the financial industry. Another tweet quoted by Coinbase on the cbBTC page of its website describes the coin as part of a "vampire attack on finance as a whole." This strategy also creates long run profits for Coinbase, as the company itself described in a blog post: "There's a natural flywheel here: Base is supporting developers who build onchain apps, those apps attract users onchain, Wallet onboards those users, and in turn more users incentivizes more developers to build onchain. And the faster we spin this flywheel, the easier it will be to bring more and more people onchain."[13]

51.    The importance of Coinbase's strategy to drive wBTC out of the marketplace is repeatedly touted on its website. Coinbase explains the importance of the wrapped Bitcoin market: "By bringing non-Ethereum assets onchain, wrapped assets like cbBTC help build a more efficient, interconnected and expansive financial ecosystem."[14] And it drives customers to Coinbase more broadly: "cbBTC is moving money forward. We're one step closer to bringing 1 billion people onchain."

52.    Coinbase posted a whitepaper for cbBTC which makes clear that its plan is to take short term losses in order to dominate the market and make profits in the long run: "There are no fees associated with minting/wrapping or burning/unwrapping cbBTC **today**. Users will be charged network fees for withdrawals from Coinbase."[15] On information and belief, Coinbase used this language—that it would not charge

---

[12] https://cointelegraph.com/news/coinbase-buys-on-chain-payments-platform-utopia
[13] https://www.coinbase.com/blog/coinbase-acquiring-team-to-accelerate-onchain-payments
[14] https://www.coinbase.com/cbbtc
[15] https://coinbase.bynder.com/m/1303c2f4d78fc966/original/cbBTC-White-Paper.pdf (emphasis added).

wrapping/unwrapping fees "today"—because it plans to do so once it has unfairly eliminated the competition.

53.    Coinbase began minting the first cbBTC tokens on or about September 12, 2024.

54.    cbBTC offers similar features to wBTC and therefore it is a competitive product to BiT Global's wBTC.

55.    On November 19, 2024, Coinbase announced to the public that it planned to delist wBTC. And it did so based on a false and defamatory statement about its reasons for the decision on Twitter: "We regularly monitor the assets on our exchange to ensure they meet our listing standards. Based on our most recent review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024, on or around 12pm ET." No written decision or reasoning was ever published or given to wBTC, and there is no process for wBTC to appeal against any decision. Coinbase had not raised any issues with wBTC prior to this announcement.

56.    Shortly thereafter, a Coinbase spokesperson was quoted in Yahoo! Finance, stating, "[e]ach asset is reviewed independently to meet our listing standards. wBTC no longer meets these standards."[16]

57.    But these statements, which suggest that wBTC had not met Coinbase's "listing standards," were false statements intended to frighten users away from wBTC—a tactic known in Silicon Valley as "FUD," which refers to intentionally spreading fear, uncertainty, and doubt about a competitor's product. Having decided to copycat wBTC with its own product, Coinbase resorted to unfair and deceptive tactics that long been used by tech giants to crush their competition.

58.    To the best of BiT Global's knowledge, Coinbase has not publicly stated what listing standards wBTC does not meet. This is because Coinbase did not perform an

---

[16] https://finance.yahoo.com/news/bit-global-accuses-coinbase-delisting-081937294.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAN5Y1glCwt3utcrn8eM2JzQ0SKEv5xsyNrA_lchBvF3-QRRkrl3gzl5Z2tQMsaD2yMIwS4CH2F2ZbWBkM5VxvPUl6YMN6Hxjc80RpzJk-l6bRv3y4QJAc-9yzkzwDXWgAJXuUOyEtqm7MFZzHaABWRdzZLFGBCYRrqwEdUZMGU9s

objective analysis against set standards. Instead, the decision to delist wBTC is a transparent attempt to push cryptocurrency holders to divest their wBTC in favor of Coinbase's competing cbBTC token.

59.    Coinbase, will of course, continue to allow trading of its competitive cbBTC product on its platform after its imminent delisting of wBTC.

60.    On November 19, the day of Coinbase's announcement, there were approximately 146,172 wBTC in circulation representing more than $13.1 billion in value based on Bitcoin's price on that day.

61.    Four days after Coinbase's announcement that it would delist wBTC, on November 23, the total wBTC in circulation dropped to approximately 140,830. The total wBTC in circulation dropped again to approximately 138,124 by November 30. Together these drops represent a reduction of more than 5% of total wBTC supply in less than two weeks:



<u>COINBASE'S NONEXISTENT LISTING "STANDARDS"</u>

62.    While Coinbase claims to have made the decision to delist wBTC to adhere to the company's "listing standards," the truth is that Coinbase has virtually no standards for what can be listed at all. Around the same time that it was delisting wBTC, Coinbase has

onboarded various "memecoins" which unlike wBTC have no inherent value other than demand created by their memetic potential as jokes. The decision to allow users to trade these memecoins makes clear that Coinbase did not delist wBTC because of any listing standard, but because Coinbase coveted wBTC's market share and wanted it for itself.

63.   On November 13, 2024, Coinbase announced that it was listing a memecoin called PEPE, named after a controversial picture of a cartoon frog which has been identified as a hate symbol and/or a "racist frog." The coin is promoted to "Dank Meme Enjoyoors" with an official website that purports to perform an "Autism Test" on their computers to ensure that the user's autism is over 9,000 before proceeding.[17]



[17] https://www.pepecoin.io/

64.    The logo for the coin is featured below:



65.    The PEPE coin passed Coinbase's nonexistent listing "standards" just six days before wBTC supposedly failed them.

66.    Also on November 13, 2024, Coinbase announced that a cryptocurrency called "Dogwifhat" had been listed under the symbol WIF. Dogwifhat (with "wif" being slang for "with") is, quite literally, a picture of a dog with a hat. A screenshot of the cryptocurrency's official webpage is below:



67.    The webpage for Dogwifhat announces proudly that the cryptocurrency is "LITERALLY JUST A DOG WIF A HAT," with a parody of promotional language crossed out in red. A scrolling ticker across the top of the website repeatedly informs purchases that "I mean bro, it's literally a dog wif a hat." The dog does, indeed, have a hat—and Coinbase chose to list this coin six days before delisting wBTC.

68.    On December 3, 2024, Coinbase announced that it was listing Mog Coin under the ticker symbol MOG. The coin's website describes itself as "tokenized winning."[18] Mog Coin satirizes the idea of having a business case for a cryptocurrency, posting a one-page White Paper on its website that consists solely of the following:



69.    The Mog website contains a similar picture of an animated cat in sunglasses and features numerous cat emojis, along with the following prominent LEGAL DISCLAIMER: "$MOG is a crypto coin with no intrinsic value or expectation of financial return. Just because some people are getting ridiculously rich buying crypto doesn't mean you definitely will. MOG is to be used strictly for getting laid and for entertainment purposes only."

---

[18] https://mogcoin.xyz/

70.   Coinbase's decision to list Mog just two weeks after delisting wBTC demonstrates that the decision had nothing to do with standards, and everything to do with unfairly and fraudulently pushing wBTC out of the market. Mog—which prominently informs users that it has no value and "is to be used strictly for getting laid"—would not have been listed if there were, in fact, some actual listing standard being applied by Coinbase to delist wBTC.

71.   These are just a few of multiple examples of cryptocurrencies Coinbase has been listing during this time which, while humorous, could not even remotely have survived the kind of review that Coinbase pretends to do for its platform. As reported by Crypto Times, Coinbase has been engaged in a "meme coin listing spree."[19]

72.   But by pretending that wBTC failed a listing standard that does not actually exist—and is not actually applied to other cryptocurrencies—Coinbase sabotaged wBTC as part of its effort to replace it. And it communicated this falsehood and spread it widely in the cryptocurrency community. Its tweet spreading this falsehood has to date been viewed more than 500,000 times:

**Coinbase Assets** 🛡️ ✅ ◉
@CoinbaseAssets                                            ...

We regularly monitor the assets on our exchange to ensure they meet our listing standards. Based on our most recent review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024, on or around 12pm ET.

9:14 AM · Nov 19, 2024 · **538.4K** Views

💬 329          🔁 335          ♡ 1.7K          🔖 114          ⬆️

---

[19] https://www.cryptotimes.io/2024/12/03/coinbase-adds-mog-coin-to-meme-coin-listing-roadmap/

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Unlawful Violations of the Sherman Act – Attempted Monopolization of the Wrapped Bitcoin Market in the United States

### 15 U.S.C § 2

73.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

74.    The Defendant's conduct here is unlawful because it committed violations of 15 U.S.C. § 2, which prohibits attempted monopolization of trade or commerce.

75.    Coinbase had the specific intent to monopolize or destroy competition in the wrapped Bitcoin market in the United States, and attempted to monopolize that market or destroy competition in it. In fact, Coinbase announced this intent to do so by posting a tweeted prediction on its website that it would surpass wBTC within six months. By delisting wBTC, Coinbase intended to deny its main competitor access to its user base entirely and exclude them from the market.

76.    Coinbase engaged in predatory or anticompetitive conduct to accomplish the monopolization. It has used its dominant power in one market—the market for centralized cryptocurrency exchanges in the United States—to attempt to exclude wBTC from that market. It has made false statements about the reasons for its delisting (with implications that the delisting was based on an in-depth review of wBTC using neutral standards, and implications that Coinbase possesses damaging information about wBTC which caused the delisting). These activities have created "FUD" surrounding wBTC (fear, uncertainty, and doubt) and were part of an intentional strategy to do so.

77.    Coinbase's activities have a dangerous probability of success. Indeed, Coinbase itself has touted predictions that it will soon displace wBTC with its cbBTC knock-off. Without access to a large portion of the market for United States cryptocurrency users, wBTC will be at a competitive disadvantage and risks being excluded from the market entirely.

78.    Plaintiff has suffered, and will suffer, causal antitrust injury. As discussed above, it has already suffered a loss of market share which was directly caused by the delisting announcement. It will further suffer injury if Coinbase is permitted to delist wBTC and force liquidations of the positions individual users hold in wBTC. And as Coinbase consolidates its market share via this anticompetitive conduct, Plaintiff will continue to be injured.

79.    Users of wBTC have been injured by Coinbase's anticompetitive conduct. They are being forced to liquidate their positions or transfer them away from Coinbase's exchange. And competition in the market for wrapped Bitcoin has been injured as well. The delisting of wBTC sends a signal that competitors to cbBTC may be delisted at any time at Coinbase's whim. It discourages application developers and other third parties in the market from developing technologies compatible with wrapped Bitcoin competitors to cbBTC generally, because they know that Coinbase may arbitrarily exclude them from its exchange in the future as well just as it did with wBTC. The "FUD" Coinbase has intentionally created further discourages such competitive innovation. Excluding wBTC from third party applications excludes it as a potential option for users, which further injures competition in the market.

80.    There are no pro-competitive justifications for Coinbase's conduct that offset the harm caused by its anticompetitive and illegal conduct.

**SECOND CAUSE OF ACTION**

**Unlawful Violations of the Sherman Act – Monopolization of the Wrapped Bitcoin Market in the United States**

**U.S.C § 2**

81.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

82.    The Defendant's conduct here is unlawful because it committed violations of 15 U.S.C. § 2, which prohibits monopolization of trade or commerce.

83.    Coinbase has dominant market share in the market for centralized cryptocurrency exchanges in the United States, as explained *supra*, and therefore has monopoly power within this market. There are significant barriers to entry to the market of centralized cryptocurrency exchanges in the United States. For example, network effects make it difficult for new entrants to gain market share. There is a "lock-in" effect that makes it difficult to convince users to switch their accounts to a new centralized cryptocurrency exchange, because users lose easy access to their trading data and history and have to make cumbersome financial transfers. A new cryptocurrency exchange must further deal with difficult and expensive regulatory issues and must enable trading of hundreds of cryptocurrencies. Existing competitors cannot increase their share easily in the short run because of the difficulty of convincing consumers to switch exchanges.

84.    Because of Coinbase's large market share in the centralized cryptocurrency exchange market, its actions had a significant effect in foreclosing wBTC from the wrapped Bitcoin market in the United States. Third party developers of applications which utilize wrapped Bitcoin will be discouraged from utilizing it instead of cbBTC, which will have a broader potential userbase in the United States because of Coinbase's illegal and anticompetitive actions. Those third party applications help drive usage of wrapped Bitcoin.

85.    In addition to this circumstantial evidence of monopoly power, the effects of Coinbase's actions on wBTC's market share described *supra* are direct evidence of its monopoly power. Coinbase's actual exclusion of wBTC via its delisting is further direct evidence of its monopoly power.

86.    The wrapped Bitcoin market in the United States is an adjacent market to the market for centralized cryptocurrency exchanges in the United States. Wrapped Bitcoin trades on centralized cryptocurrency exchanges, and depends on access to those exchanges for a significant portion of its market share. The user base between the two markets is overlapping. Power in the market for centralized cryptocurrency exchanges provides a significant amount of leverage and power over the market for wrapped Bitcoin, because

that power can be abused to exclude a wrapped Bitcoin product from the exchange and thus exclude it from a significant portion of the market.

87.    Coinbase has extended its power into the adjacent market for wrapped Bitcoin by creating its knock-off product, cbBTC, by delisting its competitor, wBTC, and by engaging in its "FUD" campaign. The anticompetitive conduct at issue was designed to help Coinbase in this adjacent market by attempting to force wBTC out of the wrapped Bitcoin market in the United States.

88.    Coinbase's actions are anticompetitive. Collectively, Coinbase's actions have a cumulative effect that has harmed competition in the wrapped Bitcoin market, including raising barriers to competition by current and potential competitors and limiting innovation. As described in the First Cause of Action, and incorporated herein by reference, Coinbase's anticompetitive actions have injured Plaintiff, injured consumers, and injured competition.

89.    There are no pro-competitive justifications for Coinbase's conduct that offset the harm caused by its anticompetitive and illegal conduct.

## THIRD CAUSE OF ACTION

### Violation of the Lanham Act

### 15 U.S.C. § 43 (now known as 15 U.S.C. § 1125)

90.    Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

91.    Under 15 U.S. Code § 1125(a)(1)(B), "[a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which… in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

92.     Defendant made a false, misleading, confusing, or deceptive statement of fact in a commercial advertisement about Plaintiff's wBTC.  On November 19, 2024 at 9:14am, Coinbase Assets posted on X: "We regularly monitor the assets on our exchange to ensure they meet our listing standards.  Based on our most recent review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024, on or around 12pm ET."

93.     Defendant made a false, misleading, confusing, or deceptive statement of fact about Plaintiff's wBTC to Yahoo! Finance, "Each asset is reviewed independently to meet our listing standards. wBTC no longer meets these standards."[20]

94.     Yahoo! Finance republished this quote to the public in a November 22, 2024 article on its website.

95.     Defendant made a false, misleading, confusing, or deceptive statement of fact about Plaintiff's wBTC to Cointelegraph, "Each asset is reviewed independently of each other, and each must independently maintain compliance with Coinbase's listing standards. wBTC no longer meets Coinbase listing standards."[21]

96.     Cointelegraph republished this quote to the public in a November 21, 2024 article on its website.

97.     Each of the above statements (on X and to Yahoo! Finance and Cointelegraph) are false, misleading, confusing or deceptive because Coinbase lists other coins that do not meet their purported listing standard, and Coinbase's statement was designed to scare members of the public away from wBTC and over to Coinbase's cbBTC by suggesting that Coinbase had performed a rigorous analysis of a listing standard which it did not actually do. The statements further implied false assertions of fact, namely that wBTC was unreliable or unsafe to invest in or transact business in. These statements implied the existence of undisclosed supporting facts for those statements which Coinbase possessed, namely that there was negative information in Coinbase's possession which made wBTC no longer a safe or reliable product.

---

[20] https://finance.yahoo.com/news/bit-global-accuses-coinbase-delisting-081937294.html
[21] https://cointelegraph.com/news/bit-global-claims-coinbase-delisted-wbtc-for-competitive-advantage

98.    These statements were commercial advertisement or promotion. They are commercial speech because they are being made for the purpose of communicating to customers or potential users of Coinbase, cbBTC, and wBTC. They were disseminated widely to the public, with at least 500,000 viewers of the tweet alone. Their subject matter is commercial, namely which products can be bought and sold on Coinbase and why. Coinbase is in commercial competition with Plaintiff, and has been since announcing its cbBTC knock-off of wBTC. As discussed *supra*, Coinbase brags on its website about its plans to replace wBTC with cbBTC and overtake its market share within six months of launch. The statements were made for the purpose of influencing consumers to buy Coinbase's cbBTC product, and to convince them to liquidate their wBTC to do so.

99.    The statements were made with malice. Coinbase made the statements as part of an intentional effort to create "FUD" and overtake wBTC with its own knock-off coin. They were part of an organized campaign to convince users to switch from wBTC to cbBTC, and were related to its delisting of wBTC and forcing Coinbase users to no longer use it.

100.    The statements were made without privilege, as they were made publicly on Twitter and in other publications.

101.    Defendant's statements deceive or have the tendency to deceive a substantial segment of the cryptocurrency audience. They are literally false by implication, namely, in the implication that wBTC is unsafe or risky such that it would not meet neutral, unbiased listing standards.

102.    Defendant's false statements are deceptive and material because the statements will influence purchasing decisions or decisions about whether to liquidate wBTC and switch to cbBTC. A failure to meet listing standards—if those "standards" had in fact been rigorous or unbiased as Coinbase purports them to be—would be material to users' decisions because it suggests there is some unknown negative information in Coinbase's possession that it knew meant wBTC was risky to use or own.

103. Defendant caused its false statement to enter interstate commerce because Defendant posted the statement on X (formerly Twitter) and the statement was disseminated by various blogs and articles. Moreover, those blogs were tailored to the cryptocurrency industry, meaning their readers are highly likely to be in the industry. Similarly, Coinbase's statement on X would have been distributed to those in the cryptocurrency industry because (1) Coinbase's followers are likely to consist of such individuals, and (2) X's algorithm would promote a Coinbase post to users based on their interest in cryptocurrency.

104. Plaintiff has been injured as a result of the false statements by a diversion of sales from Plaintiff's wBTC to Defendant's cbBTC, which is demonstrated, in part, by a significant drop in total wBTC circulation mere days after Defendant's announcement. Plaintiff's reputation has further been damaged by the implication that its product warranted delisting for reasons that relate to its trustworthiness.

105. Plaintiff seeks damages pursuant to 15 U.S.C. § 1117(a), which are subject to the principles of equity, including Defendant's profits, economic damages, and costs of this action. Plaintiff further seeks trebling of actual damages under this provision, as well as attorney's fees.

## FOURTH CAUSE OF ACTION

### Violation of the Unlawful Prong of the California Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

106. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

107. Plaintiff brings this claim under the "unlawful" prong of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq*., which provides: "unfair competition shall mean and include any **unlawful**, unfair or fraudulent business act or practice…." Business and Professions Code § 17200 (emphasis added).

### Unlawful Violations of the Federal Trade Commission Act

### 15 U.S.C. § 41, *et seq.*

108.  The Federal Trade Commission Act at 15 U.S.C. § 45(a)(1) prohibits unfair or deceptive practices in or affecting commerce: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

109.  "[U]nfair competitive practices [under 15 U.S.C. § 45(a)] were not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws; nor were unfair practices in commerce confined to purely competitive behavior." *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).

110.  On November 10, 2022, the FTC has issued a "Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act Commission File No. P221202." That policy statement likewise underlies Plaintiff's UCL "unlawful prong" cause of action to the extent it is based on 15 U.S.C. § 45(a).

111.  The FTC's Policy Statement states that 15 U.S.C. § 45(a) "reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions." *Id.* at 1. "Congress's aim was to create a new prohibition broader than, and different from, the Sherman and Clayton Acts." *Id.* at 3. "Congress evinced a clear aim that 'unfair methods of competition' need not require a showing of current anticompetitive harm or anticompetitive intent in every case." *Id.* at 4.

112.  The FTC's Policy Statement defines what a method of competition is under the statute: "conduct undertaken by an actor in the marketplace—as opposed to merely a condition of the marketplace, not of the respondent's making, such as high concentration or barriers to entry." *Id.* at 8. "The conduct must implicate competition, but the relationship can be indirect." *Id.*

113.  Coinbase's conduct is a method of competition under the FTC Act and the November 10, 2022 Policy Statement. Coinbase is an actor in the marketplace, and its actions were not merely conditions of the marketplace. Coinbase voluntarily chose to delist wBTC and voluntarily chose to make the public statements identified in the

Complaint. The conduct implicates competition because, as explained *supra*, by delisting wBTC Coinbase has removed its ability to compete on the dominant Coinbase platform entirely. Coinbase's false public statements undermine confidence in wBTC and implicate competition by driving users to its own cbBTC knock-off.

114.  The FTC's Policy Statement defines unfair under the FTC Act as "meaning that the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business acumen, truthful marketing and advertising practices, investment in research and development that leads to innovative outputs, or attracting employees and workers through the offering of better employment terms." *Id.* at 9-10. "There are two key criteria to consider when evaluating whether conduct goes beyond competition on the merits. First, the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature. It may also be otherwise restrictive or exclusionary, depending on the circumstances, as discussed below. Second, the conduct must tend to negatively affect competitive conditions. This may include, for example, conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limit choice, or otherwise harm consumers." *Id.* at 10.

115.  Coinbase's conduct is unfair because it went well beyond competition on the merits as defined by the FTC. Coinbase did not allow the market to decide which was the superior product—it simply delisted its competitor to deny Plaintiff access to users on the Coinbase platform. It used its own economic power in one realm (a platform operating similar to a stock market for cryptocurrencies) to unfairly eliminate the ability to trade a competitor's cryptocurrency. And it publicly announced on its website that its goal was to overtake wBTC with cbBTC.

116.  Coinbase's conduct also tended to negatively affect competitive conditions. By foreclosing or impairing its rival's access to Coinbase users, who had previously been trading wBTC freely in their accounts, Coinbase effectively forced those users to liquidate wBTC and switch to cbBTC if they wished to continue using wrapped Bitcoin on the

Coinbase platform. This necessarily limited choice for consumers and reduced competition between the two rival cryptocurrencies.

117. The FTC's Policy Statement specifically identifies what occurred here as an example of conduct that violates the FTC Act: "using market power in one market to gain a competitive advantage in an adjacent market by, for example, utilizing technological incompatibilities to negatively impact competition in adjacent markets." *Id.* at 14-15. Because Coinbase used its market power as a cryptocurrency platform to exclude wBTC as a competitor in an adjacent market (wrapped Bitcoin), it both gained a competitive advantage and negatively impacted competition.

118. The FTC's Policy Statement also identifies "discriminatory refusals to deal which tend to create or maintain market power" as a violation of the FTC Act. *Id.* at 16. Coinbase's refusal to allow wBTC to continue trading on its platform (which occurred suddenly after it had announced its copycat product) likewise falls within this prohibition.

119. Defendant's unfair and deceptive practices affect interstate commerce because wrapped Bitcoin transactions occur across state lines.

120. As explained supra, this conduct harmed Plaintiff by undermining the wBTC product and undermining Plaintiff's market share and ability to compete in the wrapped Bitcoin market.

### Additional Unlawful Violations

121. As detailed in Plaintiff's First and Second Causes of Action, Defendant's acts and practices are also unlawful because they violate the Sherman Antitrust Act 15 U.S.C. § 2, and the Lanham Act 15 U.S.C. § 1125.

122. The unlawful conduct described above was based on misrepresentations, deception, or omission, Defendant knew, or by the exercise of reasonable care should have known, that their representations and omissions were untrue and misleading, and deliberately made the aforementioned representations and omissions in order to deceive members of the public.

123.  Plaintiff and members of the public who purchased wBTC have suffered injury in fact and lost money and property as a result of this unfair competition and unlawful conduct, and Plaintiff is seeking all available remedies under the UCL.

124.  The unlawful, practices described herein present a continuing threat to Plaintiff and members of the public in that Defendant persists and continues to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendant's conduct will continue to cause irreparable injury to Plaintiff and members of the public unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendant to cease their unfair competitive practices, and Plaintiff is entitled to restitution of the entirety of the Defendant's revenues associated with their unlawful acts and practices, or such portion of those revenues as the Court may find equitable.

**FIFTH CAUSE OF ACTION**

**Violation of the Unfair and Fraudulent Prongs**

**of the California Unfair Competition Law**

**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

125.  Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

126. Plaintiff brings this claim under the "unfair" and "fraudulent" prongs of California's Unfair Competition Law, Business and Professions Code section 17200, *et seq*.

127.  The term "unfair" is defined in the UCL includes "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Communications v. La Cellular*, 973 P.2d 527, 565, n. 12 (1999).  As detailed in Plaintiff's First and Second Causes of Action, Defendant's acts and practices are unfair because they violate antitrust laws and they violate the policy or spirit of the antitrust laws because Defendant's conduct threatens

or harms competition by as described in the factual allegations in this Complaint and realleged by incorporation in the causes of action. As detailed in Plaintiff's Third and Fourth Causes of Action, Defendants' conduct further violates the policy or spirit of the Lanham Act and the FTC Act, which were likewise designed to address unfair competition in broader ways than the Sherman Act permits.

128.  These laws have further established public policies described *supra*, and incorporated herein by reference, which prohibit the conduct at issue and thus make it actionable under the UCL.

129.  Coinbase's conduct was further immoral, unethical, oppressive, unscrupulous and substantially injurious conduct. It is immoral, unethical, oppressive, and unscrupulous to spread "FUD" about a competitor, which involves intentionally creating false impressions in the minds of users who may choose between two competing products, and which inherently involves dishonesty. It is likewise immoral, unethical, oppressive, and unscrupulous to delist a product from an exchange, which has long been trading on that exchange, for the purpose of reducing that product's market share and replacing it with a knock-off. Both forms of conduct are also substantially injurious to Plaintiff for the reasons described herein.

130.  Coinbase's conduct satisfies the FTC test under the UCL prong as applied to unfair competition between competitors for the reasons outlined *supra* in the "unlawful prong" cause of action, which are incorporated herein by reference. Because Coinbase's conduct satisfies the FTC test, it is unfair under the UCL "unfair" prong.

131.  Coinbase's conduct satisfies the tethering test under the UCL "unfair" prong because it violates public policy or statutes, as explained in the "unlawful prong" cause of action. Because Coinbase's conduct satisfies the tethering test, it is unfair under the UCL "unfair" prong.

132.  Coinbase's conduct satisfies the balancing test under the UCL "unfair" prong because the utility of Coinbase's conduct is outweighed by harm to consumers, who can no longer freely purchase wBTC and are being forced to liquidate their holdings of wBTC

against their will and are now left with fewer choices in the market. Similarly, Coinbase's statements and efforts to create "FUD" have harmed consumers by causing consumers to sell their wBTC based on inaccurate or misleading facts. Because Coinbase's conduct satisfies the balancing test, it is unfair under the UCL "unfair" prong.

133. The fraudulent prong covers conduct which is likely to deceive reasonable members of the public.

134. On November 19, 2024 at 9:14am, Coinbase Assets posted on X: "We regularly monitor the assets on our exchange to ensure they meet our listing standards. Based on our most recent review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024, on or around 12pm ET." Shortly thereafter, a Coinbase spokesperson was quoted in Yahoo! Finance, stating, "[e]ach asset is reviewed independently to meet our listing standards. wBTC no longer meets these standards."

135. These statements were false misrepresentations, as explained *supra* and incorporated by reference herein.

136. These statements also constitute omissions, which are actionable under the fraudulent prong of the UCL.

137. Coinbase had a duty to disclose material facts to the public when it made these statements. It is a fiduciary to any members of the public who trade wBTC (or other cryptocurrencies) on the Coinbase exchange. Coinbase also had a duty to disclose because it had (and still has) exclusive knowledge of the reasons why it delisted wBTC and what "standards" it was applying in its review. Coinbase further had a duty to disclose because it actively concealed those reasons from the public, and has never provided an explanation for the delisting, or for why it has subsequently listed pictures of dogs wearing hats, cats wearing sunglasses, and racist frogs as tradeable assets on its platform which ostensibly meet its listing "standards." And Coinbase had a duty to disclose because it made partial representations that are misleading because some other material fact has not been disclosed—namely, that the reasons behind the delisting were actually part of an effort to crush the competing wBTC product, and not because of any "standards."

138. Coinbase omitted material facts from its public statements about wBTC, namely the reasons for its delisting, the fact that its delisting was designed primarily to crush wBTC as a competitor to clear the way for cbBTC, the "standards" which wBTC supposedly failed, and the reasons why wBTC was being delisted while valueless and farcical memecoins supposedly met the same "standards." These facts would have been important to consumers in deciding how to act, particularly in terms of whether to switch from wBTC to cbBTC, or whether to continue using wBTC outside of the Coinbase platform. By announcing and proceeding to delist wBTC, Coinbase portrays wBTC as being less credible than these memecoins.

139. Members of the public reasonably relied upon Defendant's misrepresentations regarding wBTC. In reasonable reliance on Defendant's false representations, and as a result of Defendant's unlawful conduct and unfair competition, Plaintiff and members of the public experienced a rapid decline in the amount of wBTC in the market, which translates to a reduction in value.  If members of the public had been aware that Defendant's representations were false or had the Defendant not engaged in the unlawful and unfair conduct described herein, Plaintiff and members of the public would not have been injured. Plaintiff and consumers ended up with wBTC that was devalued, burned, inaccurately marketed, and did not have the characteristics, qualities, or value promised by Defendant, and therefore Plaintiff and other consumers have suffered injury in fact.

140. Plaintiff and members of the public who purchased wBTC have suffered injury in fact and lost money and property as a result of this unfair competition and fraudulent conduct, Plaintiff is seeking all available remedies under the UCL.

141. The unfair and fraudulent practices described herein present a continuing threat to Plaintiff and members of the public in that Defendant persists and continues to engage in these practices and will not cease doing so unless and until forced to do so by this Court. Defendant's conduct will continue to cause irreparable injury to Plaintiff and members of the public unless enjoined or restrained. Under Business & Professions Code § 17203, Plaintiff is entitled to injunctive relief ordering Defendant to cease their unfair competitive

practices, and Plaintiff is entitled to restitution of the entirety of the Defendant's revenues associated with their unfair acts and practices, or such portion of those revenues as the Court may find equitable.

<strong>SIXTH CAUSE OF ACTION</strong>

<strong>Intentional Interference with Prospective Economic Advantage</strong>

142.   Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

143.   Plaintiff and numerous third parties were in economic relationships because those third parties mint and burn wBTC. BiT Global has economic relationships with third party approved merchants who interact with the end-users of wBTC. Those end users can mint or burn wBTC by making a request through the merchant, who performs a Know Your Customer and Anti-Money Laundering process, and then mints or burns the wBTC.

144.   BiT Global receives an economic benefit from the minting and burning of wBTC, and earns fees from doing so. There was a probable future benefit from these relationships with third parties because wBTC would continue to be minted and burned, and the more it is used, the more economic benefit Plaintiff would receive in the future.

145.   Coinbase knew of these relationships, and had knowledge of how wBTC functioned (because the product traded on Coinbase, because of Coinbase's general knowledge of the industry, and through the process of cloning wBTC for Coinbase's knock-off). The existence of these relationships was publicly known, as was the knowledge of how BiT Global receives economic benefits from them.

146.   Defendant engaged in intentional wrongful conduct with the goal of disrupting BiT Global's relationship with the third party wBTC users and the merchants. As described herein, Coinbase's false and defamatory public statements, as well as its plan to delist wBTC to force users of Coinbase's platform, were intended to disrupt BiT Global's relationships. This is evidenced, for example, by Coinbase publicly bragging on the cbBTC page of its website that it would overtake wBTC in market share within six months of launch.

147. By engaging in this conduct, Defendant intended to disrupt or knew that disruption was certain or substantially certain to occur. Coinbase knew (and planned) that wBTC would lose market share to the Coinbase knock-off product.

148. The economic relationship was disrupted, as evinced by, among other things, the drop in total wBTC in circulation shortly after Defendant's malicious statements, as described *supra*.

149. Coinbase's conduct was independently wrongful because it is proscribed by common law, which renders trade libel tortious. Plaintiff incorporates by reference its explanation from the trade libel cause of action as to why the conduct is proscribed by common law. Coinbase's conduct is further proscribed by the Sherman Act, the FTC Act, and the Unfair Competition Law. Plaintiff incorporates by reference its explanation from the Sherman Act claims and the Unfair Competition Law claims as to why Coinbase's conduct is proscribed by those laws.

150. Plaintiff was harmed and Defendant's conduct was a substantial factor in causing Plaintiff's harm. Coinbase's announcement of the delisting has already forced users to begin selling their wBTC, and the false statements and implications made by Coinbase have led to a loss of confidence in wBTC, resulting in a drop in the total circulation of wBTC as described *supra*. That drop necessarily reduces Plaintiff's revenue because there are fewer users of the product.

**SEVENTH CAUSE OF ACTION**

**Negligent Interference with Prospective Economic Advantage**

151. Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein. Plaintiff specifically incorporates the allegations in its cause of action for Intentional Interference with Prospective Economic Advantage.

152. Coinbase owed BiT Global a duty of care. The transactions at issue were intended to affect the plaintiff, and Coinbase made that intent clear by "dunking" on wBTC in its webpage announcing its knock-off product. There is a close connection between Coinbase's conduct and the injury suffered by the Plaintiff, because Coinbase's conduct

was designed specifically to try to unfairly reduce the market share of wBTC and to create "FUD" surrounding the product. Coinbase's conduct is morally blameworthy because as a goliath in the cryptocurrency injury, it is abusing the network effects of its platform to copycat an innovative product whose market share it coveted.

153.  Coinbase's duty of care is also shown by the policy of preventing future harm. If Coinbase is allowed to persist in Microsoft-style kneecapping of its competitors, it will stifle innovation in the cryptocurrency industry and put numerous other products at risk of suffering similar misconduct. Just as Microsoft gave products away temporarily to destroy Lotus 1-2-3, Netscape, Wordperfect, and many others, only to jack up the prices on consumers once it had successfully stolen the innovations of others, Coinbase threatens to abuse its power not just in relation to the Plaintiff, but to many others in the future.

154.  The disruption of Bit Global's economic relationships with the identified third parties was reasonably foreseeable. Indeed, as described *supra*, Coinbase literally posted a prediction to that effect on its own website. Coinbase could have reasonably foreseen that by issuing a cryptic statement that wBTC had failed to meet its listing standards, suggesting that there was further damaging information in its possession, this would cause fear, uncertainty, and doubt among the users and the merchants Bit Global had existing economic relationships with. Coinbase likewise knew that abusing its market power to delist a competing product just as it was introducing its own knock-off would cause users to sell wBTC.

155.  As described in the cause of action for Intentional Interference with Prospective Economic Advantage, and as incorporated by reference here, Plaintiff was harmed and Defendant's conduct was a substantial factor in causing Plaintiff's harm.

## EIGHTH CAUSE OF ACTION

### Trade Libel

156.  Plaintiff incorporates all preceding and subsequent paragraphs by reference as if set forth fully herein.

157. Defendant made a statement that clearly or necessarily was understood to disparage the quality of Plaintiff's product. As outlined above, these include Defendant's statement on X and its statements to Yahoo! Finance and Cointelegraph about delisting wBTC.

158. These statements are false, misleading, confusing and deceptive because Coinbase listed other coins in the same time period as the delisting of wBTC without applying any purported listing standard, such as $MOG, $PEPE, and $WIF. In fact, Coinbase did not actually apply a listing standard to wBTC. Coinbase delisted wBTC with the intention of removing it as a competitor to Coinbase's newly launched cbBTC. Coinbase's statement was designed to scare members of the public away from wBTC and to decrease wBTC's market share by creating "FUD."

159. The statements were made on X and in Yahoo! Finance, so the statements were made public. More than 500,000 people have viewed the statement on X alone.

160. The statements were untrue. The statements further implied false assertions of fact, namely that wBTC was unreliable or unsafe to invest in or transact business in. These statements implied the existence of undisclosed supporting facts for those statements which Coinbase possessed, namely that there was negative information in Coinbase's possession which made wBTC no longer a safe or reliable product.

161. Defendant knew the statements were untrue, or made them in reckless disregard of their truth or falsity, and intended those statements to cause harm to Plaintiff. Indeed, Coinbase publicly advertises its intention to seize market share from wBTC and that its product cbBTC will pass wBTC in market share within six months. The statements were intended to create "FUD" (fear, uncertainty, and doubt) about the viability of wBTC and to erode confidence in it to convince users to switch to Coinbase's cbBTC, and were part of an intentional plan to damage wBTC and eliminate it as competition for Coinbase.

162. As explained above, these statements did in fact cause harm to Plaintiff, and are continuing to do so by causing users of wBTC to sell the product and switch to cbBTC, thus eroding wBTC's market share exactly as Coinbase intended. Those statements have

induced users of wBTC to no longer use the product, but instead to use cbBTC, the Coinbase knock-off.

163.  Based on data from CryptoQuant, on November 19, the day of Coinbase's announcement, there were approximately 146,172 wBTC in circulation representing more than $13.1 billion in value based on Bitcoin's price on that day. Four days after Coinbase's announcement that it would delist wBTC, on November 23, the total wBTC in circulation dropped to approximately 140,830. The total wBTC in circulation dropped again to approximately 138,124 by November 30. Together these drops represent a reduction of more than 5% of total wBTC supply in less than two weeks. By December 5th, the wBTC supply had dropped further still to approximately 137,593.

164.  It was the natural and probable result of the publication of these statements that this drop in wBTC use would occur, as by implying that a large company such as Coinbase had access to undisclosed negative information about wBTC, it would tend to cause fear, uncertainty, and doubt among users about whether to maintain their ownership and use of wBTC.

165.  These statements further damaged the reputation of BiT Global as a business. They suggest that Plaintiff was not trustworthy or reliable in its operations of wBTC, and were intended to induce others not to do business with Plaintiff. Part of Coinbase's plan to gain market share revolves around third party businesses developing cryptocurrency technologies which cbBTC can be used with, and Coinbase intended to frighten such third-party businesses away from development involving Plaintiff.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff demands judgment as follows:

A.   Declaratory judgment that Defendant's actions are unfair and unlawful;

B.   An award of injunctive relief as permitted by law or equity including an order prohibiting Defendant from engaging in the unlawful and tortious acts described above, as well as prohibiting Defendant from delisting wBTC;

C.    A finding that such injunction constitutes public injunctive relief, has resulted in the enforcement of an important right affecting the public interest and otherwise meets the requirements of California Code of Civil Procedure § 1021.5, and an award of attorney's fees and costs pursuant to § 1021.5;

D.    For judgment for Plaintiff on their claims in an amount to be proven at trial, for economic, monetary, consequential, compensatory or statutory damages caused by Defendant's practices, along with punitive damages; including but not limited to the harm of loss in aggregate value of wBTC caused by the Defendant in excess of one billion dollars;

E.    For restitution and/or other equitable relief, including without limitation disgorgement of all revenues, profits, and unjust enrichment that Defendants obtained as a result of its unlawful, unfair, and deceptive business practices described herein;

F.    An award of attorney's fees and costs;

G.    For pre-judgment and post-judgment interest as provided for by law or allowed in equity; and

H.    Such other and further relief as is necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. Proc. 38(b), Plaintiff demands a trial by jury on all issues so triable.

DATED: December 13, 2024                    **KNEUPPER & COVEY, PC**

/s/Kevin M. Kneupper

Kevin M. Kneupper, Esq.
*Attorney for Plaintiff BiT Global*
*Digital Limited*