1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**KNEUPPER & COVEY, PC**
Kevin Kneupper, Esq. (CA SBN 325413)
kevin@kneuppercovey.com
A. Cyclone Covey, Esq. (CA SBN 335957)
cyclone@kneuppercovey.com
17011 Beach Blvd., Suite 900
Huntington Beach, CA 92647
Tel: 512-420-8407

*Attorneys for Plaintiff BiT Global Digital Limited*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BIT GLOBAL DIGITAL LIMITED,<br><br>           Plaintiff,<br><br>    vs.<br><br>COINBASE GLOBAL, INC.<br><br>         Defendant. | Case No.: 5:24-cv-9019<br><br>**PLAINTIFF'S *EX PARTE* EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**Hearing Date and Time:**<br>To Be Set By Court |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLEASE TAKE NOTICE that as soon as this matter might be heard in the Court Plaintiff BiT Global Digital Limited ("BiT Global") will move the Court pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-1 for a Temporary Restraining Order against Defendant Coinbase Global, Inc. ("Coinbase").

This motion seeks a temporary restraining order in the form of Exhibit 22 prohibiting Coinbase from delisting BiT Global's wrapped bitcoin token ("wBTC") from Coinbase's trading platform.

Pursuant to Local Rule 65-1(a) Plaintiff includes the following documents:

- A copy of the complaint as Exhibit 21;
- The proposed temporary restraining order and order to show cause as Exhibit 22;
- A declaration by counsel, which includes a certification that notice will be promptly provided to the Defendant.

## BRIEF IN SUPPORT OF PLAINTIFF'S EX PARTE EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  FACTS ................................................................................................................2

   A.  Cryptocurrency Background ...........................................................................2

   B.  About Wrapped Bitcoin Products ...................................................................2

   C.  Coinbase As a Centralized Exchange .............................................................4

   D.  Coinbase's Move Into Wrapped Bitcoin .........................................................4

   E.  Coinbase's Listing Process Is a Sham ............................................................5

   F.  COINBASE'S cbBTC PRICING IS ILLUSORY ..........................................11

III.  ARGUMENT ......................................................................................................11

   A.  Legal Standard .............................................................................................11

   B.  BiT Global Is Likely to Succeed on the Merits ............................................12

      1.  BiT Global Will Prevail on its UCL/FTC Act Claim (15 U.S.C. § 41 et seq.) .12

      2.  BiT Global Will Prevail on its Trade Libel Claim ....................................17

   C.  Irreparable Harm Is Imminent .....................................................................18

   D.  The Balance of Equities Weight in Favor of A TRO .....................................22

   E.  An Injunction is in the Public Interest ..........................................................22

IV.  CONCLUSION ...................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*All. For The Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ...................................................................11

*Blair v. Rent-A-Center, Inc.*,
  928 F.3d 819 (9th Cir. 2019) ....................................................................21

*Citibank, N.A. v. Mitchell*,
  No. 24-cv-08224-CRB,
  2024 U.S. Dist. LEXIS 215481 (N.D. Cal. Nov. 26, 2024) .........................11

*Concord v. Bos. Edison Co.*,
  915 F.2d 17  (1st Cir. 1990)......................................................................11

*Consumer Fin. Prot. Bureau v. D & D Mktg.*,
  No. CV 15-9692 PSG (Ex),
  2017 U.S. Dist. LEXIS 221039 (C.D. Cal. Mar. 21, 2017)..........................13

*Estate of Casey v. Commissioner*,
  Docket No. 19512-94,
  1996 Tax Ct. Memo LEXIS 166 (T.C. Mar. 27, 1996) ................................18

*FTC v. Accusearch, Inc.*,
  570 F.3d 1187 (10th Cir. 2009) .................................................................13

*FTC v. Brown Shoe Co.*,
  384 U.S. 316 (1966)...................................................................................13

*FTC v. Gratz*,
  253 U.S. 421 (1920).............................................................................12, 13

*FTC v. Motion Picture Advert. Serv. Co.*,
  344 U.S. 392 (1953).............................................................................13, 15

*FTC v. Texaco*,
  393 U.S. 223, 226 (1968) ........................................................................ 14

*Gardner v. Martino*,
  563 F.3d 981 (9th Cir. 2009) ................................................................. 17

*Glob. Plasma Sols., Inc. v. Iee Indoor Env't Eng'g*,
  600 F. Supp. 3d 1082 (N.D. Cal. 2021) ................................................. 17

*Inga v. Bellacor*,
  No. 2:19-cv-10406-MWF-MRW,
  2020 U.S. Dist. LEXIS 188297 (C.D. Cal. July 17, 2020) .................... 12

*Kindred Studio Illustration & Design, LLC v. Elec. Commun. Tech., LLC*,
  No. CV 18-7661-GW(GJSx),
  2018 U.S. Dist. LEXIS 223304 (C.D. Cal. Dec. 3, 2018) ..................... 12

*McGill v. Citibank, N.A.*,
  2 Cal. 5th 945 (2017) ............................................................................ 21

*Nichols v. Great Am. Ins. Cos.*,
  169 Cal. App. 3d 766 (1985) ................................................................. 16

*Reno Air Racing Ass'n, Inc. v. McCord*,
  452 F.3d 1126 (9th Cir. 2006) ............................................................... 11

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
  944 F.2d 597 (9th Cir. 1991) ................................................................. 21

*Roper v. Big Heart Pet Brands*,
  510 F. Supp. 3d 903 (E.D. Cal. 2020) ................................................... 16

*Rubenstein v. Neiman Marcus Grp. Ltd. Liab. Co.*,
  687 F. App'x 564 (9th Cir. 2017) (unpublished) ................................... 12

*Schmitt v. SN Servicing Corp.*,
  No. 21-cv-03355-WHO,
  2021 U.S. Dist. LEXIS 219292 (N.D. Cal. Nov. 12, 2021) .............. 12, 16

*Spiegel, Inc. v. FTC,*
     540 F.2d 287 (7th Cir. 1976) ...................................................................... 13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
     240 F.3d 832 (9th Cir. 2001) ............................................................... 11, 21

*Taewoo Kim v. Jump Trading, LLC,*
     No. 23 CV 2921,
     2024 U.S. Dist. LEXIS 100817 (N.D. Ill. June 6, 2024) .............................. 19

*Winter v. NRDC, Inc.,*
     555 U.S. 7 (2008) .......................................................................................... 11

*Zhang v. Superior Court,*
     57 Cal. 4th 364 (2013) ........................................................................... 11, 12

**Statutes**

15 U.S.C. § 45 ...................................................................................................... 12

**Other Authorities**

Elendner, Hermann; Trimborn, Simon; Ong, Bobby; Lee, Teik Ming, *The cross-section
     of crypto-currencies as financial assets: An overview*, SFB 649 Discussion Paper, No.
     2016-038, Humboldt University of Berlin, Collaborative Research Center 649 -
     Economic Risk, Berlin (2016) ....................................................................... 18

Maiello, Michael, *How to Make Cryptocurrencies More Stable*, Chicago Booth Review
     (April 1, 2024)............................................................................................... 19

Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section
     5 of the Federal Trade Commission Act Commission, File No. P221202 (Nov. 10,
     2022) ....................................................................................................... 14, 15

I.    **INTRODUCTION**

This case involves cryptocurrency concepts and terms that may be unfamiliar to the Court, but the fundamental dispute is the same plot with different players in a new market. Coinbase is weaponizing its position as a market leader in the cryptocurrency exchange market to give itself an unfair advantage with a different product that Coinbase has recently launched. Absent Court intervention, on December 19, Coinbase will cut off the public's ability to trade BiT Global's[1] wrapped bitcoin product ("wBTC") on the Coinbase platform. (This cut off is known in the industry as "delisting.") Specifically, on November 19, 2024, Coinbase published the following statement on its X account:

> We regularly monitor the assets on our exchange to ensure they meet our listing standards. Based on our most recent review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024, on or around 12pm ET.[2]

ECF 1 at 11 (Complaint ¶ 55). In addition to announcing the delisting on X, Coinbase made similar statements to Yahoo! Finance, stating "[e]ach asset is reviewed independently to meet our listing standards. wBTC no longer meets these standards," which Yahoo! republished. ECF 1 at 21 (Complaint ¶¶ 93-94). Coinbase made virtually the same statement to Cointelegraph, which it also republished. ECF 1 at 21 (Complaint ¶¶ 95-96). Not coincidentally, on September 12, 2024, Coinbase launched its own wrapped bitcoin token, cbBTC. ECF 1 at 9 (Complaint ¶ 47). On its face, Coinbase's decision to delist a competing product from its exchange smacks of unfair competition. Instead of allowing the market to decide which product may be better, Coinbase has decided to use its status as the number one US-based cryptocurrency exchange to force cryptocurrency users to use the Coinbase cbBTC product.

Coinbase's delisting of wBTC will undoubtedly harm wBTC's value and therefore impact the thousands of users holding wBTC. Cryptocurrency users and market watchers

---

[1] BiT Global Digital Limited (the Plaintiff) is referred to as BiT Global. A separate entity, BiT Global Trust Limited, is referred to by its full name when referenced.
[2] https://x.com/CoinbaseAssets/status/1858921827159945638

understand the impact will be significant. For example, Yahoo! Finance reported, "[regarding] WBTC's future[,] Coinbase's delisting announcement and the shift in custodial practices have amplified debates about trust and competition within the tokenized Bitcoin market. … attention now turns to the Dec. 19 delisting date and its potential market impact."[3] Decl. of Cyclone Covey, Ex. 1. The Court should enjoin this delisting until it can conduct a full merits hearing.

## II.    FACTS

### A. Cryptocurrency Background

Bitcoin is the most famous cryptocurrency. Bitcoin was designed to allow the simple transfer stores of value (cryptocurrency) between digital wallets. ECF 1 at 5 (Complaint ¶ 23). Bitcoin uses a digital ledger, a blockchain, to track all transactions on the network. ECF 1 at 5 (Complaint ¶ 23). Later cryptocurrencies developed after Bitcoin implemented significant improvements in the way digital transactions could be recorded. ECF 1 at 5 (Complaint ¶ 24). These improvements include the speed in which transactions are logged and the type of transactions that could be utilized. ECF 1 at 5 (Complaint ¶ 24). Those new cryptocurrencies, including Ethereum, allowed users to not just use cryptocurrency as a store of value, but for self-executing "smart contracts" that could decentralize not just currency, but eliminate middlemen from a broad swathe of industries including escrow services and traditional banks. ECF 1 at 5-6 (Complaint ¶ 25).

### B. About Wrapped Bitcoin Products

In 2018, a group of companies realized that Bitcoin's technological constraints could be overcome—and owners of Bitcoin could unlock new value while continuing to possess the underlying asset by "wrapping" bitcoin into another platform. ECF 1 at 6 (Complaint ¶ 26). In this context a user "wraps" their bitcoin by depositing their bitcoin into the digital wallet of a trusted third party, which is known as a custodian. ECF 1 at 6 (Complaint ¶ 27). That custodian then issues a token or digital coin on another blockchain

---

[3] https://finance.yahoo.com/news/wrapped-bitcoin-drops-5-200-081121515.html

network, such as Ethereum. ECF 1 at 6 (Complaint ¶ 27). The new digital coin acts as a proxy for the Bitcoin asset. ECF 1 at 6 (Complaint ¶ 27). Meanwhile, the custodian holds the Bitcoin in trust for the user. This process of wrapping Bitcoin is very much akin to the trading of commodities, such as gold and silver. ECF 1 at 6 (Complaint ¶ 28). Gold, for example, is an exchange-traded product. In a physically backed gold ETP, a custodian physically holds gold in its vault on behalf of users. Users trade the certificates, each of which is physically backed by allocated gold that the custodian holds. ECF 1 at 6 (Complaint ¶ 28). The goal, both for gold and for wrapped Bitcoin, is for the price of the traded item (wrapped Bitcoin or the gold certificate) to very closely mirror the price of the underlying assets. ECF 1 at 6 (Complaint ¶ 29).

In cryptocurrency parlance, the process of a user submitting their Bitcoin in exchange for a different coin or token to be used on a different network, such as the Ethereum network, is called "minting" a new token. ECF 1 at 6 (Complaint ¶ 30). Similarly, when a token holder wishes to redeem (or "unwrap") their token for the underlying Bitcoin the holder redeems their token by "burning" it. ECF 1 at 6 (Complaint ¶ 30). The token is then effectively burned and the holder then receives their Bitcoin back from the custodian. ECF 1 at 6 (Complaint ¶ 30).

BitGo, a current partner of BiT Global, began issuing its version of wrapped Bitcoins in 2018. ECF 1 at 6 (Complaint ¶ 31). These wrapped bitcoins (known as wBTC) were not and are not the only wrapped Bitcoin product in existence. ECF 1 at 7 (Complaint ¶ 31). Over time wBTC became the most popular wrapped Bitcoin product. Since its inception, wBTC has grown such that its outstanding tokens represent more than $13 billion worth of all Bitcoin using current exchange rates. ECF 1 at 7 (Complaint ¶ 32). In 2024, BiT Global and its affiliates formed a joint venture relationship with BitGo to manage and operate the wBTC business, and BiT Global Trust Limited would act as the custodian of the underlying Bitcoin of wBTC. ECF 1 at 7 (Complaint ¶ 33). The joint venture arrangement further provided that BitGo and its Singapore subsidiary would hold

two of the three custodian keys for the wBTC custodial digital wallets holding the underlying Bitcoins ("Custodial Wallet"). ECF 1 at 7 (Complaint ¶ 34). BiT Global Trust Limited holds the third custodian key. ECF 1 at 7 (Complaint ¶ 34). Two keys are required to unlock access to the Custodial Wallet. ECF 1 at 7 (Complaint ¶ 35). Therefore no single party can unilaterally access the Bitcoins that are held as underlying assets for wBTC. ECF 1 at 7 (Complaint ¶ 36). BitGo representatives must also participate in any unlocking of the Custodial Wallet. ECF 1 at 7 (Complaint ¶ 36). BiT Global earns a process fee whenever a cryptocurrency user mints or redeems wBTC through authorized merchants. ECF 1 at 7 (Complaint ¶ 37).

### C. Coinbase As a Centralized Exchange

Coinbase is a centralized cryptocurrency exchange, with a dominant market share in the United States. It allows users to swap cryptocurrencies for the prevailing rates, purchase cryptocurrency with fiat currency (such as the US Dollar or the Euro), or sell cryptocurrency for fiat currency. ECF 1 at 7 (Complaint ¶ 38). Coinbase does this by holding its users' cryptocurrencies in a Coinbase-controlled digital wallet. ECF 1 at 7 (Complaint ¶ 39). Users with Coinbase accounts see totals much like a bank shows account totals to its customers, but all of the cryptocurrency is stored in central digital wallets. ECF 1 at 7 (Complaint ¶ 39). Coinbase is the largest US-based centralized cryptocurrency exchange. ECF 1 at 8 (Complaint ¶ 41). As of December 2024, Coinbase is estimated to have between 60% and 75% of the US market share for centralized cryptocurrency exchanges. ECF 1 at 8 (Complaint ¶¶ 41-42).

### D. Coinbase's Move Into Wrapped Bitcoin

On September 12, 2024, Coinbase launched its own version of wrapped Bitcoin, which it named cbBTC. ECF 1 at 9 (Complaint ¶ 47). While it has minor differences, perceived by many as being inferior, this product is substantially similar to wBTC in that Coinbase holds Bitcoin as a custodian and mints cbBTC, which the user can then trade on other networks, such as Ethereum. ECF 1 at 10, 11 (Complaint ¶¶ 51, 54). As outlined

above, Coinbase wasted little time in moving to delist wBTC from Coinbase's exchange, announcing wBTC's delisting approximately two months after cbBTC's launch.

### E. Coinbase's Listing Process Is a Sham

As outlined above, two months after launching cbBTC, Coinbase announced it would delist wBTC from the Coinbase exchange. ECF 1 at 11 (Complaint ¶ 55). This delisting is to be effective on December 19, only a few days away. ECF 1 at 11 (Complaint ¶ 55). Coinbase claims that wBTC does not meet its listing standards. But this claim is simply a pretext for delisting wBTC.

Coinbase publishes its listing standards on a web page entitled "Asset Listings Process." Here Coinbase claims to perform "a rigorous vetting/review process that evaluates assets against legal, compliance, and technical security standards … to ensure continued adherence to our listing standards." Ex. 2 p. 2. This web page then links to a PDF, entitled *Listing Prioritization Process & Standards*, which purports to offer more detail on Coinbase's listing standards. Ex. 3. A closer look reveals that the listing standards on both pages are just a smokescreen for what really happens, which is that Coinbase employees simply pick-and-choose what they want to include on the Coinbase platform.

Coinbase's Asset Listings Process website acknowledges as much, stating, "[o]ur Digital Asset Support Group (DASG) votes on which assets can be listed on our exchange, informed by a rigorous vetting/review process." Ex. 3 p. 2. This is code for "a few of us go into a room and agree on whatever we want." The *Listing Prioritization* PDF further confirms that Coinbase's "process" is largely a subjective process in which their group considers items as far flung as "social media sentiment," ex. 3 p. 2, "operations which, in the opinion of Coinbase, are contrary to public interest," and "[the] Project's responsiveness to ongoing due diligence requests." Ex. 3 p. 5. No additional useful details exist. One cannot tell how Coinbase's group gages social media sentiment or how important this metric is. "Public interest" is undefined. And no details exist on "due diligence." Presumably a single X post bashing a cryptocurrency asset because of the

asset-backer's failure to promptly respond to that individual's request for detailed information (due diligence) would provide Coinbase with sufficient grounds to ban the asset from Coinbase's exchange.

Coinbase's *Listing Prioritization* PDF links to additional pages entitled "Legal", "Compliance", and "Technical Security." Ex. 3 p. 2. A user who chooses to follow this rabbit warren of links discovers that each page contains more mushy language. For example, Coinbase's "Asset legal review" page, which is the link from the PDF's "Legal" page, contains more disclaimers than substance, stating "[t]here is significant uncertainty as to how crypto assets should be characterized under securities laws," and "[w]hile we use our best efforts to comply in such an environment, we understand that this presents many questions for asset development teams as to how Coinbase conducts its legal analysis." Ex. 4 p. 1. And the "Technical Security" link takes users to a page entitled "How Coinbase Protects Users From Risky Assets." Ex. 5. Here Coinbase claims to be "objective," but later admits that its decisions to delist are based on issues "*we perceive* to be high risk and have chosen not to list." Ex. 5 p. 2. This same page also says that Coinbase evaluates "the legitimacy of the project's white paper" as a factor in its "objective and nuanced" framework. Ex. 5 p. 1.

Notably Coinbase does not provide details or the rationale behind of any of its decisions. Coinbase's website provides no examples of cryptocurrency tokens or assets that have gone through the "rigorous vetting" to explain how its analysis actually works. Coinbase certainly has provided no details on its decision concerning wBTC. Other than obliquely stating that wBTC does not meet Coinbase's standards, Coinbase has not provided any public statement explaining its delisting decision. Moreover, Coinbase did not provide BiT Global or the cryptocurrency community written reasoning for Coinbase's decision, and Coinbase offers no internal process for BiT Global (or anyone else) to appeal the delisting. ECF 1 at 11 (Complaint ¶ 55).

This lack of detail is unsurprising because Coinbase would be hard pressed to explain why wBTC does not meet its standards. The few truly objective criteria in Coinbase's listing standards include the following elements (i) trading volume and market capitalization, (ii) token traction, (iii) whether the project is discontinued. By all of these measures wBTC is a runaway success as Coinbase's own webpage devoted to wBTC acknowledges that wBTC's market capitalization exceeds $13 billion. Coinbase has listed wBTC on its platform since October 2020, Declaration of Cyclone Covey ¶ 22, and Coinbase had not raised any issues prior to its delisting announcement. ECF 1 at 11 (Complaint ¶ 55). The joint venture relationship formed between BiT Global and BitGo clearly helps to strengthen the project and guarantee the proper custody controls of the underlying assets.

In contrast, Coinbase continues to allow trading many more dubious assets on the Coinbase exchange. One example is the asset "Dogwifhat" (presumably pronounced "dog with hat"). Below is a screenshot of the top of the Dogwifhat website:



Brief in Support of Plaintiff's
Ex Parte Motion for TRO
5:24-cv-9019

Ex. 6. Below this is a video with a header that says, "WHAT IS WF? BE FR." The video is roughly 38 seconds long with loud, pounding, rave style music and a series of dog photos with various hats quickly flashing in and out with the phrase "$WIF" floating over the screen. Ex. 6, 7. (Plaintiff encourages the Court to watch the video, which is Exhibit 7. The brief's description does not do justice to how ridiculous the video is.)

Another cryptocurrency asset that Coinbase allows on its platform is PEPE. Below are selections from the official PEPE website:





Ex. 8.

1    In addition to these pages, Crypto.News recently reported that Coinbase has gone
2  on a "meme coin listing spree" that includes "a basket of top tokens from the speculative
3  sector." Ex. 9 p. 1. The article then referred to Coinbase as a "digital asset titan" and
4  reported that Coinbase featured Peanut the Squirrel "on the company's Apple Pay tutorial,
5  raising suspicious about a possible listing [of the meme coin Peanut the Squirrel] in the
6  coming days." Ex. 9 p. 1. Coinbase also announced on December 3, 2024 that it will add
7  MOG Coin to its listing platform. Ex. 10. Mog Coin satirizes the idea of having a business
8  case for a cryptocurrency, posting a one-page White Paper on its website that consists
9  solely of the following:



21  Ex. 11. Mog's home page features a similar picture of an animated cat in sunglasses. Ex.
22  12. The home page also includes the following disclaimer:

> LEGAL DISCLAIMER: $MOG is a crypto coin with no intrinsic value or expectation of financial
> return. Just because some people are getting ridiculously rich buying crypto doesn't mean you
> definitely will. MOG is to be used strictly for getting laid and for entertainment purposes only.

27  Ex. 12 p 1.

Coinbase claims to protect users from risky assets with a "nuanced" framework that includes "the legitimacy of the project's white paper." Ex. 5 p. 1. Despite MOG's mockery of the white paper process, Coinbase permits its trading. Indeed, Coinbase cannot credibly claim that any of these meme cryptocurrencies are more reliable or credible than wBTC, yet Coinbase permits them to be traded on the Coinbase exchange. The inescapable conclusion is that Coinbase has attempted to give an air of legitimacy to its unilateral and subjective internal delisting decisions by an unknown "Digital Asset Support Group." Coinbase has created a series of web pages and PDFs that appear to outline an objective, rigorous, and multifaceted review. But these pages are replete with mushy language designed to hide the fact that Coinbase employees just pick-and-choose who they want on their platform. In this case, Coinbase's delisting "decision" is simply a pretext for its desire to use its position as the dominant US-based centralized exchange to influence the wrapped bitcoin market and unduly push the market to use its cbBTC token.

When the largest US-based centralized exchange delists wBTC, it is sending a very clear message to the cryptocurrency market that wBTC is not to be trusted. As Coinbase knows, most cryptocurrency users will not turn a critical eye to Coinbase's listing process. The users will see the multiple links, including one to an official-looking PDF, with links to pages entitled "Legal" and "Technical Compliance" and assume that the publicly traded Coinbase is looking out for the community and using objective metrics to make listing decisions. When a user who believes in the objectivity of Coinbase's listing process sees within a few weeks (i) Coinbase's meme listing bonanza adding cryptocurrencies such as Dogwifhat, PEPE, Peanut the Squirrel, and Mog Coin and (ii) Coinbase's decision to delist wBTC, the inescapable conclusion is that wBTC must be less reliable and trustworthy than these memecoins that have "no intrinsic value" and are "strictly for … entertainment purposes only." By pretending that wBTC failed a listing standard that does not actually exist—and that is not actually applied to other cryptocurrencies—Coinbase sabotaged wBTC as part of its effort to replace it. And it communicated this falsehood and spread it

widely in the cryptocurrency community. Its X post spreading this falsehood has to date been viewed more than 500,000 times. Ex. 13.

### F. COINBASE'S cbBTC PRICING IS ILLUSORY

Coinbase posted a whitepaper for cbBTC which makes clear that its plan is to take short term losses in order to dominate the market and make profits in the long run: "There are no fees associated with minting/wrapping or burning/unwrapping cbBTC **today**. Users will be charged network fees for withdrawals from Coinbase." Ex. 14 p. 3. (emphasis added). Coinbase used this language—that it would not charge wrapping/unwrapping fees "today"—because it plans to do so once it has unfairly eliminated the competition. This is a classic tactic for companies attempting to use market power; they take short term losses to gain market share only to dramatically raise prices once they have squeezed other large players out of the market. *See generally Concord v. Bos. Edison Co.*, 915 F.2d 17, 23 (1st Cir. 1990) (discussing price squeeze tactics).

### III.  <u>ARGUMENT</u>

#### A. Legal Standard

The party seeking a temporary restraining order must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008). The Ninth Circuit has interpreted *Winter* to mean that "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). The standards for a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The purpose of a temporary restraining order is to preserve the *status quo* and prevent irreparable harm

until a hearing can take place on the propriety of a preliminary injunction. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006).

### B. BiT Global Is Likely to Succeed on the Merits

As outlined above, BiT Global only needs to show "serious questions going to the merits" if it can demonstrate the other factors. BiT Global can make such a showing. Notably, "[t]he likelihood of success on even just one claim is sufficient as long as that claim would support the injunctive relief sought." *Citibank, N.A. v. Mitchell*, No. 24-cv-08224-CRB, 2024 U.S. Dist. LEXIS 215481, at *8 (N.D. Cal. Nov. 26, 2024). This is particularly true because BiT Global has asserted UCL claims, and "the UCL 'borrows' rules set out in other laws and makes violations of those rules independently actionable." *Zhang v. Superior Court*, 57 Cal. 4th 364, 370 (2013). And the UCL permits prevailing plaintiffs to obtain injunctive relief. *Id.* at 371. Thus if Plaintiff demonstrates a likelihood of success on just one of its claims then it will have met the required standard.

### 1. BiT Global Will Prevail on its UCL/FTC Act Claim (15 U.S.C. § 41 *et seq.*)

The FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The Ninth Circuit has recognized that FTC Act violations are sufficient to state a UCL claim under the unlawful prong. *Rubenstein v. Neiman Marcus Grp. Ltd. Liab. Co.*, 687 F. App'x 564, 567 (9th Cir. 2017) (unpublished); *Kindred Studio Illustration & Design, LLC v. Elec. Commun. Tech., LLC*, No. CV 18-7661-GW(GJSx), 2018 U.S. Dist. LEXIS 223304 at *17-18 (C.D. Cal. Dec. 3, 2018); *Inga v. Bellacor*, No. 2:19-cv-10406-MWF-MRW, 2020 U.S. Dist. LEXIS 188297 at *7-8 (C.D. Cal. July 17, 2020); *Schmitt v. SN Servicing Corp.*, No. 21-cv-03355-WHO, 2021 U.S. Dist. LEXIS 219292 at *14-15 (N.D. Cal. Nov. 12, 2021).

As the *Schmitt* court noted (in reversing its own prior opinion), the weight of authority favors Plaintiff's position that the FTC Act can serve as a predicate to a UCL

"unlawful" prong claim given the most recent California state law. In addition, none of the courts holding to the contrary appear to have considered the anti-preemption clause in the FTC which conclusively forecloses contrary arguments. *See* 15 U.S.C. § 57b(e) ("Remedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law."); *see also Consumer Justice Ctr. v. Olympian Labs, Inc.*, 99 Cal. App. 4th 1056, 1059-62, 121 Cal. Rptr. 2d 749 (2002) (conduction a preeemption analysis and concluding that California can, and did, create a private cause of action for the FTC Act under the UCL).

As to whether Defendant's conduct violates the FTC Act, and thus can serve as a predicate for a UCL "unlawful" prong claim, *FTC v. Gratz*, 253 U.S. 421 (1920), is instructive. There the FTC alleged unfair competition because the defendant "refus[ed] to sell cotton ties unless the customer would purchase with each six ties also six yards of bagging." *Id.* at 431 (Brandeis, J. dissenting). The majority ruled that the tying of one product to another was not unfair competition. Justice Brandeis dissented, arguing, [t]hese are conditions closely resembling those under which 'full-line forcing,' 'exclusive-dealing requirements' or 'shutting off materials, supplies or machines from competitors' -- well known methods of competition, have been held to be unfair, when practiced by concerns holding a preponderant position in the trade." *Id.* at 441. Importantly, the Supreme Court stated in *FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966), that later Supreme Court decisions rejected the *Gratz* majority opinion and adopted Justice Brandeis's dissent. *Id.* at 320-21. The *Brown Shoe* Court went on to clarify that proof of a violation of antitrust laws is not required to prove unfair competition, "the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act . . . to stop in their incipiency acts and practices which, when full blown, would violate those Acts . . . as well as to condemn as 'unfair methods of competition' existing violations of them.'" *Id.* at 322 (quoting *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 395 (1953)). The Supreme Court has therefore made clear that the bar is lower for proving unfair

competition under the FTC Act than what the Plaintiff must prove under the Sherman or Clayton Acts. Indeed, an FTC Act violation can occur without the express violation of any other law. *FTC v. Accusearch, Inc.*, 570 F.3d 1187, 1194 (10th Cir. 2009) ("FTCA enables the FTC to take action against unfair practices that have not yet been contemplated by more specific laws."); *Spiegel, Inc. v. FTC*, 540 F.2d 287, 291-94 (7th Cir. 1976) (catalog retailer's practice of suing customers in distant forum was unfair even if practice was allowed under state law); *Consumer Fin. Prot. Bureau v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2017 U.S. Dist. LEXIS 221039, at *16 (C.D. Cal. Mar. 21, 2017) ("In the analogous context of the FTCA, courts of appeal have affirmed Federal Trade Commission enforcement actions "without preexisting rules or regulations specifically addressing the conduct-at-issue.") (citing *Accusearch*).

The Supreme Court has noted that the FTC is "an expert body charged with the practical application of the [FTC Act]" and the FTC's determinations "are entitled to great weight. *FTC v. Texaco*, 393 U.S. 223, 226 (1968). *See also* Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act Commission, File No. P221202 (Nov. 10, 2022) Ex. 15 p. 7 n. 28 (collecting cases). Accordingly, the FTC's recent comments on what constitute "unfair competition" should be given great weight.

In its November 2022 Policy Statement, the FTC outlined its criteria to determine whether a particular action constitutes "unfair competition." Ex. 15 (FTC Policy Statement) p. 8. The first requirement is that the conduct must be "a method of competition" "undertaken by an actor in the marketplace." *Id.* The second requirement is that the competition must "go[] competition on the merits." *Id.* Examples of valid competition on the merits includes "superior products or services, superior business acumen, truthful marketing and advertising practices, … research … that leads to innovative outputs, or attracting employees and workers through the offering of better employment terms." *Id.* at 8-9.

Analysis of the second prong—competition on the merits—itself involves two criteria. The first criteria (which we label 2(A)) is whether the conduct is "deceptive, predatory, or involve the use of economic power of a similar nature." *Id.* at 9. "It may also be otherwise restrictive or exclusionary." *Id.* The second criteria, 2(B) is that the conduct "must tend to negatively affect competitive conditions." *Id.* Examples include "conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limit choice, or otherwise harm consumers." *Id.* These two criteria 2(A)—deceptive, predatory, or exclusionary acts—and 2(B)—reduction of competition or limiting choice—are "weighed according to a sliding scale." *Id.*

Furthermore, actual harm need not be shown as part of criteria 2(B). *Id.* at 9-10. ("this inquiry does not turn to whether the conduct directly caused *actual* harm") (emphasis in original). The question is only whether the defendant's conduct "has a tendency to generate negative consequences; for instance, raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing other market participants." *Id.* at 10. Finally, a claim under the FTC Act "does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions." *Id.* "[T]he inquiry will not focus on the 'rule of reason' inquiries more common in cases under the Sherman Act, but will instead focus on stopping unfair methods of competition in their incipiency based on their tendency to harm competitive conditions." *Id.*

Based on the FTC's interpretation of the FTC Act, which this Court should give "great weight," it is plainly apparent that Coinbase's threatened delisting is unfair and violates the FTC Act—and thus can serve as a predicate for a UCL "unlawful" prong claim. All the FTC's hallmarks of unfair competition exist here. First, Coinbase is undoubtedly in the market, satisfying prong one. Second, Coinbase satisfies prong 2(A) because its actions have been deceptive, predatory, and involve the use of economic power. As outlined above and in the Complaint, Coinbase has used its position as the

largest US-based centralized cryptocurrency exchange to create the false impression that wBTC is less reliable than the memecoins that Coinbase has begun listing. And Coinbase's refusal to allow wBTC transactions while Coinbase is actively touting its competitive cbBTC product smacks of predatory action.

Coinbase's actions satisfy also prong 2(B) of the FTC's test because, by definition, the delisting of wBTC forecloses and impair the opportunities of market participants to trade whatever wrapped bitcoin product they wish to trade. Such an action necessarily limits consumer choice and also reduces BiT Global's ability to compete with Coinbase's cbBTC on the merits. Additionally, cbBTC's short-term zero fee plan for its cbBTC is exactly the kind of incipient monopolistic behavior that the FTC Act is designed to intercept before Coinbase's market power cbBTC can grow into its own separate full-blown Sherman Act violation. *Motion Picture Advert. Serv. Co.*, 344 U.S. at 395.

Coinbase's actions have hit all the key points the FTC identifies as elements for a FTC Act violation, which in turn trigger a UCL "unlawful" prong violation. Coinbase has acted deceptively and created the impression that wBTC cannot be trusted. It is introducing a competitive product and, at the same time, kicking wBTC off one of its major trading platforms. These actions necessarily reduce consumer choice and have no legitimate justification. It is precisely these kinds of actions the FTC Act was designed to stop.

In addition, Plaintiff separately asserts a UCL "unfair" prong violation. "The unfair prong of the UCL creates a cause of action for a business practice that is unfair even if not proscribed by another law." *Schmitt*, 2021 U.S. Dist. LEXIS 219292 at *17. Plaintiffs prevail under a "unfair" prong claim under the UCL "by either alleging immoral, unethical, oppressive, unscrupulous or substantially injurious conduct by defendants or by demonstrating that defendants' conduct violated an established public policy." *Id.* at *17-18. Courts often look specifically to the FTC Act in determining whether conduct violates the "unfair" prong of the UCL, especially in cases of anticompetitive behavior. *Roper v.*

*Big Heart Pet Brands*, 510 F. Supp. 3d 903, 919-20 (E.D. Cal. 2020). And they also apply the "public policy" test, which looks to whether there are regulatory provisions or other expressed public policies that the behavior violates (such as those in the FTC policy paper).

Whether under the "unlawful" or "unfair" prong, BiT Global has clean claims against Coinbase which are likely to prevail. And via the UCL, BiT Global has the right to enjoin Coinbase's unfair action.

### 2. BiT Global Will Prevail on its Trade Libel Claim

Trade libel is a California common law claim that involves "an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff." *Nichols v. Great Am. Ins. Cos.*, 169 Cal. App. 3d 766, 773, 215 Cal. Rptr. 416, 419 (1985). "The plaintiff must prove in all cases that the publication has played a material and substantial part inducing others not to deal with him, and that as a result he has suffered special damages." *Id.* BiT Global can show all three elements. First, as outlined above and in the Complaint, Coinbase made intentionally disparaging statements at least to Yahoo! Finance and Cointelegraph, and Coinbase made a similar intentionally disparaging statements on its X account.

Second, the announcement that wBTC does not meet Coinbase's standards has induced others to stop dealing in wBTC. The total circulation of wBTC dropped by more than 5% less than two weeks after Coinbase's announcement. Exactly zero new wBTC have been minted since Coinbase's announcement while more than 10,000 wBTC have been burned in the same period. Third, BiT Global has been harmed by wBTC's circulation drop as Coinbase has been taking wrapped bitcoin market share from BiT Global since Coinbase's announcement. BiT Global is suffering from erosion in confidence in its product.

Even if Coinbase claims that its delisting decision was its opinion, "[s]tatements of opinion do not enjoy blanket protection from defamation claims." *Glob. Plasma Sols., Inc.*

*v. Iee Indoor Env't Eng'g*, 600 F. Supp. 3d 1082, 1096 (N.D. Cal. 2021) (analyzing trade libel claims). "Statements of opinion that imply a false assertion of fact are actionable." *Id.* The Ninth Circuit has adopted a three-part test to determine if statements imply an assertion of objective fact: "(1) whether the general tenor of the entire work negates the impression that the defendant [is] asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009).

Applying those facts to Coinbase's X post and to its statements to cryptocurrency news outlets reveals that Coinbase attempted to present an objective fact—not meeting Coinbase's standards—in an oblique way to avoid liability. First the X post was a very short statement saying that Coinbase has decided to delist wBTC. Nothing of the tenor of the post would imply that Coinbase was not trying assert an objective fact. The same is true for the quotes Coinbase provided to Yahoo! and Cointelegraph. The statements were two sentences stating that wBTC does not meet Coinbase's standards. Second, neither the X post nor the statements to the press used hyperbolic language. Third, the statement can be proven false because, as outlined above, Coinbase does not actually have any actual listing standards that it follows. The standards are meaningless and certainly not objective. Coinbase has documents on its website to create the façade of having standards, ostensibly to allow Coinbase to make whatever decisions it pleases without explanation and to avoid having to answer to regulators when Coinbase attempts to use its market power.

## C. Irreparable Harm Is Imminent

Allowing Coinbase to follow through with its delisting threat will cause BiT Global and wBTC holders irreparable damage. While Coinbase's delisting announcement certainly damaged wBTC's reputation in the community, the actual delisting will be far worse. Delisting would immediately reduce demand because it means that wBTC holders will have a more difficult time trading that cryptocurrency, particularly given Coinbase's

size within the US. Indeed, an exchange on Reddit post from November 22, 2024 (two days after Coinbase's wBTC delisting announcement) provides a salient example. In this post a user asked, "I would like to convert my wBTC on Coinbase to regular BTC or ethereum but do not necessarily want to sell it. I am confused by the options … Can anyone advise on a safe path to convert the wBTC? I could send it to Coinbase wallet or keep it in the Coinbase exchange." Ex. 16. Official Coinbase support responded the same day with a five-step process on how to use Coinbase's "conversion feature" to convert the wBTC to bitcoin or Ethereum. The user replied, "Thank you! That was easy!" *Id.* Obviously once the delisting occurs Coinbase users like this will no longer have this easy option to trade their wBTC, effectively reducing liquidity. It is axiomatic that reduced liquidity can suppress the value of an asset. *See, e.g. Estate of Casey v. Commissioner*, Docket No. 19512-94, 1996 Tax Ct. Memo LEXIS 166, at *14 (T.C. Mar. 27, 1996) ("a willing buyer would expect a discount for delay in the realization of the liquidated value"). This is also true for cryptocurrency. Ex. 17 (Elendner, Hermann; Trimborn, Simon; Ong, Bobby; Lee, Teik Ming, *The cross-section of crypto-currencies as financial assets: An overview*, SFB 649 Discussion Paper, No. 2016-038, Humboldt University of Berlin, Collaborative Research Center 649 - Economic Risk, Berlin (2016)) p. 26 ("crypto-currencies exhibit a size effect like stock. The market's deepening liquidity is accompanied by increases in market valuations."). Indeed, Coinbase's own blog acknowledges that a drop in liquidity "further drives prices lower and lower." Ex. 18 p. 1.

Cryptocurrency stability, much like bank stability, largely hinges on trust and confidence. Cryptocurrency stablecoins provide an example of how important market confidence is. Cryptocurrencies that are pegged to fiat currency are known as stablecoins, with the stated purpose of the stablecoin to be a one-to-one-proxy for the underlying asset, just like gold ETFs track the price of the underlying gold. In an article entitled, *How to Make Cryptocurrencies More Stable*, the Chicago Booth Review, a publication from the

University of Chicago Booth School of Business, explains that, despite pegs to underlying assets, stablecoins require confidence to remain viable:

> Coordinated confidence in the system's ability to stay pegged to [the underlying asset] is crucial to its success. 'If everyone believes that they are in a stable equilibrium, then you're going to behave as though it is stable… If users lose confidence in the system, that is a self-fulfilling prophecy, and the stablecoin's price falls to zero.'

Ex. 19 p. 2 (Maiello, Michael, *How to Make Cryptocurrencies More Stable*, Chicago Booth Review (April 1, 2024) (quoting Quentin Vandeweyer, Assistant Professor of Finance and Fama Faculty Fellow at the University of Chicago Booth School of Business)). The article then points to another cryptocurrency stablecoin, Terra, which was supposed to be pegged to the US Dollar. "Terra was one of the fastest-growing stablecoin platforms. … The platform's algorithmic stablecoin pegged to the US dollar, reached a peak market value of close to $20 billion. … But in May 2022, loss of confidence in Terra precipitated the mechanism's collapse." Ex. 19 p. 3, 5. Terra's crash is empirical evidence that confidence is critical and loss of confidence is not something that can later be restored if the cryptocurrency crashes. Lost confidence can turn into a runaway train that cannot be called back to the station. *See Taewoo Kim v. Jump Trading, LLC*, No. 23 CV 2921, 2024 U.S. Dist. LEXIS 100817, at *5 (N.D. Ill. June 6, 2024) ("the price of UST dropped dramatically again due to the failure of the algorithm. With no artificial support from Jump Trading this time, the value of UST and aUST plummeted quickly to virtually nothing, leading to the collapse of not only those assets, but also LUNA assets and the entire TFL cryptocurrency system. The collapse destroyed nearly $40 billion worth of market value, including $18 billion in UST and aUST assets. Purchasers of UST … lost everything.").

wBTC is not a stablecoin, but it is similar to stablecoins because wBTC is backed by Bitcoin and therefore is (and should always be) pegged to Bitcoin's price. Like stablecoins, market confidence is critical to wBTC's continued success. In the case of

wBTC, loss of confidence likely would widen the price spread between wBTC and the underlying Bitcoin, which could drive wrapped bitcoin users to alternative products such as cbBTC, which is exactly what Coinbase wants to happen.

Wrapped bitcoin users may switch from wBTC to cbBTC because of the impossibility of trading wBTC on Coinbase's platform, because of perceived loss of market confidence in wBTC, or both. Regardless of the reason, however, once a user makes the effort to switch from wBTC to cbBTC those consumers will likely be locked into cbBTC. "Lock-in" means consumers become dependent on supplier for a specific service, and they become resistant to move to another supplier or system because of actual or perceived costs or inconvenience. Once these users switch to Coinbase's competing product they will likely decide to simply keep cbBTC and not take the time to switch back to wBTC in the future even if Coinbase re-lists wBTC at some point in the future. *See e.g. Mich. Div. - Monument Builders of N. Am. v. Mich. Cemetery Ass'n*, 524 F.3d 726, 737 (6th Cir. 2008) ("Market power may exist in a lock-in case where once a customer buys one product, he or she is locked in to buying another product because of the seller's rules").

The fact that BiT Global will certainly lose some of its customers to Coinbase's cbBTC product is sufficient to show irreparable harm because, at a minimum, Bit Global would lose future profits from users who no longer trade in wBTC. *Synopsys, Inc. v. InnoGrit, Corp.*, No. 19-CV-02082-LHK, 2019 U.S. Dist. LEXIS 107215, at *8-9 (N.D. Cal. June 26, 2019) ("lost profits are irreparable because it is neither easily calculable, nor easily compensable and is therefore an appropriate basis for injunctive relief.") (citation omitted). *See also Stuhlbarg Int'l Sales Co.*, 240 F.3d at 841 ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.).

Even absent the imminent loss in market share that may never be recovered, the injury to Bit Global's goodwill and the hit to wBTC's reputation as a result of the delisting would constitute irreparable injury. *Rent-A-Center, Inc. v. Canyon Television & Appliance*

*Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"). As outlined thoroughly above, Coinbase's delisting of wBTC is a clear message to the cryptocurrency community that wBTC is less trustworthy than Dogwifhat and Peanut the Squirrel.

Finally, BiT Global has asserted UCL claims for injunctive relief, which are claims that are asserted for the benefit of the public at large. *McGill v. Citibank*, *N.A.*, 2 Cal. 5th 945, 951 (2017); *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 824 (9th Cir. 2019). As explained above, Coinbase's delisting will negatively affect all wBTC holders in addition to BiT Global. Even if the delisting does not cause an immediate crash in market value for wBTC, consumers holding wBTC, like the one who posted on the Reddit forum discussed above, will be immediately impacted because they will lose a significant exchange through which they can trade wBTC. This is true both for people who own wBTC today and for consumers who may want to purchase wBTC in the future.

### D. The Balance of Equities Weight in Favor of A TRO

This factor strongly favors BiT Global. Coinbase will suffer no discernable legitimate harm from keeping wBTC on its platform. Coinbase can simply maintain the *status quo*. Indeed, Coinbase will continue to earn transaction fees any time wBTC is traded on its platform. As explained in detail above, the only "harm" to Coinbase in allowing wBTC to remain as a tradable asset on Coinbase's exchange is that Coinbase cannot use its market influence to push cryptocurrency users to switch to its copycat product, cbBTC. Of course, any person who wishes to use cbBTC will be free to do so, but they would have the choice of using wBTC, cbBTC, or both. And issuing an injunction preserves the *status quo* to allow the court—and a jury—to weigh the evidence and make a fully-informed decision.

### E. An Injunction is in the Public Interest

This final factor also weighs in favor of BiT Global. Allowing wBTC to remain on the Coinbase platform gives the public more choice and more options. Instead of allowing

Coinbase to unilaterally decide what is "safe" for the public, each user can research and come to their own conclusions about what wrapped bitcoin product they wish to use.

## IV.    CONCLUSION

Coinbase has no legitimate justification for its actions and any attempt to rationalize its delisting of wBTC is a smokescreen for its true desire to unfairly push cryptocurrency users out of wBTC and into its competitive cbBTC product. Coinbase should be enjoined from delisting wBTC from its platform and allow trading of wBTC indefinitely without restriction.

DATED: December 13, 2024                    **KNEUPPER & COVEY, PC**

                                           /s/Kevin M. Kneupper

                                           Kevin M. Kneupper, Esq.

                                           *Attorney for Plaintiff BiT Global Digital Limited*