WILMER CUTLER PICKERING
 HALE AND DORR LLP

SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
 2600 El Camino Real, Suite 400
 Palo Alto, California 94306
 Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
 7 World Trade Center
 250 Greenwich Street
 New York, New York 10007
 Telephone: (212) 230-8800

*Attorneys for Defendant Coinbase Global, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BIT GLOBAL DIGITAL LIMITED,<br><br>                    Plaintiff,<br><br>        v.<br><br>COINBASE GLOBAL, INC.,<br><br>                    Defendant. | Case No. 3:24-cv-09019-AMO<br><br>**DEFENDANT COINBASE GLOBAL, INC.'S OPPOSITION TO *EX PARTE* EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Hearing Date: December 18, 2024<br>Time: 11 a.m. PT<br>Judge: Hon. Araceli Martínez-Olguín |

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................4

    A.    Coinbase's Standards For Listing And De-Listing Assets On Its Exchange ..........4

    B.    Wrapped Bitcoin Tokens ...............................................................................6

    C.    BitGo Partners With BiT And Justin Sun ...................................................6

    D.    Coinbase's Review And Decision To Delist wBTC From The Exchange .............8

ARGUMENT .......................................................................................................................9

I.    BiT Has Failed To Show Imminent Irreparable Harm .......................................9

    A.    BiT's Delay In Seeking Emergency Relief Forecloses A TRO ..........................10

    B.    BiT Faces No Irreparable Harm From Lost Profits ................................11

    C.    BiT Faces No Irreparable Harm From Damage To Its Reputation ......................13

    D.    Purported Irreparable Harm To The Public Cannot Justify A TRO ...................15

II.    BiT Cannot Show A Likelihood Of Success On The Merits ...................................16

    A.    BiT's "UCL/FTC Act" Claim Is Unlikely to Succeed..........................................16

        1.    BiT Is Not Likely To Succeed Under the "Unfair" Prong........................17

        2.    BiT Is Not Likely To Succeed Under the "Unlawful" Prong ...................18

            a)    BiT Cannot Circumvent *Cel-Tech* ...............................................18

            b)    BiT Cannot Show A Violation Of The FTC Act ...........................20

    B.    BiT's Trade Libel Claim Is Unlikely to Succeed.................................................20

III.    There Is No Public Interest In Forcing Coinbase To Allow wBTC Trading ........23

IV.    The Balance Of Equities Weighs Against The Extraordinary Relief Sought ........................................................................................................24

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Africa v. Jianpu Technology Inc.*,
  2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)........................................................21

5

6

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ...............................................................................14

7

*AlterG, Inc. v. Boost Treadmills LLC*,
  388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...............................................................22

8

9

*American Passage Media Corp. v. Cass Communications, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ...............................................................................11

10

*American Trucking Associations v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ...............................................................................10

11

12

*Amylin Pharmaceuticals Inc. v. Eli Lilly & Co.*,
  456 F. App'x 676 (9th Cir. 2011) ...........................................................................11

13

14

*Arenas v. Shed Media U.S. Inc.*,
  881 F. Supp. 2d 1181 (C.D. Cal.),
  *aff'd*, 462 F. App'x 709 (9th Cir. 2011)................................................................14

15

16

*Aurora World, Inc. v. Ty Inc.*,
  719 F. Supp. 2d 1115 (C.D. Cal. 2009) .................................................................11

17

18

*Bernhardt v. Los Angeles County*,
  339 F. 3d 920 (9th Cir. 2003) ...............................................................................23

19

*BoomerangIt, Inc. v. ID Armor, Inc.*,
  2012 WL 2368466 (N.D. Cal. June 21, 2012) ..................................................12, 14

20

21

*Brooks v. It Works Marketing, Inc.*,
  2022 WL 2217253 (E.D. Cal. June 21, 2022) .......................................................15

22

23

*Carlson v. Coca-Cola Co.*,
  483 F.2d 279 (9th Cir. 1973) ...............................................................................19

24

*Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*,
  20 Cal. 4th 163 (1999) ...........................................................................17, 18, 19

25

26

*In re Citigroup, Inc. Securities Litigation*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................21

27

*ComputerXpress, Inc. v. Jackson*,
  93 Cal. App. 4th 993 (2001) .................................................................................21

28

*Creative Mobile Technologies, LLC v. Flywheel Software, Inc.*,
2017 WL 679496 (N.D. Cal. Feb. 21, 2017) ..........................................................17

*CZ Services, Inc. v. Express Scripts Holding Co.*,
2018 WL 4998141 (N.D. Cal. Oct. 15, 2018)..........................................................11

*Dahl v. Swift Distributions, Inc.*,
2010 WL 1458957 (C.D. Cal. Apr. 1, 2010) ...........................................................10

*E.I. du Pont de Nemours & Co. v. FTC*,
729 F.2d 128 (2d Cir. 1984)....................................................................................20

*Epic Games, Inc. v. Apple Inc.*,
2020 WL 5073937 (N.D. Cal. Aug. 24, 2020) ........................................................14

*Flexible Lifeline System, Inc. v. Precision Lift, Inc.*,
654 F.3d 989 (9th Cir. 2011) ...................................................................................12

*Frontline Medical Associates, Inc. v. Coventry Healthcare Workers
   Compensation, Inc.*, 620 F. Supp. 2d 1109 (C.D. Cal. 2009) .................................15

*FTC v. Paramount Famous-Lasky Corp.*,
57 F.2d 152 (2d Cir. 1932).......................................................................................20

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972).................................................................................................19

*Goldie's Bookstore, Inc. v. Superior Court*,
739 F.2d 466 (9th Cir. 1984) ...................................................................................12

*Grigorian v. Citibank, N.A.*,
2024 WL 2106944 (C.D. Cal. Apr. 17, 2024) ........................................................16

*Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*,
736 F.3d 1239 (9th Cir. 2013) .................................................................................12

*Hodges v. Comcast Cable Communications, LLC*,
21 F.4th 535 (9th Cir. 2021) ...................................................................................16

*Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*,
12 F. Supp. 2d 1035 (C.D. Cal. 1998) ....................................................................22

*Koller v. Brown*,
224 F. Supp. 3d 871 (N.D. Cal. 2016) ......................................................................9

*Leatt Corp. v. Innovative Safety Tech., LLC*,
2010 WL 1526382 (S.D. Cal. Apr. 15, 2010)..........................................................14

*Life Alert Emergency Response, Inc. v. LifeWatch, Inc.*,
601 F. App'x 469 (9th Cir. 2015) ...........................................................................14

*Lopez v. Brewer*,
    680 F.3d 1068 (9th Cir. 2012) ........................................................................................9

*Los Angeles Memorial Coliseum Commission v. National Football League*,
    634 F.2d 1197 (9th Cir. 1980) ......................................................................................11

*MetroNet Services Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ......................................................................................17

*Miller for & on Behalf of N.L.R.B. v. California Pacific Medical Center*,
    991 F.2d 536 (9th Cir. 1993), *on reh'g*, 19 F.3d 449 (9th Cir. 1994) ......................15

*Muddy Waters, LLC v. Superior Court*,
    62 Cal. App. 5th 905 (2021) .........................................................................................22

*Nutrition Distrib. LLC v. Lecheek Nutrition, Inc.*,
    2015 WL 12659907 (C.D. Cal. June 5, 2015) ............................................................13

*Nutrition Distribution, LLC v. Enhanced Athlete, Inc.*,
    2017 WL 5467252 (E.D. Cal. Nov. 14, 2017) ............................................................11

*O'Donnell v. Bank of America, N.A.*,
    504 F. App'x 566 (9th Cir. 2013) ................................................................................19

*Oakland Tribune, Inc. v. Chronicle Publishing Co.*,
    762 F.2d 1374 (9th Cir. 1985) ......................................................................................10

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
    555 U.S. 438 (2009) ......................................................................................................17

*People's Choice Wireless, Inc. v. Verizon Wireless*,
    131 Cal. App. 4th 656 (2005) ......................................................................................17

*Piping Rock Partners, Inc v. David Lerner Associates, Inc.*,
    946 F. Supp. 2d 957 (N.D. Cal. 2013) ........................................................................22

*Prehired, LLC v. Provins*,
    2022 WL 1093237 (E.D. Cal. Apr. 12, 2022) .............................................................22

*Protech Diamond Tools, Inc. v. Liao*,
    2009 WL 1626587 (N.D. Cal. June 8, 2009) ..............................................................10

*Puma SE v. Forever 21, Inc.*,
    2017 WL 4771003 (C.D. Cal. June 2, 2017) ..............................................................14

*Quick Dispense, Inc. v. Vitality Foodservice, Inc.*,
    2024 WL 2925589 (C.D. Cal. June 4, 2024) ..............................................................19

*Royalty Ambulance Services v. HHS*,
    2014 U.S. Dist. LEXIS 64000 (C.D. Cal. May 8, 2014) ...........................................10

*Sanchez v. City of Fremont*,
    2024 WL 2031633 (N.D. Cal. May 6, 2024) ...........................................................................9

*Sovereign Natchez Nation v. Riverside County Department of Social Services*
    *Children Protective Services*, 2022 WL 19865440 (C.D. Cal. Mar. 10, 2022) .......................10

*Stackla, Inc. v. Facebook Inc.*,
    2019 WL 4738288 (N.D. Cal. Sept. 27, 2019) ...........................................................2, 23, 24

*Studio 010, Inc. v. Digital Cashflow LLC*,
    2020 WL 3605654 (W.D. Wash. July 2, 2020) ...........................................................10, 11, 14

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .................................................................................................11

*Synopsys, Inc. v. InnoGrit, Corp.*,
    2019 WL 2617091 (N.D. Cal. June 26, 2019) .....................................................................11, 12

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ..............................................................................................................17

*Western Sugar Refinery Co. v. FTC*,
    275 F. 725 (9th Cir. 1921) .....................................................................................................20

**Docketed Cases**

*SEC v. Sun*,
    No. 1:23-cv-02433 (S.D.N.Y. Mar. 22, 2023) .........................................................................7

**Statutes**

Cal. Bus. & Prof. Code § 17200 ....................................................................................................16

**INTRODUCTION**

Coinbase made the decision—based on a rigorous internal process—that wBTC should be delisted from Coinbase's exchange due to the unacceptable risk that control of wBTC would fall into the hands of Justin Sun. BiT now asks the Court to override, on an emergency basis no less, Coinbase's judgment that continuing to list wBTC could compromise the integrity of its platform and put customers at risk. BiT seeks to force Coinbase to do business with an entity that no longer complies with Coinbase's standards due to Mr. Sun's "material[] involve[ment]." And yet, Mr. Sun's name and connection to wBTC is conspicuously absent from BiT's Complaint and TRO request. So too is any acknowledgement that he has repeatedly been accused of, investigated for, and sued for financial misconduct, and that reports of his alleged misdeeds abound in the press and crypto community more broadly.

No law supports BiT's claims—and certainly none compels Coinbase to host an asset on its exchange that is now connected to an individual with a long history of alleged fraud and market manipulation. Nor can BiT claim harm, let alone irreparable harm, from being delisted from an exchange where less than 1% of transactions involving wBTC are made. Perhaps that is why BiT sat on its claims for nearly a month before filing suit, belying any urgency for relief.

In August 2024, the firm BitGo announced a joint venture in which Plaintiff BiT, in partnership with Mr. Sun, would share control of "wrapped Bitcoin" (wBTC)—a digital asset (aka cryptocurrency) collateralized by Bitcoin held in reserve. Fundamental to wBTC is the requirement that billions of dollars' worth of Bitcoin be held in reserve by an issuer who can be relied upon to take stewardship over those reserves. Coinbase—like many others in the industry—had serious questions about whether BiT could be a reliable steward given Mr. Sun's involvement. He has reportedly violated industry and government standards intended to prevent fraud. He has been sued by the SEC for fraud and market manipulation. It has been reported that he is being investigated for potential criminal wrongdoing by both the FBI and the U.S. Attorney's Office for the S.D.N.Y. And just last year Coinbase closed the account of a company owned by one of Mr. Sun's known associates and tied to Mr. Sun for violating Coinbase's Terms of Service.

After the announcement of a material change in control and Mr. Sun's involvement,

Coinbase initiated a review of wBTC following its standard process outlined on its website. Consistent with that process, Coinbase conducted careful diligence, including asking BiT questions about who ultimately owned and controlled BiT. BiT refused to answer, presumably to conceal Mr. Sun's role, much as it has done here. At the conclusion of its diligence, Coinbase concluded that Mr. Sun's affiliation with—and potential control over—wBTC presented an unacceptable risk to its customers and the integrity of its exchange. Accordingly, on November 19, 2024, Coinbase publicly announced it would suspend wBTC trading 30 days later.

BiT did nothing for weeks. Then, just four business days before the delisting was set to take effect, it filed this lawsuit and motion for a TRO, manufacturing an "emergency" and asking this Court to force Coinbase to grant wBTC "unabated" access to its exchange. This is not relief that should be granted at all, let alone on a truncated record and hyper-compressed timeline. BiT's lengthy and inexplicable delay in filing this action makes clear that it will not suffer any real harm absent relief. That alone is sufficient grounds to deny the motion.

If the Court reaches the other elements for emergency relief, it will find more reasons to deny it. BiT's legal theories are frivolous, and its cries of foul play and injury are unsupported. The core of BiT's argument is that it has an absolute right to offer wBTC on Coinbase's exchange—even where wBTC presents a serious risk to Coinbase's customers and its platform. The implications of such a ruling would be significant, not only in the crypto industry but across technology platforms more generally. It is common sense that Coinbase should be able to enforce its listing standards, which protect its customers from fraud and actors like Mr. Sun. Courts in this district have consistently recognized the public interest in allowing technology companies to exercise their expert judgment to protect their platforms and users. *See, e.g.*, *Stackla, Inc. v. Facebook Inc.*, 2019 WL 4738288, at *6 (N.D. Cal. Sept. 27, 2019) (denying TRO and highlighting public interest in allowing technology company to police integrity of platforms).

The balance of hardships likewise disfavors a TRO, as demonstrated by BiT's anemic showing of supposed irreparable injury. BiT principally claims that it will lose business and profits because some wBTC users will switch to Coinbase's wrapped Bitcoin asset cbBTC. A (supposed) financial injury like this is compensable through monetary damages after trial—and BiT's

imagined losses are speculative to boot. It never explains how delisting wBTC from a single exchange that hosts a de minimis (less than 1%) portion of wBTC trading could wreak irreparable harm. BiT's claimed reputational harms fail as well. While BiT attempts to lay blame on Coinbase, the reality is that Coinbase's decision is a *symptom* of the broader crypto community's lack of confidence in BiT and Mr. Sun, *not its cause*. The day after the announcement, Mr. Sun was forced to take to X to try to allay concerns about his involvement in wBTC. Declaration of Sonal N. Mehta ("Mehta Decl.") Ex. A. According to wBTC's X account, the fallout led to "panic" and "FUD" (fear, uncertainty, doubt). *Id.* Ex. B. And, long before Coinbase took any action, wBTC's circulation had already started to fall. The net of this is that any diminished trust in wBTC was caused by its association with Mr. Sun—not by Coinbase.

If the Court were to even reach the question of likelihood of success on the merits, that would confirm that emergency relief should be denied. Despite pleading a host of headline-grabbing antitrust and business tort claims, BiT does not bother to assert that it is likely to succeed on any of them. That is likely because—as the record before the Court on this motion clearly shows—Coinbase does not have anything approaching monopoly power, and because its decision to delist wBTC was proper and justified based on the careful review it undertook and the unacceptable risk of doing business with an entity associated with Mr. Sun.

The two claims on which BiT did base its TRO request are unlikely to succeed for substantially the same reasons. *First*, BiT's claim under California's Unfair Competition Law fails because Coinbase has the right to choose whom to do business with, and no law requires it to allow bad actors or suspected bad actors onto its exchange. The result is the same whether the Court evaluates this claim under the "unfairness" prong of the UCL, or according to BiT's unusual attempt to leverage the UCL's "unlawful" prong to manufacture a private cause of action for a purported violation of Section 5 of the FTC Act. Neither the UCL nor the FTC Act obligates firms—even monopolists, which Coinbase decidedly is not—to do business with their self-described rivals, particularly where, as here, that purported rival poses a serious risk to Coinbase's business and customers. *Second*, BiT's claim that Coinbase's announcement of its delisting decision constitutes "trade libel" falls flat because it does not identify a single false statement

Coinbase made. The statements at issue—that wBTC does not meet Coinbase's listing standards and that Coinbase intends to suspend trading of the asset—are true. BiT does not and cannot credibly argue otherwise. Its motion for a TRO should be denied.

## BACKGROUND

Cryptocurrencies—also known as digital assets—gained prominence in the early 2010s as an alternative to traditional financial systems. Declaration of Daniel Kim ("Kim Decl.") ¶3. For many, the appeal of digital assets lies in their decentralization from banks and governments, and the security of cryptography. *Id.* ¶4. Like any financial system, however, digital assets are not without risk. *Id.* Consumer confidence is paramount to the health of the crypto ecosystem, including the exchanges on which they are traded. *Id.*

### A.    Coinbase's Standards For Listing And De-Listing Assets On Its Exchange

Coinbase operates an exchange on which users can trade and store digital assets. Kim Decl. ¶¶8-9. More than 270 assets are listed on its retail exchange. *Id.* ¶9. Coinbase is one of dozens of similar exchanges operating in the U.S., from which it faces robust competition. *Id.* ¶10. It also faces increasing competition from emergent "decentralized exchanges," peer-to-peer systems on which users transact directly. *Id.* ¶11. Binance is the largest digital asset exchange globally. *Id.* ¶10.

Coinbase's reputation for reliability and security is critical to its business. Declaration of Court Hillman ("Hillman Decl.") ¶7. As with any exchanges of assets, parties will be drawn to Coinbase's exchange only if they believe Coinbase ensures honest trading and appropriately vets the actors and assets on its platform. *Id.* ¶7. Coinbase is committed to living up to its brand as the "Most Trusted Crypto Exchange," and as part of that, it employs teams of experts across multiple fields—including lawyers, technologists, and finance veterans—to review assets for listing on its exchange and make the best judgments on how to ensure platform integrity. *Id.* ¶7.

To be listed on Coinbase's exchange, a digital asset must be reviewed and approved by Coinbase's Digital Asset Support Group ("DASG"). Hillman Decl. ¶8. Coinbase vets digital assets based on its legal, technical/security, and compliance requirements. *Id.* ¶8. The legal review focuses on whether the asset is likely to be deemed a security and therefore could trigger

registration requirements. Mehta Decl. Ex. C. The technical/security review focuses primarily on token custody risks based on an analysis of "smart contract code, the design of the token system, and the governance" of an asset. *Id.* Ex. D. Compliance review assesses consumer protection considerations and associations with illicit activities, including money laundering and terrorist financing. It also includes research into "the background and history of the project team's experience in related industry and crypto, and other projects they've supported in the past." *Id.* Ex. E. After the vetting process is complete, DASG members decide whether to recommend an asset be listed. Hillman Decl. ¶9. Historically, approximately 90% of digital assets reviewed by Coinbase do not meet the requirements of Coinbase's listing standards and are not listed. *Id.* ¶9. In addition to DASG approval, Coinbase will assess whether there is a business rationale for listing the asset, with a focus on commercial priorities, available resources to support the listing, business metrics, and the track record of the individuals involved with the digital asset. *Id.* ¶10.

To ensure the integrity of the exchange and protect its users, Coinbase monitors assets listed on the exchange for ongoing compliance with its listing standards. Hillman Decl. ¶11. Coinbase uses market intelligence alerts and updates from crypto research firms to detect events that could negatively impact a digital asset. *Id.* ¶11. Events that trigger additional review of a digital asset by Coinbase personnel include attacks on or newly discovered bugs in a digital asset's underlying software; major protocol changes for that digital asset; or changes to an asset issuer's strategy, leadership, or legal status. *Id.* ¶11. To conduct this additional due diligence review, Coinbase may analyze open sources or request further information from the issuer. *Id.* ¶12.

In accordance with Coinbase's ongoing review of whether assets meet its listing standards, Coinbase delists assets with regularity. Hillman Decl. ¶34. In the past 21 months, Coinbase has delisted or announced its intention to delist at least six other assets for failure to meet its listing standards, including BarnBridge, Decentralized Social, Multichain, Ooki, Status Network, and Unifi Protocol DAO. *Id.* ¶35.

A delisted asset is not cut off from the Coinbase platform. Kim Decl. ¶36. A user who owns a delisted asset can still store that asset in their Coinbase account or move it to another exchange that continues to list that asset (if they want to sell it). *Id.* Coinbase users can also

continue to purchase delisted assets through the Coinbase Wallet, a separate software application on which users can trade thousands of digital assets through decentralized exchanges and store them using their own mobile device. *Id.* ¶37.

### B.    Wrapped Bitcoin Tokens

Bitcoin is one of the most well-known and widely traded digital assets, and is regarded within the industry as a secure, trustworthy token. Kim Decl. ¶6. Since Bitcoin's creation, newer assets have implemented technology with advantages like improved speed and the ability to execute "smart contracts," which are computer programs designed to automatically execute the terms of an agreement between parties. *Id.* ¶¶6-7. One example is Ethereum. *Id.* ¶7. Because different blockchains, like Bitcoin and Ethereum, have different protocols, digital assets on one network are typically incompatible with other networks. *Id.* ¶12.

Wrapped Bitcoin was an innovation reconciling that incompatibility. Kim Decl. ¶12. A Bitcoin user can "wrap" or "mint" Bitcoin by giving their Bitcoin to a merchant, who deposits it with a custodian. *Id.* ¶13. The custodian issues new tokens—the wrapped Bitcoin—of equivalent value to the deposited Bitcoin on another blockchain network, such as Ethereum. *Id.* The Bitcoin owner can then redeem (or "burn") their wrapped Bitcoin token with the custodian and receive their underlying Bitcoin back in exchange. *Id.* ¶14. The wrapped Bitcoin is thus backed by Bitcoin, and the value of the wrapped Bitcoin generally tracks the value of the underlying Bitcoin. *Id.* ***Critically***, wrapped Bitcoin has a key risk compared to Bitcoin: Owners of wrapped Bitcoin must be able to trust the custodian because the custodian could misappropriate or otherwise mishandle the underlying Bitcoin, rendering the wrapped Bitcoin worthless. *Id.* ¶15.

BitGo began issuing its wrapped Bitcoin tokens, known as "wBTC," on the Ethereum network in January 2019. Kim Decl. ¶16. Pursuant to Coinbase's process for reviewing applications to list a digital asset on its exchange, wBTC was approved for listing in October 2020. *Id.* ¶17. Coinbase's exchange handles a low volume—less than 1%—of wBTC activity globally. *Id.* ¶40. The bulk of wBTC trading occurs on other platforms, including Binance and Uniswap. *Id.*

### C.    BitGo Partners With BiT And Justin Sun

On August 9, 2024, BitGo announced a joint venture with Plaintiff BiT, Justin Sun, and

the TRON blockchain platform. Mehta Decl. Ex. F. Mr. Sun's involvement in the venture was widely publicized by other wBTC-affiliated entities and Mr. Sun himself. The announcement described the effort as a "strategic partnership" with Mr. Sun. *Id.* BitGo's CEO Mike Belshe confirmed the next day that "we made sure to be very clear about [Mr. Sun's] name" in the announcement, *id.* Ex. G, and reiterated that Mr. Sun "is materially involved, which is why we stated that in the very first announcement," *id.* Ex. H. Mr. Belshe also gave multiple interviews following the announcement discussing Mr. Sun's involvement. *Id.* Exs. I, J, K. And Mr. Sun highlighted his involvement on X. *Id.* Exs. A, L.

The announcement prompted widespread alarm. Just one day later, Mr. Sun himself recognized "that the community has some concerns about my involvement in various projects, including WBTC." Mehta Decl. Ex. A. Sky, f/k/a MakerDAO, an influential digital asset community that allows users to borrow and lend digital assets, passed a resolution proposing to bar the use of wBTC as collateral for such transactions. Mehta Decl. Ex. M; *see also* Kim Decl. ¶26. As wBTC's own X account put it, the news created "panic" and "FUD," i.e., fear, uncertainty, and doubt. Mehta Decl. Ex. B.

This was not an overreaction. Mr. Sun is infamous in the crypto community and has been accused of, among other things, fraud, misappropriation of digital assets, and market manipulation. Kim Decl. ¶¶22-24; Hillman Decl. ¶20. An expose by *The Verge*, a widely read technology news website, reported that, in 2019, Mr. Sun took control of the digital asset exchange Poloniex and proceeded to misappropriate cryptocurrency from users' accounts, while instructing employees to "fake" the vetting process for customers before allowing them to trade on the exchange. Kim Decl. ¶23; Mehta Decl. Ex. N. Allegations of similar misconduct abound. Kim Decl. ¶22. Mr. Sun has been accused of, for example, manipulating crypto markets and engaging in highly risky trading behavior for his own gain. An SEC investigation found, and a civil complaint filed against him alleges, that Mr. Sun engaged in fraud and manipulated the price of TRX, the flagship digital asset of his cryptocurrency network TRON, through wash trades—a market manipulation tactic where the same entity buys and sells financial instruments to drive up price through the false impression of market activity. Compl., *SEC v. Sun*, No. 1:23-cv-02433 (S.D.N.Y. Mar. 22, 2023), Dkt. 1; *see*

*also* Kim Decl. ¶24. It has also been reported that, as of 2022, Mr. Sun was under investigation by the FBI and U.S. Attorney's Office for the Southern District of New York for potential criminal charges. Mehta Decl. Ex. N; *see also* Kim Decl. ¶25. Coinbase's own experience with Mr. Sun comports with his reputation. Hillman Decl. ¶21. For example, in 2023, Coinbase closed the account of a company tied to Mr. Sun for violating Coinbase's Terms of Service. *Id.* ¶21.

Perhaps unsurprisingly given Mr. Sun's reputation, the August 9 announcement of his involvement in wBTC coincided with a significant drop in the total supply of wBTC. Kim Decl. ¶27. Between August 9 and November 18—the day *before* Coinbase announced its delisting decision—supply fell from over 154,000 wBTC tokens to less than 147,000, a nearly 5% decrease equivalent to roughly $713 million. *Id.*; *see also* Mehta Decl. Ex. O.

**D.    Coinbase's Review And Decision To Delist wBTC From The Exchange**

BitGo's joint venture announcement was a trigger event that required re-evaluation of wBTC's compliance with Coinbase's Listing Standards. Hillman Decl. ¶18. On September 10, 2024, DASG members convened to review the results of a compliance review of wBTC. *Id.* ¶26. The members decided to seek further information on BitGo's partnership with BiT and the nature of Mr. Sun's relationship to BiT. *Id.* ¶26. Accordingly, on September 12, a member of the Coinbase Listings Team emailed BitGo representatives to inquire about BiT's directors and Ultimate Beneficial Owners (UBOs) and how the new venture would impact wBTC's operations in an effort to understand the scope of Mr. Sun's involvement. *Id.* ¶27. Coinbase employees followed up on these requests four more times between September 24 and October 16. *Id.* Ex. I.

On October 16, 2024, a BitGo employee introduced Coinbase to a representative of BiT, who provided the names of six entities that had ownership stakes in BiT and two directors. Hillman Decl. ¶30. On October 24, 2024, the Coinbase Listings Team asked for the UBOs behind the BiT entities. In response, the BiT representative asserted that Mr. Sun "is not involved in the shareholding structure [of BiT] directly or indirectly," but declined to provide UBO information for the BiT entities, claiming he was "bound by confidentiality." *Id.* ¶30. Notwithstanding the substantial industry concern around Mr. Sun's involvement and Coinbase's repeated inquiries, BiT provided no information to assure Coinbase that Mr. Sun would not be in a position to compromise

1   wBTC's integrity. *Id.* ¶30.

2       On November 1, 2024, DASG reconvened to consider delisting wBTC. Hillman Decl. ¶31.

3   In its evaluation, DASG considered BiT's refusal to provide answers about its UBOs. *Id.* ¶31.

4   BiT's evasiveness exacerbated doubts about its assertion that Mr. Sun "is not involved in the

5   shareholding structure" of BiT. *Id.* ¶31. DASG concluded there was an unacceptable risk Mr. Sun

6   could misappropriate the deposited Bitcoin for wBTC and create losses for Coinbase users holding

7   wBTC. *Id.* ¶31. Based on these known and anticipated risks, DASG determined wBTC no longer

8   met Coinbase's listing standards and voted to delist it. *Id.* ¶31.

9       On November 19, 2024, Coinbase announced that wBTC would be delisted from

10  Coinbase's exchange in 30 days. Hillman Decl. ¶32. Its post on X explained that Coinbase

11  "regularly monitor[s] the assets on [its] exchanges to ensure they meet [Coinbase's] listing

12  standards." Mehta Decl. Ex. P. The announcement further explained: "Based on our most recent

13  review, Coinbase will suspend trading for wBTC (wBTC) on December 19, 2024 on or around 12

14  pm ET." *Id.* The public announcement by Coinbase was consistent with its approach of not

15  providing details about specific delisting determinations. Hillman Decl. ¶33.

16  **ARGUMENT**

17      Both a temporary restraining order and a preliminary injunction are "extraordinary and

18  drastic remed[ies] … that should not be granted unless the movant, *by a clear showing*, carries the

19  burden of persuading." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Plaintiffs seeking

20  either must show that they: "(1) are likely to succeed on the merits; (2) are likely to suffer

21  irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor;

22  *and* (4) an injunction is in the public interest." *Sanchez v. City of Fremont*, 2024 WL 2031633, at

23  *5 (N.D. Cal. May 6, 2024).[1] All four requirements point decisively against granting BiT's motion.

24  **I.    BiT HAS FAILED TO SHOW IMMINENT IRREPARABLE HARM**

25      "An adequate showing of irreparable harm is the 'single most important prerequisite for

26  the issuance of a [TRO].'" *Koller v. Brown*, 224 F. Supp. 3d 871, 879 (N.D. Cal. 2016). The

27  irreparable harm standard is demanding: "[A]n injunction cannot issue merely because it is

28

---

[1] Unless otherwise noted, emphasis is added and citations are omitted throughout.

possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be." *Am. Trucking Ass'ns v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). BiT falls far short.

## A.    BiT's Delay In Seeking Emergency Relief Forecloses A TRO

On November 19, 2024, Coinbase announced its decision to delist wBTC and provided 30 days advance notice. Compl. ¶55. BiT did not file its complaint and motion until nearly a month later, on Friday, December 13, 2024, and only four business days before the delisting. Neither the complaint nor the motion provides any explanation for this delay.

"[U]ndue delay, standing alone, constitutes grounds for rejecting a" TRO. *Protech Diamond Tools, Inc. v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal. June 8, 2009). That is because a "long delay before seeking a [TRO] implies a lack of urgency and irreparable harm" stemming from that action. *Oakland Trib., Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985). That is especially so where, as here, "[t]here is no indication that Plaintiff was unable to make this emergency request sooner; and Plaintiff provides no explanation for why it waited until the eleventh hour to file." *Sovereign Natchez Nation v. Riverside Cnty. Dep't of Soc. Servs. Child. Protective Servs.*, 2022 WL 19865440, at *1 (C.D. Cal. Mar. 10, 2022). Courts have regularly denied TROs for delays of even shorter duration than the one here. *See, e.g.*, *Dahl v. Swift Distrib., Inc.*, 2010 WL 1458957, at *4 (C.D. Cal. Apr. 1, 2010) (18-day delay "implie[d] a lack of urgency and irreparable harm"); *Studio 010, Inc. v. Digital Cashflow LLC*, 2020 WL 3605654, at *2 (W.D. Wash. July 2, 2020) (three-week delay undermines irreparable harm); *Royalty Ambulance Servs. v. HHS*, 2014 U.S. Dist. LEXIS 64000, at *8-9 (C.D. Cal. May 8, 2014) (ten-day delay "negates" assertion of irreparable harm). If BiT truly faced a serious irreparable injury, it would have—and should have—moved immediately for relief, rather than lying in wait for weeks to manufacture an artificial emergency. The Court should deny the TRO based on delay alone.

In the face of that dispositive delay, BiT superficially alleges two forms of irreparable harm it supposedly faces. First, BiT claims it might "lose some of its customers to Coinbase's cbBTC product" if BiT's digital asset becomes harder to obtain and consumers lose confidence in its stability. Mot. 21. Second, BiT says it might experience an undefined reputational injury from being delisted, since delisting "is a clear message to the digital asset community that wBTC is less

1    trustworthy than Dogwifhat and Peanut the Squirrel," which are other digital assets on Coinbase's

2    exchange. Mot. 21. Both arguments fail.

3    **B.    BiT Faces No Irreparable Harm From Lost Profits**

4    "It is well established" that "monetary injury is not normally considered irreparable." *L.A.*

5    *Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980). Scores

6    of cases reaffirm that lost sales or lost profits do not establish irreparable injury. *See, e.g.*, *Amylin*

7    *Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 678 (9th Cir. 2011) ("[L]ost profits due to lost

8    sales generally constitutes the type of harm that is fully compensable through money damages and

9    therefore does not support injunctive relief."); *Studio 010, Inc.*, 2020 WL 3605654, at *2 ("[A]ny

10   damages resulting from lost profits are purely financial and do not support a finding of irreparable

11   harm."); *CZ Servs., Inc. v. Express Scripts Holding Co.*, 2018 WL 4998141, at *3 (N.D. Cal. Oct.

12   15, 2018) ("customer losses are effectively a claim for lost revenue and profit, which is redressable

13   with an award of damages and consequently not a basis for finding irreparable harm."); *Nutrition*

14   *Distrib., LLC v. Enhanced Athlete, Inc.*, 2017 WL 5467252, at *3 (E.D. Cal. Nov. 14, 2017) (lost

15   sales not cognizable irreparable harm); *Aurora World, Inc. v. Ty Inc.*, 719 F. Supp. 2d 1115, 1169

16   (C.D. Cal. 2009) (same). That principle extends to antitrust and unfair competition claims.

17   "Without a sufficient showing that" a challenged act threatens the plaintiff's "existence, any loss

18   in revenue due to an antitrust violation is compensable in damages." *Am. Passage Media Corp. v.*

19   *Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985).

20   BiT's purported irreparable harm—"los[ing] some of its customers to Coinbase's cbBTC"

21   and thus "los[ing] future profits"—is thus quintessentially remediable after any trial. BiT can

22   identify the loss of demand (if any) following the delisting, and then calculate the lost profits from

23   that loss. BiT does not—and cannot—explain how that classic monetary harm is irreparable.

24   Instead of providing an explanation, BiT offers two unexplained citations to intellectual property

25   cases as support for the proposition that lost profits constitute irreparable harm. Mot. 21 (citing

26   *Synopsys, Inc. v. InnoGrit, Corp.*, 2019 WL 2617091, at *4 (N.D. Cal. June 26, 2019) and

27   *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). Those cases

28   appear to be holdovers from an earlier era in which irreparable injury could "'be *presumed* from a

1   showing of likelihood of success on the merits of a trademark infringement claim'" or other

2   intellectual property claim. *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1249

3   (9th Cir. 2013); *see also Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th

4   Cir. 2011) (copyright). This is, of course, not an intellectual property case. And since at least 2008,

5   this presumption has not been the law, even for intellectual property cases. *See Herb Reed Enters.*,

6   736 F.3d at 1249; *Flexible Lifeline Sys.*, 654 F.3d at 998.

7       To the extent *Synopsys* and *Stuhlbarg* remain good law at all, they reflect merely that lost

8   profits flowing from brand dilution in intellectual property cases may be harder to quantify than

9   other forms of lost profits, and thus not easily compensable. *See Synopsys*, 2019 WL 2617091, at

10  *4. That is not this case. While there is every reason to believe that any reduction in sales resulting

11  from Coinbase's delisting will be de minimis, and every reason to conclude that any decline is

12  really a function of the market reaction to Mr. Sun's announcement and not Coinbase's delisting

13  decision, whatever lost profits may occur are calculable and compensable—not irreparable.

14      Beyond that, BiT's lost profits argument must be rejected because it rests on unsupported

15  speculation. "Speculative injury does not constitute irreparable injury." *Goldie's Bookstore, Inc.*

16  *v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984). And BiT "did not provide any evidence indicating

17  it is likely to lose sales" to Coinbase's cbBTC. *BoomerangIt, Inc. v. ID Armor, Inc.*, 2012 WL

18  2368466, at *4 (N.D. Cal. June 21, 2012). Despite having more than three weeks to prepare TRO

19  papers, it cited no affidavits from customers—or even a BiT employee—and not a single study of

20  consumer behavior suggesting that delisting of a digital asset from a single trading platform tends

21  to produce a significant loss of customers. Nor is it clear why it would "certainly" do so, as BiT

22  asserts. Mot. 21. The Complaint includes a chart purporting to show a decrease in wBTC

23  circulation following Coinbase's delisting announcement, but BiT's motion does not cite it.

24  Compl. ¶61. That may be because the total wBTC in circulation had been falling long before

25  Coinbase's delisting. *See supra* p.8.

26      It is not just that BiT lacks proof of irreparable harm—there is ample evidence

27  affirmatively demonstrating that delisting wBTC will have little to no effect on BiT's profits. For

28  one thing, only a tiny fraction—less than 1%—of all wBTC trading occurs on Coinbase (the

majority occurs on other platforms like Binance and Uniswap), meaning that its delisting from Coinbase cannot have more than a de minimis impact on the market. *See supra* p.6. And Coinbase delisting wBTC does not prevent trading of wBTC through other exchanges. Nor does it prevent Coinbase users from holding wBTC in their wallets. Indeed, it does not even prevent them from trading wBTC using Coinbase Wallet. Given all those options to easily continue trading wBTC, it is pure speculation to assert—without proof—that a meaningful number of customers (to the extent they have not *already* abandoned wBTC) will nonetheless pivot to cbBTC. Extraordinary relief cannot be justified on such threadbare conjecture.

### C.   BiT Faces No Irreparable Harm From Damage To Its Reputation

BiT's claimed irreparable harm from damage to its reputation fares no better. Reputational harm is not inherently irreparable. *See Nutrition Distrib. LLC v. Lecheek Nutrition, Inc.*, 2015 WL 12659907, at *7 (C.D. Cal. June 5, 2015) ("[A]lleged harm in terms of potential loss of goodwill or market share, could be remedied by monetary damages and thus, a preliminary injunction is not appropriate."). Rather, a plaintiff must affirmatively demonstrate that its claimed reputational harm cannot be remedied by monetary damages—for instance, through a libel claim like the one BiT brings here. Because BiT gives no reason its feared reputational harm could not be remedied by monetary damages, those feared harms cannot justify a TRO. But even putting that threshold problem aside, BiT's asserted reputational harm fails both because it is illusory and because it would not be remedied by the requested TRO.

*First*, and most importantly, BiT has not shown and cannot hope to show that Coinbase's decision to delist wBTC—as it has delisted other assets in the past—is the cause of any alleged reputational injury to BiT, given its association with Mr. Sun. A TRO cannot remedy a public belief "that wBTC is not to be trusted," Mot. 10, because BiT's own actions have made clear to the public that it does not deserve their trust. As detailed above, Mr. Sun has been sued by the SEC, is reportedly being investigated by the FBI and the S.D.N.Y. U.S. Attorney's Office, and has been accused of misappropriating customer funds by his own former employees. Sky voted to remove wBTC from their list of acceptable collateral assets when news broke that Mr. Sun might have access to the Bitcoin reserves that support wBTC. *See supra* p.7. The digital asset press

1   repeatedly observed the collapse of public confidence in wBTC following Mr. Sun's entrance. *See,*

2   *e.g.*, Hillman Decl. Exs. D, E (describing industry fears and scrutiny over Mr. Sun's wBTC

3   association). And as described above, the result of all of this was, by Mr. Sun and wBTC's own

4   account, "concern," "panic," and "FUD"—weeks before Coinbase announced (or even decided

5   on) delisting. Mehta Decl. Exs. A, B.

6        "[S]elf-inflicted wounds are not irreparable injury," *Al Otro Lado v. Wolf*, 952 F.3d 999,

7   1008 (9th Cir. 2020), and BiT's "predicament" is "of its own making," *Epic Games, Inc. v. Apple*

8   *Inc.*, 2020 WL 5073937, at *3 (N.D. Cal. Aug. 24, 2020). Granting a TRO can do nothing to repair

9   or protect a reputation that BiT itself has already sullied. Where, as here, a plaintiff's "highly

10  publicized behavior" has already inflicted the very reputational harm a TRO is sought to prevent,

11  the plaintiff "fails to show a likelihood of irreparable harm." *Arenas v. Shed Media U.S. Inc.*, 881

12  F. Supp. 2d 1181, 1194 (C.D. Cal.), *aff'd*, 462 F. App'x 709 (9th Cir. 2011).

13       *Second*, any reputational injury is based on pure speculation. "[S]peculation that its

14  reputation and market share *may* be damaged if a TRO is not immediately issued does not justify

15  ex parte relief." *Studio 010*, 2020 WL 3605654, at *2; *see also Leatt Corp. v. Innovative Safety*

16  *Tech., LLC*, 2010 WL 1526382, at *10 (S.D. Cal. Apr. 15, 2010) ("a court may deny a preliminary

17  injunction where the allegations of intangible injury are speculative or unsupported by evidence").

18  Plaintiffs who successfully demonstrate irreparable reputational harm must come forward with

19  evidence that harm is real and imminent—like "numerous and persistent complaints" or "emails

20  and social media posts from consumers" substantiating the reputational harm. *Life Alert*

21  *Emergency Response, Inc. v. LifeWatch, Inc.*, 601 F. App'x 469, 474 (9th Cir. 2015). BiT, by

22  contrast, offers no evidence of harm at all. Instead, it offers the kind of bare assertion that "its

23  brand image and prestige have or will be harmed" that courts have rejected. *Puma SE v. Forever*

24  *21, Inc.*, 2017 WL 4771003, at *3 (C.D. Cal. June 2, 2017). Because BiT "did not cite any evidence

25  or authority to show that the claimed loss of good will is real, imminent, and significant, and not

26  just speculative or potential," its TRO should be denied. *BoomerangIt*, 2012 WL 2368466, at *4.

27       *Third*, BiT's asserted reputational harm would not be remedied by the proposed TRO. For

28  one thing, under BiT's own theory, delisting itself is not the source of its purported reputational

harm. "[T]he mere fact that Plaintiff [will be] removed from" Coinbase's listings "does not itself affect Plaintiff's reputation." *Frontline Med. Assocs., Inc. v. Coventry Healthcare Workers Comp., Inc.*, 620 F. Supp. 2d 1109, 1111 (C.D. Cal. 2009). Rather, if there is any impact to BiT's reputation, BiT itself recognizes it flows from Coinbase's "message to the cryptocurrency community that wBTC is less trustworthy" than other digital assets. Mot. 22. But whether or not Coinbase is allowed to actually delist wBTC, the cat is out of the bag and has been for nearly a month. BiT has not identified any concrete injury to its reputation stemming from Coinbase's actions in that time, let alone an irreparable one. Moreover, to the extent BiT's claimed reputational harm stems from uncertainty about wBTC's future stability and liquidity, a TRO will do no good. The mere fact that litigation is ongoing means wBTC's stability will be uncertain relative to competitors. Where the "detrimental effects" of an act "have already taken their toll," they cannot be the basis for irreparable harm. *Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *on reh'g*, 19 F.3d 449 (9th Cir. 1994).

## D.    Purported Irreparable Harm To The Public Cannot Justify A TRO

Perhaps recognizing that it faces no real irreparable harm, BiT also briefly argues that the court should grant a TRO to prevent irreparable harm to all wBTC holders because they "will lose a significant exchange through which they can trade wBTC." Not so. wBTC holders are free to trade wBTC through a variety of other exchanges. Individuals who hold wBTC on Coinbase can still use it. The public can buy and sell wBTC on other exchanges—including those where the vast majority of wBTC trading actually happens. BiT does not even attempt to explain what harm the loss of a single exchange inflicts, let alone irreparably.

Beyond that, BiT never explains why its "request for public injunctive relief modifies the requirement that a plaintiff must demonstrate irreparable harm to obtain such relief." *Brooks v. It Works Mktg., Inc.*, 2022 WL 2217253, at *7 (E.D. Cal. June 21, 2022). There is no authority cited for the proposition that a plaintiff may obtain a TRO where it faces no irreparable harm just because some members of the public—who have not sued—might. And in all events, BiT's assertion of public harm rests on the false premise that BiT is pursuing public injunctive relief. It is not. "[P]ublic injunctive relief … is limited to forward-looking injunctions that seek to prevent

future violations of law for the benefit of the general public as a whole, as opposed to a particular class of persons[.]" *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535, 542 (9th Cir. 2021). BiT's motion makes clear that, to the extent BiT's suit aims to protect the public at all, it protects only a narrow, particular class of persons: "consumers holding wBTC." Mot. 22. Under *Hodges*, that is not an appropriate basis for seeking public injunctive relief. Furthermore, "public injunctive relief must do more than incidentally benefit the public"—it must "*primarily* benefit the general public as a more diffuse whole." *Grigorian v. Citibank, N.A.*, 2024 WL 2106944, at *4 (C.D. Cal. Apr. 17, 2024). There can be little doubt that a motion which mentions the public only in passing, and then only a small portion of the public, primarily serves to benefit BiT, not the public as a whole. The public has no interest in forcing Coinbase to continue listing a high-risk asset. That would undermine, rather than serve, the public interest.

## II.    BiT Cannot Show A Likelihood Of Success On The Merits

Although the Complaint alleges eight causes of action, including splashy but unsupported allegations that Coinbase is a monopolist and has violated the Sherman and Lanham Acts, BiT does not even attempt to argue it is likely to succeed on the merits on the majority of those claims. Instead, it attempts to support its request for emergency relief based on only two causes of action: violation of the UCL and trade libel. It is not likely to succeed on either.[2]

### A.    BiT's "UCL/FTC Act" Claim Is Unlikely to Succeed

California's UCL prohibits "unlawful, unfair or fraudulent business act[s] or practice[s]." Cal. Bus. & Prof. Code § 17200. BiT contends that Coinbase's decision to limit its dealings with BiT by delisting wBTC on one of its trading platforms violates the UCL's "unlawful" and "unfair" prongs. Because BiT's motion does not argue it is likely to prevail on a claim that Coinbase's delisting violated the federal antitrust laws, the relevant question at present is whether its UCL claim is likely to succeed under either of these prongs in the absence of a demonstrated antitrust violation. BiT comes nowhere close to meeting the demanding standard for a UCL claim in such circumstances.

---

[2] Coinbase will address additional dispositive defects with BiT's claims in its motion to dismiss.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 1. BiT Is Not Likely To Succeed Under the "Unfair" Prong

BiT devotes only a single paragraph to its likelihood of success under the UCL's "unfair" prong. That is unsurprising, as *Cel-Tech Comms, Inc. v. L.A. Cellular Telephone Co.* squarely bars its claim under that prong. 20 Cal. 4th 163 (1999). Under *Cel-Tech*, "[w]hen a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200," as BiT does here, the word "unfair" means "conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." 20 Cal. 4th at 186-187. BiT's claim is that Coinbase acted unfairly by deciding to delist wBTC on one of its trading platforms. But it is axiomatic that, under the antitrust laws, "there is no duty to aid competitors." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004). Federal antitrust law generally imposes no limitation on a competitor's ability to "exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Instead, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

While California law does not require an antitrust violation to state a claim under the UCL's "unfair" prong, such a claim still must hew closely to "cognizable antitrust evils to warrant intervention by a California court." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668 (2005). A claimant must point to an "unusual aspect of the alleged conduct that would make that conduct something that violates the 'policy and spirit' of the antitrust laws without violating the actual laws themselves." *Creative Mobile Techs., LLC v. Flywheel Software, Inc.*, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017). Applying these principles, the California Court of Appeal has held that "the mere refusal to deal does not violate the spirit or policy of antitrust law." *People's Choice Wireless*, 131 Cal. App. 4th at 667. Instead, a plaintiff alleging a refusal to deal theory under the UCL must satisfy the same standard as federal antitrust law: establishing that (1) the defendant has conducted "an abuse of monopoly power in a relevant market" and (2) an "exception" to the "sacrosanct" right to refuse to deal applies. *Id.*

Although it far from clear (let alone plausibly alleged), BiT's claim appears to be one for a refusal to deal—its claim turns on Coinbase's "refusal to allow wBTC" on its platform, and its injunction would compel Coinbase to "allow trading of wBTC indefinitely without restriction." Mot. 16, 23. In other words, Coinbase has chosen not to list wBTC on its trading platform, and BiT contends that the law compels Coinbase to do so. But BiT's motion does not even attempt to show that either of the two requirements for a refusal to deal claim are satisfied. BiT does not attempt to define or prove a relevant antitrust market. It cites no evidence of monopoly power. Indeed, the complaint alleges that BiT, not Coinbase, is the dominant seller of wrapped Bitcoin. *See* Compl. ¶32. And as demonstrated, Coinbase's exchange is home to only a tiny fraction of wrapped Bitcoin trades. *See supra* p.6. The Complaint does not identify any applicable exception to the right to refuse to deal. BiT's motion thus fails to establish a basis on which it could prevail under—or even adequately plead—violation of the unfairness prong. Perhaps recognizing those deficiencies, the TRO does not even attempt to argue that BiT is likely to prevail on its federal antitrust claims. If those claims are too feeble to support emergency relief, there is no reason to think state law claims predicated on federal antitrust law could fare any better.

### 2. BiT Is Not Likely To Succeed Under the "Unlawful" Prong

Unable to prevail under the UCL's "unfair" prong in light of *Cel-Tech*, BiT attempts to circumvent that decision by shoehorning the FTC Act's unfairness standard into the UCL's unlawful prong. That effort fails for at least two reasons: (1) It is an improper attempt to circumvent *Cel-Tech*, and (2) Coinbase's delisting does not violate the FTC Act.

### a) BiT Cannot Circumvent *Cel-Tech*

BiT's claim under the UCL's "unlawful" prong is an attempt to avoid *Cel-Tech*'s rule that an act is unfair only if it is an incipient violation of an antitrust law. Because BiT cannot satisfy the UCL's "unfairness" requirement, it attempts to satisfy the FTC Act's "unfairness" requirement and graft that onto the "unlawful" prong of the UCL. If that were permissible, it would vitiate *Cel-Tech* entirely—any plaintiff who could not meet *Cel-Tech*'s standard could simply take their chances on the FTC Act's definition of "unfair" and ignore the UCL's "unfair" prong entirely. That is not the law. As *Cel-Tech* itself recognizes, the FTC Act and the UCL closely parallel one

another. 20 Cal. 4th at 185 ("In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive."). *Cel-Tech*'s limits on plaintiffs bringing claims of "unfairness" are drawn directly from case law interpreting the FTC Act. For the same reasons BiT cannot satisfy the standards for unfairness under the UCL, it cannot satisfy the nearly identical standard under the FTC Act. A claim that alleges unfairness too vague to satisfy the UCL's "unfair" prong does not suddenly become concrete and cognizable when accompanied by a citation to the FTC Act's materially identical "unfair" standard. Coinbase is aware of *no* case (and BiT cited none) in which a claim that failed under the unfairness prong was allowed to proceed under the unlawful prong on the ground that the conduct violated the FTC Act.

Permitting private plaintiffs to smuggle free-floating FTC Act "unfairness" claims—i.e., those untethered to real or genuinely incipient antitrust violations—through state law misunderstands the way the FTC Act's unfairness standard works. Where the FTC Act's unfairness prong reaches beyond express violations of the antitrust laws, it does so *only* because the FTC— an expert agency—is charged with adjudicating those claims in the first instance and deciding on the proper contours of "unfair" activity. "[L]abel[ing] a practice 'unfair'" is "a determination of policy or judgment which the agency alone is authorized to make" in its administrative forum. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 249 (1972); *Carlson v. Coca-Cola Co.*, 483 F.2d 279, 280 (9th Cir. 1973) ("The protection against unfair trade practices afforded by the act invests initial remedial power *solely* in the Federal Trade Commission."). BiT does not get to define the scope of the FTC Act for itself as a means to circumvent the limits of California law, when the only reason the FTC Act stretches further than the antitrust laws in the first place is because of the confidence Congress placed in the FTC, which has not challenged Coinbase's delisting decision. It is no surprise that, because of the FTC's exclusive role in defining the scope of the FTC Act, courts have repeatedly rejected efforts by plaintiffs to rely on their own reading of the FTC Act "as a predicate for a UCL claim." *See, e.g.*, *Quick Dispense, Inc. v. Vitality Foodservice, Inc.*, 2024 WL 2925589, at *13 (C.D. Cal. June 4, 2024); *O'Donnell v. Bank of Am., N.A.*, 504 F. App'x 566, 568 (9th Cir. 2013) ("The federal statute doesn't create a private right of action, and plaintiffs can't

use California law to engineer one."). In light of these decisions, BiT has not only failed to show it is likely to succeed, but has pled a theory that is highly *unlikely* to succeed under precedent applying the UCL's "unlawful" prong.

### b)    BiT Cannot Show A Violation Of The FTC Act

Even putting *Cel-Tech* aside, BiT has not even pleaded—let alone established a likelihood of success based on—an FTC Act violation. A firm does not violate the FTC Act simply by choosing the parties that it will do business with. *See W. Sugar Refinery Co. v. FTC*, 275 F. 725, 733 (9th Cir. 1921) ("[i]t is the settled law that the individual dealer may select his own customers for reasons sufficient to himself, and he may refuse to deal with a proposed customer who he thinks is acting unfairly and is trying to undermine his trade"); *FTC v. Paramount Famous-Lasky Corp.*, 57 F.2d 152, 156 (2d Cir. 1932) (a firm "has the right to select his own customers and to sell such quantities at given prices, or to refuse to sell at all to any particular person for reasons of his own"); *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138 (2d Cir. 1984) (even a monopolist, "as long as he has no purpose to restrain competition or to enhance or expand his monopoly, and does not act coercively, retains [the right to trade with whom he wishes]" (original alteration)). The premise of BiT's UCL claim is that Coinbase was under an obligation to continue to do business with it. But it has been clear for over a century that the FTC Act imposes no such duty.

That is particularly true where, as here, a firm has a "legitimate business justification" for refusing to deal with a putative rival. *See* Mot. Ex. 15 at 16 n.89 (FTC policy statement on scope of FTC Act). Here, Coinbase has a legitimate justification for delisting wBTC. Coinbase's business model depends on being a "trusted crypto platform." *See* Hillman Decl. ¶5. Coinbase earns and retains user trust in its exchange by monitoring listed assets and delisting those that fall out of compliance with its publicly announced listing standards. *See id.* ¶7. BiT's association with Mr. Sun triggered a review of wBTC, and pursuant to its protocol, Coinbase determined that wBTC no longer met its standards. The decision to delist pursuant to that process cannot possibly violate the FTC Act—and BiT thus lacks any predicate violation for its UCL "unfairness" claim.

### B.    BiT's Trade Libel Claim Is Unlikely to Succeed

BiT alleges that Coinbase's post on X that it would suspend trading for wBTC and its

corresponding statements to the publications Yahoo! Finance and Cointelegraph that wBTC does not meet Coinbase's listing standards constitute "trade libel." Compl. ¶¶92-93, 95. BiT has no likelihood of success on this claim because each of the challenged statements is true, and in any event BiT has not shown that it suffered special damages from any of the statements.

*First*, BiT has not and cannot show that any of the challenged statements are false. "To constitute trade libel, a statement must be false." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001). As detailed, Coinbase undertook a review of wBTC that considered, among other things, BiT and BitGo's failure to adequately respond to diligence requests concerning the ownership structure of the new joint venture controlling wBTC and the risks to customers associated with listing an asset in which Justin Sun was materially involved. Hillman Decl. ¶31. Based on this review, Coinbase concluded that wBTC presented unacceptable risks and as a result no longer met Coinbase's listing standards. *Id.* ¶31. Accordingly, each of the challenged statements is truthful, and accurately conveys Coinbase's decision and the results of its assessment.

BiT's only basis for claiming that any of these statements were false is the demonstrably incorrect and conclusory assertion that "Coinbase does not actually have any actual listing standards that it follows." Mot. 18. Of course—and as even BiT concedes, Mot. 5–6—Coinbase does have listing standards, which are summarized for the public on its website, *see supra* pp.4-5. Faced with this reality, BiT contends that these listing standards are a "sham," an allegation based entirely on its characterizations of Coinbase's listing process as "largely [] subjective" with only a "few truly objective criteria in Coinbase's listing standards," and BiT's belief that wBTC better satisfies these criteria than other assets Coinbase allows to be listed on its retail exchange. Mot. 5-10; Compl. ¶¶62-72. That does not come anywhere close to establishing—or even suggesting—that the challenged statements are false. BiT offers no facts, either in its Complaint or its motion, "showing that [Coinbase's] descriptions of [its listing] processes were false … nor facts showing that the processes were not followed." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004); *see also Africa v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022) ("the fact that there were noncompliant providers on [platform] does not mean that … statements regarding the Company's regulatory compliance measures were untrue when made").

1    Thus, BiT's contention that Coinbase's listing process is a "sham" such that the challenged

2    statements were false is entirely speculative and cannot support its trade libel claim. *See Prehired,*

3    *LLC v. Provins*, 2022 WL 1093237, at *4-5 (E.D. Cal. Apr. 12, 2022) (denying trade libel TRO

4    where movant did not "prov[e] that the statements made by Defendant are in fact false").

5        *Second*, BiT has not established that it is likely to succeed in establishing that it suffered

6    special damages. An "essential element" of a trade libel claim is "that the plaintiff suffered direct

7    financial harm because someone else acted in reliance on the defendant's statement." *Muddy*

8    *Waters, LLC v. Super. Ct.*, 62 Cal. App. 5th 905, 925 (2021). "[U]nder Fed. R. Civ. P. 9(g) the

9    pleader must state special damages with specificity." *Piping Rock Partners, Inc v. David Lerner*

10   *Assocs., Inc.*, 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013). "[A] plaintiff 'may not rely on a general

11   decline in business arising from the [alleged] falsehood, and must instead identify particular

12   customers and transactions of which it was deprived as a result of the libel." *AlterG, Inc. v. Boost*

13   *Treadmills LLC*, 388 F. Supp. 3d 1133, 1154-55 (N.D. Cal. 2019) (quoting *Mann v. Quality Old*

14   *Time Serv., Inc.*, 120 Cal. App. 4th 90, 109 (2004)).

15       Neither BiT's complaint nor its motion makes any attempt to specifically identify particular

16   customers or transactions it lost as a result of Coinbase's actions. Instead, it points only to a

17   decrease in circulation of wBTC since Coinbase announced its decision and the supposed fact that

18   cbBTC "has been taking wrapped Bitcoin market share." Mot. 17. That is not enough to plead a

19   trade libel claim—let alone to show a likelihood of success—and an independent reason why BiT's

20   trade libel claim fails. *Isuzu Motors Ltd. v. Consumers Union of United States, Inc.*, 12 F. Supp.

21   2d 1035, 1047 (C.D. Cal. 1998) ("A bare allegation of the amount of pecuniary loss is insufficient

22   for the pleading of a trade libel claim."). That is especially true where the generalized decrease in

23   wBTC circulation BiT relies on predates Coinbase's delisting announcement and flows from the

24   public's wariness about BiT's affiliation with Mr. Sun—not from anything Coinbase has done.

25   *See supra* pp.7-8. A decrease in business caused by the plaintiff's own actions, rather than the

26   conduct challenged in litigation, cannot form the basis for a trade libel claim. *See AlterG*, 388 F.

27   Supp. 3d at 1155 (customer loss must be "attributable to Defendants' trade libel"); *Piping Rock*

28   *Partners*, 946 F. Supp. 2d at 981 (dismissing claim where "it is not even clear if" alleged lost sales

1    were "connected to" libel).

2    **III.    THERE IS NO PUBLIC INTEREST IN FORCING COINBASE TO ALLOW wBTC TRADING**

3         In evaluating the public interest factor, the Ninth Circuit has directed courts to primarily

4 consider the "impact on non-parties rather than parties" and "pay particular regard for the public

5 consequences in employing the extraordinary remedy of injunction." *Bernhardt v. Los Angeles*

6 *Cnty.*, 339 F. 3d 920, 931-32 (9th Cir. 2003). The public consequences of granting this TRO would

7 be profound, ranging from exposing the public to greater risk of market manipulation and fraud to

8 undermining the role of platforms in providing users the protection and confidence in their

9 transactions that brought them to those platforms in the first place.

10         Coinbase plans to delist wBTC precisely because doing so serves the public interest.

11 Coinbase has reason to believe that leaving wBTC on Coinbase's exchange exposes the public to

12 significant financial risk. And correspondingly, a court order ordering Coinbase to continue listing

13 a potentially compromised digital asset—presenting concerns not just in Coinbase's eyes, but in

14 the eyes of many sophisticated players in the cryptocurrency space—would clearly undermine,

15 rather than serve, the public interest.

16         BiT's contrary assertion that compelling Coinbase to continue to list wBTC will serve the

17 public by giving users "more choice and more options" conflates its own interests with the public's.

18 BiT's desire for a platform where "each user can research and come to their own conclusions about

19 what wrapped Bitcoin product they wish to use," Mot. 23, can already be found in other exchanges.

20         The public interest is better served by allowing Coinbase to do what exchanges have done

21 for generations: provide a platform for legitimate trading and protect users and the market from

22 fraud and manipulation. The particular danger at issue here—forcing an exchange to continue

23 trading of a digital asset despite its diligence pointing to potential control by someone who has

24 repeatedly been accused of financial misconduct—goes to the heart of platforms' role in

25 facilitating trust and security in digital asset exchanges. Courts have found that platforms of all

26 types acted in the public interest in taking similar steps to protect their users. *See, e.g., Stackla*,

27 2019 WL 4738288, at *6 ("Facebook's ability to decisively police the integrity of its platforms is

28 without question a pressing security interest."). In *Stackla*, Judge Hamilton denied a TRO sought

by an app developer Facebook found to have collected user data without authorization. *Id.* The court declined to order Facebook to grant access to its platform, ruling that its "ability to decisively police the integrity of its platforms is without a question a pressing public interest." *Id.*

The public interest in allowing Coinbase to police the integrity of its own platform is at least as significant here. To the extent there is *any* public interest in maintaining Coinbase users' ability to trade wBTC on Coinbase (which they can still do on other platforms), that interest is far outweighed by the need to allow exchanges to provide a secure experience. Granting BiT's motion for a TRO here would have the effect of second-guessing, through a federal civil action, Coinbase's careful exercise of its platform enforcement authority in the face of involvement by an alleged fraudster under criminal investigation. The ramifications for digital asset exchanges and a host of other online platforms would be far-reaching and fundamentally at odds with the efforts that Coinbase and others take every day to ensure fair and secure digital asset trading.

## IV. THE BALANCE OF EQUITIES WEIGHS AGAINST THE EXTRAORDINARY RELIEF SOUGHT

BiT incorrectly asserts that Coinbase would suffer "no discernable legitimate harm" from keeping wBTC on its platform. Mot. 22. Far from it. As discussed above, Coinbase has worked tirelessly and invested extensively to earn its reputation for reliability and security. *See supra* p.4. Coinbase adheres to a strong compliance foundation, rooted in best practices from the traditional financial services industry in combination with sophisticated technology, to live up to the standard it has set for itself as the "Most Trusted Crypto Exchange." Hillman Decl. ¶7. Its business depends on upholding these commitments and screening untrustworthy assets from its platform. *Id.* ¶7.

Coinbase achieved and maintained its position as the most trusted exchange by carefully striking the appropriate balance between supporting the exchange of a breadth of assets and ensuring the legitimacy of those assets. And Coinbase (which has a team of experts who specialize in assessing risk to consumers) must be allowed to exercise its judgment on how best to strike that balance. If Coinbase is unable to exercise its own judgment to remove potentially dangerous assets from its platform, malicious actors will take advantage. The trust Coinbase has expended immeasurable effort earning will be degraded and its reputation will be put at serious risk.

These are not hypothetical risks. In the wake of the collapse of other digital asset

exchanges, an exchange's reputation is more important than ever. Judicial intervention on behalf of one jilted token offeror would jeopardize investor confidence across this growing sector. A TRO could lead users to reasonably fear that Coinbase or other experts approved of a token not because of their expertise, but rather because they had their hand forced by the threat of litigation.

The harms that Coinbase faces are thus both discernable and legitimate, outweighing the minor harms alleged by BiT. Users seeking wBTC will still be able to purchase it on other exchanges, and any wBTC they currently hold will remain in their Coinbase wallets. BiT's hyperbolic claims of lock-in misrepresent the highly dynamic wrapped tokens space. Moreover, any reputational harm from being delisted is unlikely to outweigh the reputational hit BiT took on when it associated itself with Justin Sun.

Dated: December 17, 2024                           Respectfully submitted,

                                                   By: */s/ Sonal N. Mehta*
                                                   SONAL N. MEHTA (SBN 222086)

                                                   *Attorney for Defendant Coinbase Global, Inc.*