**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

BIT GLOBAL DIGITAL LIMITED, )
)
Plaintiff, )
)
VS. ) **NO. 3:24-CV-09019-AMO**
)
COINBASE GLOBAL, INC., )
)
Defendant. )
)

San Francisco, California
Wednesday, December 18, 2024

**TRANSCRIPT OF REMOTE ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:
KNEUPPER & COVEY, PC
11720 Amber Park Drive, Suite 160 PMB 1271
Alpharetta, GA 30009
**BY: ALEXANDER C. COVEY**
**ATTORNEY AT LAW**

For Defendant:
WILMER, CUTLER, PICKERING, HALE AND DORR, LLP
2600 El Camino Real, Suite 400
Palo Alto, CA 94306
**BY: SONAL M. MEHTA**
**ATTORNEY AT LAW**

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**Wednesday - December 18, 2024** **11:00 a.m.**

**P R O C E E D I N G S**

**---o0o---**

**THE COURTROOM DEPUTY:** Calling civil matter 24-9019, BiT Global Digital Limited v. Coinbase Global, Incorporated. Counsel, please state your appearances for the record starting with the plaintiff.

**MR. COVEY:** Good morning, Your Honor. Cyclone Covey for the plaintiff, BiT Global Digital.

**THE COURT:** Good morning, Counsel.

**MS. MEHTA:** Good morning, Your Honor. Sonal Mehta from Wilmer Hale on behalf of defendant Coinbase Global. And with me observing are a number of my colleagues, as well as a number of folks from Coinbase, including Ryan VanGrack, who is a VP of legal and heads up litigation at Coinbase.

**THE COURT:** Good morning, Counsel.

All right. Folks, so we're here on BiT Global's motion for temporary restraining order. I have a number of questions, and so I want to start with them. I want to start with my questions, and after that point I will go ahead and give you each a chance to address anything that we haven't by way of my questions.

So to that end. All right, Mr. Covey, I want to start by asking you a number of questions. Apologies. I'm trying to reposition you all on the screen for myself.

There we are.

All right. So I want to start by just asking you some questions, Mr. Covey, about -- well, about the delay. Right? From what I can see in your papers, you were given notice back November 19th that this action was coming, that the delisting was coming, and we -- I got this from you on Friday, the Friday before Coinbase was set to take its action. So could you please sort of talk to me a little bit about why you waited three weeks to bring this emergency motion?

**MR. COVEY:** Yes, Your Honor.

So once BiT Global Digital discovered that Coinbase had made this announcement -- it's a Hong Kong company -- it had to take several days just to find counsel, and the call to us was not -- it's not like we got the call the same day. And BiT Global Digital candidly was calling other law firms first and ended up with us only after they had gone through other -- another firm, or at least one other firm there trying to find them.

After we get engaged, our firm then has to understand -- and they're in Hong Kong, so we have a time difference.

We had to understand the specifics, not just general areas of crypto, but the specifics behind wrapped Bitcoin, Coinbase, the various entities that were going on involved in BiT Global Digital, then draft the complaint, which is fairly involved. It's not super long, but there are several claims. We had to

research Sherman Antitrust Act, the FTC, and there's a good bit going on there. Also looking into Coinbase's digital asset listing and all of the details in the complaint and the brief concerning that.

So, and the other thing I will point out, Your Honor, is that this -- a lot of this happened over the Thanksgiving holiday. We were working generally a lot during that time, but there was also some time that was being taken off.

So if you look at the delay in terms of the total amount of time, we were devoting as much resources as we could to get this done as quickly as possible, because we knew that if we waited too long, that the Court probably wouldn't even be able to schedule the hearing in time before the delisting occurred. So our goal was always to try to get it done very end of the week before -- because we figured that would be enough time not only for us to get it filed, but to also give Coinbase notice. And Your Honor saw in the docket entries we were doing our best to try to get at least informal notice to them as quickly as possible to give them time.

So I think that's the best we can explain in terms of why there was a delay. I can also address the cases that the defendants cite in their brief concerning a delay if Your Honor would like, but --

**THE COURT:** No, those are --

**MR. COVEY:** -- they're not the same, because the

delay they're talking about there is the delay between filing the complaint and filing a TRO, and we did ours simultaneously, because we knew that this was something we needed to move as quickly as possible on.

**THE COURT:** All right. Let me ask you a couple more questions about the irreparable harm that you allege here.

It sounds like the biggest threat of harm posed by delisting is a potential loss of profits.

Could you please address why a loss of profits is irreparable?

**MR. COVEY:** Well, I guess there's two pieces to that. It's more than just loss of profits in the traditional sense. And so I would like to talk about that later, but I'll directly answer your question now concerning loss of profits being irreparable.

The first thing is that under the UCL, which is the main argument that we are asserting for the temporary restraining order, money damages are not recoverable.

And Your Honor even has a case from last September, *Aegis Senior Communities*, where you recognize that we can't recover money damages.

And so if Coinbase is right that all the other claims that we have are incorrect and the only claim we are left with is the UCL, then we can't even get lost profits as damages. So to the extent that they are right and all of our other claims are

bad, then if we go towards the money damages recovery, there's no way we will actually be able to do that under solely the UCL claim.

The second thing is that lost profits and a lot of the other things that sort of go along with that have been found by multiple courts -- we cited some, but there's a lot of other cases that talk about lost profits being irreparable. And the reason they do that, there are a few reasons:

One is that in certain contexts, the lost profits are not the kind of thing that are easily calculated, because it's very difficult to know how well a company would have done but for the harm or the negative action that the other side took. And the second reason is that if you look at things in the context of trademark violations and --

**THE COURT:** Well, we're not there. We're not there. That's not -- your claims don't sound in that.

**MR. COVEY:** I agree, Your Honor, they're not the same. But the point is that when there is somebody else who is misappropriating, for example, somebody's -- they're selling a scam product or a --

**THE COURT:** I'm sorry. Let me make it clearer. I'm not interested in an argument --

**MR. COVEY:** Okay.

**THE COURT:** -- about what happens in IP cases, because this isn't that. Those aren't the claims you're

bringing.

So when I tell you you're not there, I'm not saying keep telling me about that.

I'm saying ...

**MR. COVEY:** Okay. I'll stop, Your Honor.

**THE COURT:** Yeah.

**MR. COVEY:** Understood.

**THE COURT:** All right. So let me ask you. I guess this is the other thing I'm trying to understand.

So the -- well, you've brought up -- I'm trying to not go completely sideways on my questions for you, but since you have brought up the UCL claim, I guess I don't believe I saw in your papers, and I'm wondering if you can point me to cases in which a court granted a TRO for a UCL claim based on an FTC act violation.

**MR. COVEY:** That specifically, I'm not aware of a case, Your Honor, that has that exact fact pattern. But the only thing I will say there is the UCL is focused on equitable relief and not damages. But other than that, I do not have a case for you.

**THE COURT:** And as long as we're talking about your UCL claim, I think the other piece that I just want to make sure I grasp or understand is that there is -- I will -- let me say this to you. I'm focusing you, and I still have a few more questions for you about imminent irreparable harm in part

because I'm having a hard time, right, to the extent that you need all four, all four of the factors in order to get a TRO, I'm trying not to dig in too deep on your likelihood of success on the merits even though I have questions around that, but I'm trying to stay focused instead on the irreparable harm piece in part because it isn't clear to me.

So maybe I'll pose this now as my next question to you. I don't -- what you are -- most of your pleading is -- has lots of speculation about what the harm could be.

What evidence do I have from you about the -- about the irreparable harm?

**MR. COVEY:** The fact that immediately after the announcement, wBTC circulation dropped by more than 5 percent, and we point to that specifically. And, I mean, that correlates so closely that it's very difficult to argue that that announcement did not lead to that drop in circulation. So that is an example of the kind of harm, and that was just based on the announcement. Once the delisting actually happens, there's no reason to believe that wBTC would just continue smooth sailing. It's going to take another hit. And we don't have to necessarily prove that it's going to be gigantic. They make the argument in their brief, oh, it's only 1 percent of trading. I have a lot of responses to that, but 1 percent of something that has tens of billions of dollars in market value still is a very significant damage.

**THE COURT:** What percentage of wBTC are exchanged on Coinbase right now?

**MR. COVEY:** When you say "exchanged," do -- are you talking -- is the Court talking about actually being traded?

**THE COURT:** Yes.

**MR. COVEY:** I do not have that number, Your Honor. That's something that we need to take time to get experts to analyze, look at the things on chain, and we do not -- I don't have that information for you.

**THE COURT:** Okay. So I just want to make sure that I've closed the loop on this question. The evidence you're pointing me to is the drop in circulation after the -- after the November 19th announcement?

**MR. COVEY:** That is one thing.

Coinbase itself his publicized on its own website that it's trying to take over --

**THE COURT:** No, sir. I'm asking you about the irreparable harm. Hold on. Hold on. I'm trying to ask you about the irreparable harm. Right? I'm asking you about what evidence you have for me that BiT Global stands to suffer imminent irreparable harm. So you're pointing me, I thought, to -- you're pointing me to the circulation drop after the announcement and that -- and your argument is that if the delisting happens, then something similar to that or more than that is what will result, and that's the imminent harm? Is

that ...

Am I following you?

**MR. COVEY:** You are following me, yes, Your Honor.

**THE COURT:** Okay. What else have you got?

**MR. COVEY:** Well, in addition to -- part of the issue is, Your Honor, when you're talking about evidence, you can look at things like people's postings on Twitter or things like that, but it's very difficult to say that that's evidence, because that's just somebody talking on Twitter or some social media post about their particular opinion. You don't even know whether or not that person's actually holding wBTC or whether they would or wouldn't buy it. So it's very difficult to do that without looking specifically at the chain, looking at the assets and deciding, you know, who has made these transfers or not.

The most clearcut example is that drop in circulation immediately after their delisting announcement. And like I said to the Court and then I'll stop talking about this, you know, the best way to get this kind of evidence, unless it happens and then we just see what occurs, would be to have experts looking at the amount of transfers that happened, the number of assets that are being held by wBTC holders who are holding it on Coinbase or who are trading it on Coinbase.

**THE COURT:** So let me ask you. Can you explain to me

the potential losses to customers who are holders of wBTC? Because, yeah, I could use a little bit more on that.

**MR. COVEY:** So you're talking about the people who are holding wBTC?

**THE COURT:** Yes.

**MR. COVEY:** Well, basically what happens is -- and we alluded to this as an example in the brief as one person who was trying to liquidate or transfer their wBTC holdings. You get people who are not as sophisticated cryptocurrency users as others.

They have their wBTC on the Coinbase exchange.

And there's a reason why Coinbase is a very large U.S.-based exchange. It's because people are familiar with it; they know how to use it; they're comfortable with it. And so once those people are no longer able to do what they normally were able to do with wBTC, now they will have to figure out, well, what do I do? I have to transfer it to some other wallet, figure out some other way to trade the wBTC, and if those users -- so there are some issues there with them being able to do that.

And every -- as Your Honor probe knows, with crypto-currency every day there's a delay there can be massive swings in the market. So the valuation of what they actually get when they want to make a trade, particularly if something else happens in the world that might affect cryptocurrency prices,

even a day delay could significantly impact that particular consumer's ability to transfer the assets either to buy more or sell more.

And so now their harm is essentially that becoming a significantly less liquid cryptocurrency asset is the harm that the public would face in the immediate short-term. And then longterm they would have to decide do they want to stick with wBTC or switch to something like Coinbase's cbBTC instead. And then obviously, you know, we've talked about lock-in and things like that, but that's not necessarily a public harm if those items were completely comparable, and we don't really want to get into the weeds on debating that, I don't think, in this hearing.

**THE COURT:** So Mr. Covey, those are the questions that I have for you. I want to give you an opportunity to make any other arguments that you would like to, but I want to give Ms. Mehta an opportunity to respond to your answers to my questions if she would like that opportunity now.

**MS. MEHTA:** Thank you, Your Honor. I'll just briefly respond to a few points.

I think first let's start with the delay in filing the motion. As Your Honor noted, they've had notice of this since November 19th. Essentially they've had their TRO. They had three and a half weeks to come to court and seek relief. And I understand all of the arguments that Mr. Covey made about why

they took the time they did, but I can tell you from personal experience that you can deal with these issues over a weekend or a long weekend, having just done that this past weekend. And the whole purpose of emergency relief is to be able to actually get to the Court in time to get emergency relief when there's a real emergency.

With respect to the likelihood of success on the merits, I won't get into the details of that, but I do want to address the intersection between that and the irreparable injury point that Mr. Covey made, which is his suggestion that somehow we can take lost sales, which would otherwise not be compensable, or it would not be incompensable and therefore not be a basis for irreparable injury and somehow make them a basis for irreparable injury, where the claim that you choose out of all the claims you make to bring forward on an emergency motion is a claim for injunctive relief.

That doesn't make sense. They pled a whole host of claims. They chose which claims they wanted to move for injunctive relief on. Some of their claims will entitle them to damages; others wouldn't. But they still have to prove irreparable injury. And if the particular claim that they are bringing forth here doesn't itself allow you to have a lost profits-based damages theory, then what that means is you're entitled to whatever the relief is that you get under that claim.

It doesn't mean we're gonna take that and say, well, that's going to create irreparable injury for purposes of injunctive relief. Otherwise, you could always just end run around the rule that irreparable injury cannot be based on lost sales, which are otherwise compensable. So that argument I think doesn't make sense.

More fundamentally, the lost sales that have been presented to the Court are purely speculative. What Mr. Covey said was, well, the circulation has declined. As Your Honor knows from the papers, Coinbase hosts less than 1 percent of the trading volume for wBTC, and that is undisputed. You just asked Mr. Covey what the trading volume was, and he doesn't know. So the undisputed record is that it's less than 1 percent.

Trading volume where the exchange is hosting less than 1 percent cannot possibly give rise to lost sales, even if lost sales were somehow irreparable injury. And that's especially true where they've adduced no evidence to the Court that would make any kind of connection between the drop in circulation on this minor exchange and actual lost sales or lost profits to BiT Global as an entity. No explanation of what those lost sales would be, how that would be material, how that would be irreparable.

So the lost sales doesn't work.

Instead what they've said is, well, if you look at the day

after or the period after the announcement of the delisting was made, our circulation started to drop. That is not something that started when Coinbase announced the delisting. Circulation started to drop when they made the announcement about the new joint venture and about Mr. Sun's involvement with wBTC. And attached to my declaration, Mehta Declaration Exhibit O is a screenshot that shows the decline. If you zoom out and actually look at a broader time period, you see that decline started long before the announcement.

So at every point their argument with respect to irreparable injury fails. There's simply no injury here at all beyond speculation, let alone irreparable injury, let alone one that constitutes a basis for emergency relief.

The final thing I want to address, Your Honor, just in terms of responses to Mr. Covey's answers to your questions, is his response with respect to customers and what happens to customers that are holding wBTC. Basically what I understood his argument to be was, well, it might be hard for some folks to figure out what to do with their wBTC on Coinbase after it's delisted. That is not cognizable.

People will get help. They will figure out how to do whatever they need to do on their technology tools to be able to get their money out.

As we outline in the final section of the Kim declaration, we are not taking anyone's wBTC. We're not divesting anyone of

the wBTC they have. They can continue to hold it, and they can move it out of the Coinbase exchange and continue to do whatever they want with it if they choose to continue to hold wBTC after the delisting decision has been implemented. So these customers are not in any way stuck, to the extent that would even be cognizable for purposes of irreparable injury in this kind of motion at all, which I think is definitely a question, but we wanted to make sure our customers were gonna not lose their wBTC. We're (sic) going to be able to do what they needed to do with it. We gave them the month's notice, and that was essentially the TRO that gave Mr. Covey and his client a chance to figure out what they were going to do in response.

**THE COURT:** Thank you, Ms. Mehta.

Mr. Covey, are there other points that you wish to make?

**MR. COVEY:** Yes, there are a lot, Your Honor.

I do want to address the irreparable injury, since that's something that we've been focusing on.

So in addition to the drop -- and they are correct that there were drops previously, but the point is that we point to a very substantial drop that in time correlates very closely to Coinbase's announcement. So just because there may have been drops previously or other fluctuation, it's very difficult for Coinbase to credibly say with a straight face, our announcement had nothing to do whatsoever with wBTC's drop.

The second thing is that there's not a requirement that the injury has to be gigantic in order for us to win irreparable injury. It's not large irreparable injury, it's just irreparable injury.

And for example, we talk about consumer lock-in and somebody who struggles with getting their wBTC off and then is still using the Coinbase platform. Somebody like that is absolutely going to be locked into a different wrapped Bitcoin product, and I guarantee Coinbase wants it to be their wrapped Bitcoin product. And so even if there's one consumer who gets locked into cbBTC, that is still irreparable injury and sufficient for us to get a TRO. It doesn't have to be a gigantic amount of people.

So that is number one.

Number two concerning the UCL, Coinbase is basically taking the position that you can't plead in the alternative. And if we have a single claim that might survive -- and the UCL, by the way, is very different from all the other claims because it loops in the FTC act. And so because of that, and the standards for winning that claim are different, they can't say, oh, well, they've got other claims for money damages, so you can't have irreparable injury.

If we -- the FTC act -- and there's a reason why we only talked about that, because the standard for proving an FTC act violation, and sort of by virtue of that a UCL violation, is

much lower than for a Lanham Act or a Sherman Act claim, for example. And therefore we're more likely to win that FTC act claim. But if that's the only one we win and we're stuck trying to pursue damages, then we're done. There's nothing we can do.

So that's why we specifically pursued that, and all of their arguments talking about lost profits assume Sherman antitrust claims or other types of claims that aren't the same thing. So that's -- I think the answer's there.

I do want to hit on a few other things, Your Honor, if I may.

**THE COURT:** Go ahead.

**MR. COVEY:** They don't answer any of our arguments about how Coinbase's listing process is really a pretext. I mean, they -- we talk about these main points. It's ridiculous. They list those. There's no response to that in the brief. And really, I mean, I don't know how I would respond to that if I were their defense counsel. I mean, it is just completely a pretext. Even their complaints about Mr. Sun are a pretext, because they didn't announce any problems or say, we have a problem with Mr. Sun announced in August.

They waited until October to start even quote-unquote performing due diligence, and then they didn't announce it until November.

So, I mean, you look at that amount of delay just for them

to make their own internal decision, and then they're complaining it took us three weeks to put together a complaint and a TRO motion on this issue.

**THE COURT:** Mr. Covey, Mr. Covey, I raised that issue first. I know it's in their papers, and that's because it's the standard. Right? It's about imminence, the imminence of that harm.

**MR. COVEY:** That's correct.

**THE COURT:** I'm so sorry. I think your argument is misplaced with regard to that.

**MR. COVEY:** Okay.

**THE COURT:** Please go ahead. Continue with the other arguments you want to make.

**MR. COVEY:** Certainly. Certainly.

With respect to the question about the UCL -- and there's two prongs to that. Well, there are actually three. There's unfair, unlawful and fraudulent.

The *Cel-Tech* case that they cite is very specific that the prongs are separate, and the Court even takes specific pains to point out that it's disjunctive, which means that unfair and unlawful are not the same thing. And in Footnote 11 of the opinion it talks about that and also explains that you could be one but not the other and vise versa. So, and they're trying -- Coinbase is trying to loop all of the FTC act claims into one prong under the UCL, but *Cel-Tech* is very clear that

that's not the way that the Court should evaluate it. And on top -- and we only have to prove one or the other. We don't have to prove both. So as long as we prove one or the other, we win.

Under the unfair prong, the question the California courts look at is they sort of borrow from the FTC, but the case law is very clear that it's persuasive authority, it's not mandatory authority. So the standard is a little bit different, because under the unlawful prong, now we're asking is it unlawful under the FTC act and not California's unfair interpretation of the FTC act. So those are a little bit different.

As far as their refusal to deal arguments, those are all talking about refusal to deal on the context of creating a contract between parties, which is not what we have here. This is not a Coinbase has a contract with BiT Global Digital. This is they're a marketplace.

And so all of their refusal to deal cases which are talking about antitrust are misplaced.

With respect to their refusal to deal under the FTC act, the only two cases they cite are really, really old, 1920 and 1930. And that's why we talk about the original Supreme Court *Gratz* opinion, which basically was in accord with those old cases they cite, but then it gets overruled in *Brown Shoe*, and now Justice Brandeis' dissent in *Gratz* is the prevailing law in

terms of how the FTC act needs to be interpreted. So that's a very good example of why their cases talking about freedom to deal are completely irrelevant.

The next thing concerning the unlawful prong of the FTC act, which is, again, not California's persuasive interpretation, but literally is it unlawful under the FTC act, there are a couple of issues. There is case law going both ways as to whether there is an independent cause of action under the unlawful prong for violations of the FTC act under the UCL. They cite cases; we cite cases. There is conflicting authority, we will agree with that.

But there are reasons why our side of the authority is better.

The first one is that there is a specific statute in the FTC act, 15 U.S.C. 57(b), that has a specific anti-preemption clause which basically says the opposite of preemption, Subsection E it says: "The availability of additional federal or state remedies are unaffected. Remedies provided in this section are in addition to and not in lieu of any other remedy or right of action provided by state or federal law." So the statute is very specific, we're not preempting state law's ability to hook into this.

And the most thoroughly reasoned case on this point is the *Schmitt versus SN Servicing* case that we cite in our brief where the judge initially went the other way and decided what

Coinbase said was right and then looked at the law and said, actually, no, I think it is a private right of action, and the reason the Court concluded that --

**THE COURT:** But Mr. Covey I'm going to stop you. I'm going to stop you, because right now here's what I hear you arguing to me. You're arguing to me that a private right of action is possible, that's fine. In fact, I think what I hear you arguing to me and what I've taken from much of your -- from much of your motion for the TRO is that the inferences should be read in your favor. You're asking the Court to sort of read everything in your favor, and that would be fine if you were looking to oppose a motion to dismiss. But that's not what this is. Right?

Assume that I agree with you that it is possible for you to sustain this cause of action. That's not what you're trying to overcome here. You need to show me your likelihood of success on the merits. And you're so busy arguing with me that it's possible for you to bring this cause of action. Assume I agree with you. Why have you won? And that's the part -- so this is one of the reasons why I'm focusing you on irreparable harm. So I want to give Ms. Mehta a chance, but I'm focusing you on irreparable harm rather than likelihood of success on the merits, because frankly your papers were exceedingly thin on it and I don't think you've given me any -- you've just shown that a claim can be had.

You haven't shown me why you're likely to win it, just that it exists.

So I honestly, if I needed to reach likelihood of success on the merits, I don't think you have made it out. I'm trying to keep you focused on the irreparable harm piece, because I'm not convinced you have that either.

So to the extent that you want to keep talking about the merits to me, you're welcome to. But I'm going to ask you to stop arguing that the claim exists, because the whole point is that even if it does exist, that doesn't get you a TRO. You need to tell me why -- I'll take for granted -- let me tell you right now you can take for granted that I agree with you that it exists.

Why have you won? Why have you shown that you are likely to succeeded on the merits of that claim?

**MR. COVEY:** Okay. So if I'm understanding Your Honor, you would like at least at this point like me to talk about the violation of the FTC act itself and whether or not what the defendant has done violates the act. Is that correct?

**THE COURT:** If you want to keep talking about -- let me say it this way. I don't think we need to get into the merits. If you want to keep talking to me about the merits, then I want you to tell me why you're likely to succeed on the merits, rather than just telling me why the claim is possible.

**MR. COVEY:** Well, I don't want to argue something

that the Court doesn't want me to spend time on.

So if there's something else the Court wants me to focus on I will go to that, because I don't want to be a blowhard and just --

**THE COURT:** No, no. This is your time. I mean, there is a -- this is your time. So I'm trying to -- that's the -- this is the dance we're doing, Mr. Covey. I want to give you a chance to be heard, but I also at some point don't -- want to get you past the idea that what you're trying to do is convince me that the right of action exists.

**MR. COVEY:** Okay.

**THE COURT:** Right? Because that -- assume that's the case because that doesn't -- for these purposes, given the standard here, let's assume that's right. It's push forward to tell me why you think you've got -- why you think you can win on the merits, because that's the standard I have to apply.

**MR. COVEY:** Okay. Well, we win on the merits under the FTC act claim because of the policy statement which is very specific that the FTC issued in 2022. And the policy statement is very clear that we don't have to win Sherman Act -- or Lanham antitrust -- Sherman Act or Lanham Act claims. And it even says in page 3 of the policy statement: Congress' aim was to create a new prohibition broader than and different from the Sherman and Clayton Acts, and it purposely introduced the phrase "unfair methods of competition" and made clear Section 5

was designed to extend beyond the reach of antitrust laws. So concluding that a static definition would soon become outdated, Congress wanted to give the Commission flexibility to adapt to changing circumstances. So the FTC lays that out early in their policy statement.

Then they go on to explain -- we talk about this in our brief -- legal or permissible types of competition on the merits, and then they go on and talk about things that are not legal or not fair competition. And those are things like foreclosing market opportunity, limiting choice, reducing choice, deceptive acts, discriminatory refusals to deal, which tend to create market power. And that's exactly what we're talking about here. They're refusing to allow wBTC to be traded, which is specifically intended to give cbBTC more market power, more market share.

And if they wanted to compete and just say, our product is better, you can trust us better, it's faster or it's cheaper, whatever, that's fine. But when they just say, we're gonna cut wBTC off and not even let that be traded anymore, that's an exact type of example that the FTC is talking about in its policy statement, and that's why we win under the FTC act claim.

**THE COURT:** Okay. So Mr. Covey, can you point me to a -- so I earlier asked you to point me to cases where a TRO had been issued under the UCL asserting essentially a

violation. Okay. So not that. I understood.

**MR. COVEY:** I will concede I don't have that.

**THE COURT:** That's okay.

Can you point me to a case where a court has found that any of the things listed in the policy statement, the list that you're giving me, are used to, right, where a plaintiff wins establishing that claim?

**MR. COVEY:** No, Your Honor.

Now, I will point out that most states are not like California. So we are limiting to a very few, California and perhaps one or two other states that might borrow the FTC act claim, and this policy statement was issued in 2022. It's very new, and so we're looking at things in the last couple of years. So, you know, it's -- and the FTC's very clear this is an evolving area of law. We're trying to stamp out insipient violations that will eventually become Sherman antitrust claims.

So, but to directly answer your question, I do not have a case. If I had one, I would definitely inform the Court of that.

**THE COURT:** Go ahead, Mr. Covey. I'll give you another few minutes here. Go ahead.

**MR. COVEY:** Okay. Yeah, the only other thing is in terms of irreparable harm, it's not -- it -- there are multiple things that go on when delisting occurs. Right? So we've

talked about lost profits and loss of circulation, but the case law is very -- there are a lot of cases, I can cite some to Your Honor if you'd like, that talk about price erosion, damage to reputation, loss of business opportunities. Those are all valid grounds to find irreparable harm.

And so what's happening is Coinbase has gone out and taken this action and said, you know, wBTC is not to be trusted, and they've done it in sort of an oblique and indirect way, only to admit in their brief what they were really trying to do. And now they're saying, oh, well, it's not going to harm wBTC at all. They turn around and say, you know, we are the biggest and most trusted market exchange. And so for them to talk out of both sides of their mouth and say, we're the big trusted exchange that everybody believes in, and, you know, what we say really matters for our consumers, and then turn around and say, well, it doesn't matter to anybody if we kick this wBTC off of our platform, I mean, that's completely inconsistent position.

And so the fact that they are doing this, that means they know it's going to have a significant impact, and that's why they're trying to do it.

**THE COURT:** Again, just so I'm following you, Mr. Covey, but the evidence that I have from you about that is about the loss -- is about the 5 percent drop in circulation. That's what you point me to in the record, right?

**MR. COVEY:** That is the sort of empirical evidence

that we have that we can point to. It's -- I mean, that's the whole point is irreparable harm is something that's going to happen. And so without some kind of expert witness who comes in and sort of can say, I've done this regression analysis and point to something that's going to happen in the future, it's very difficult for us to point to something and predict the future, and that's why we would need an expert.

And that's -- and I'll also sort of hearken back to Your Honor. This is a TRO motion. We did have to move as quickly as we can to get this filed. We don't have the benefit and the luxury of time to do those kinds of analysis and present to the Court a very long and detailed analysis of, you know, what might happen once this occurs. And an erosion of good will, market share, any of those things doesn't have to be a lot. It simply has to exist.

And if that's the case, and pointing to a very specific correlation between their announcement and the drop in circulation is a very good example that there is a material impact in the market when Coinbase takes this action.

**THE COURT:** Mr. Covey, is there anything else that you'd like to add?

**MR. COVEY:** Your Honor, I'll wait and address other specific questions or do a rebuttal, but, no, Your Honor, I'll stop.

**THE COURT:** Ms. Mehta, is there anything you'd like

to be heard on at this point?

**MS. MEHTA:** Your Honor, I'll be very brief. I just want to make a couple of quick points in response to what Mr. Covey said. The first is with respect to irreparable injury, because I know that's where the Court is most focused.

What we essentially heard was the only actual evidence that they have is that there was a drop in circulation, which again is not -- has not been articulated to actually tie or correlate to a loss in sales in any way, but a drop in circulation following the announcement.

But as I said, we can see that that actually started well before the announcement.

Everything else that Mr. Covey just pointed to is purely speculative. And while Mr. Covey argues that it doesn't have to be huge, which I think suggests that maybe he acknowledges that it is not huge, the impact, it does have to be real and nonspeculative. You cannot come to court ever, let alone on an emergency motion for temporary restraining order, and say, well, there might be these theoretical harms, and therefore you need to enter a TRO, where you don't have a declaration from an expert, you don't have any declaration from anyone associated with BiT Global, all you have is the speculation of counsel. So from an irreparable injury perspective, that is simply not cognizable.

Second, with respect to likelihood of success on the

merits, I don't want to respond to everything Mr. Covey said in the interest of time. I know there may be a future point in the case where we have to deal with that on a motion to dismiss. Suffice it to say Mr. Covey's argument I think fails at a couple of levels. One is the legal level that I articulated earlier, which is you simply can't say, I'm going to take an unfair standard under the FTC act and then convert it into a lawful violation under the UCL.

But apart from all of that, even if we sort of set aside all of the legal problems with their argument, their fundamental argument is Coinbase was obligated to keep wBTC on the exchange, obligated to do business with wBTC. That is not the law. The law is clear, and we cite the *Trinko* case from the Supreme Court on page 17 of our brief. The law is clear that we are not under an obligation to do business with anyone, including a competitor. And there are very, very, very rare circumstances in which people can try to articulate an exception to that that haven't even been articulated here. So from a likelihood of success on the merits perspective the claim just fails.

And I think part of the reason that you see some of this contortion around what the standards are in an attempt to move away from all the antitrust claims to the FTC act claim is because their complaint acknowledges that they are the dominant player in wBTC, not Coinbase. They are the dominant player.

They've alleged that in their complaint. And if what they're complaining about at the bottom of all of the different legal theories they have and setting aside all of the different rhetoric in the brief, if what they're really complaining about is they're worried about competition from Coinbase, that is not anticompetitive under the antitrust laws. That is pro competitive. That is why they're not likely to succeed on the merits of the FTC act claim, or frankly from our perspective any of the claims they've brought in this lawsuit.

The final issue I want to address, Your Honor, is the argument about pretext, the suggestion that our delisting decision was pretext for this alleged anticompetitive behavior. As I said, that's not -- nothing that's been alleged would actually spell out any kind of anticompetitive conduct given their market position in wBTC and given what the laws encourage in terms of enhanced competition under their own theory. And we don't agree with most of their allegations, but under their own theory.

But on the pretext point in particular, the suggestion is the decision was pretext, and the only basis for that suggestion was their identification of certain meme coins that continue to be listed on the Coinbase exchange. And they pulled some colorful examples, and they tried to make the sort of suggestion that all of our rules and all of our standards have to be completely pretextual, because if these colorful

examples remain on the exchange, how can there be real standards?

And I want to address that in a couple of ways.

One is the argument about pretext is not backed by any evidence at all, whereas we have submitted sworn declarations from people involved in the decision about the process that we went through, documents that identify on our website so that everyone can know exactly what our process is, what the process is, what our listing standards are, the notice that we give to the world that we're going to continue to monitor assets on the exchange for ongoing compliance with our standards.

So to suggest against that record that this is pretext just because there happened to be these meme coins on the exchange, I just, I don't think that works. And I think it's especially important to think about why that analogy or that example doesn't prove the point they're trying to make. And that's because wrapped Bitcoin assets present a different in-kind risk than other assets that are listed on the digital exchange. And I won't get into all the details of that. It's in the papers.

I know Your Honor studied them.

But the whole point about the wrapped Bitcoin asset is that it requires the trust of the custodian to whom the customer is giving their Bitcoin and then receiving the wrapped Bitcoin asset, to not misappropriate or otherwise abscond with

the Bitcoin that's being entrusted to them. It's that custodial relationship that makes wrapped Bitcoin different and why the risks in this particular case were heightened and why it was incredibly important once certain flags and triggering events happened for Coinbase to undertake the process it undertook, which is what happened here as outlined in our declarations and shown in the documents. So the pretext argument I think just doesn't work.

Fundamentally the case is about Coinbase being allowed to do what it needs to do to protect its platform, and that's what happened here. It's not about, you know, monopolist. It's not about antitrust claims. It's not about the FTC act. It is about the exchange being able to do what it needs to do to protect the integrity of the exchange and to protect its customers.

**THE COURT:** Thank you, Ms. Mehta.

Mr. Covey?

**MR. COVEY:** Yes, Your Honor. A few things.

First, the assertion that BiT Global is the dominant player in wBTC completely mixes metaphors. BiT Global issues, mints and then burns wBTC. They're not -- they don't control the exchange of wBTC. And so the exchange of wBTC is what we're talking about here, the ability for people to transfer those back and forth. BiT Global is not the dominant player in the exchange. Coinbase is significantly more dominant than BiT

Global.

Concerning this pretext. You know, they basically said, oh, don't worry about all the meme coins, that's not relevant. But the point is the meme coins and all of those things show that the process is not objective and it's not consistent. But on top of that their arguments about Mr. Sun are also pretextual, because they say, oh, look at the FBI, look at the SEC, look at these investigations. But then on the other side, their CEO and general counsel are publicly attacking the SEC and FBI, saying that they make politically motivated raids and things like that.

So on one hand Coinbase is publicly stating, their top people are publicly saying, yes, the SEC and FBI aren't to be trusted, but when it comes to Justin Sun, all of a sudden they are to be trusted, and that's a complete double standard. So you have all of these pretextual arguments that don't hold up under scrutiny, and when you start looking at the asserted reasons, they're completely inconsistent with the way Coinbase actually behaves. So for them to say, oh, we have flags and triggering events, it's just a very self-serving way for them to justify what they're trying to do.

And Coinbase's counsel is right. This is about competition between cbBTC and wBTC. But when you have potential for consumer lock-in and they can get people who are using wBTC now to stop using it and start moving to their

competitive product, not because the product is any better, but because people don't have access to wBTC on Coinbase anymore, that's when you start running into unfair competition, irreparable injury and the reason why this case is being brought in the first place.

**THE COURT:** Thank you, Counsel.

So I'm going to go ahead and give you all my ruling now, and here's where we are.

So, right, BiT Global is moving for a TRO and a preliminary injunction, both of which are extraordinary and drastic remedies. Right? And they are not to be granted unless there's a clear showing that carries the burden of persuading. And plaintiff needs to show that they are likely to succeed on the merits, that they're likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tip in their favor and the injunction is in the public interest. Right? You need to show all four of those things, and the inability to show any one is reason enough to deny a TRO.

So as you can see, I've been most concerned and I remain concerned, and ultimately I'm going to conclude that BiT Global has failed to show imminent irreparable harm. I will say that I think that the -- I appreciate you spelling out what took the time, that your client needed to engage you and that you needed to draft the complaint, and I respect that. I respect you

taking the time to do that.

That said, I will say that the delay still undermines the needed showing. I'm not concluding, despite Coinbase's invitation to conclude that that is reason alone to find that you haven't shown imminent irreparable harm, I'm not reaching there. I do think that it undermines the showing somewhat.

But frankly ultimately I won't issue a TRO because ultimately I have no evidence from you about what is to come. And while I understand that you are noting that there -- that some of that evidence may be hard to get, ultimately I can only act on evidence that is in front of me, and what I have from you I ultimately agree with Coinbase is mostly speculative about what will come, what could come, not what will come and what will result.

Now, as is true with all of these things, I also want to note to the extent that you are moving on~-- that you are asserting both remedies for the UCL violation and also the reputational harm, I will say that it also isn't clear to me that a TRO is an effective remedy for the reputational harm, because as I understand your argument it happened the day the announcement was made. So I'm not sure that the TRO really resolves that either.

So at this juncture I'm not issuing a TRO if -- as if -- right. So I will not stop Coinbase from delisting wBTC. If, Mr. Covey, you have more evidence, right, we can revisit this,

but that's my ruling today.

**MR. COVEY:** Understood, Your Honor.

So just to make sure I'm clear, the ruling is without prejudice for us to I guess in the next case move for preliminary injunction, provided that we can provide the Court better evidence of ongoing irreparable injury that would satisfy the Court, and obviously we have to meet the other factors, as well.

**THE COURT:** Right.

**MR. COVEY:** But that's something we would be able to renew if we believe we could show it?

**THE COURT:** That's right. That's right.

At this point, based on the evidence that I have -- yeah, at this point based on the evidence I have, I'm not going to issue a TRO. If you think you can gather the evidence to make sufficient showing for a preliminary injunction, by all means that remains available to you.

**MR. COVEY:** Understood.

**THE COURT:** All right. Counsel, I thank you for your time today. I'm sure I'll see you all again soon. Hopefully not before the holidays.

You do what you need.

**MS. MEHTA:** Thank you, Your Honor.

**THE COURT:** Thank you, Counsel.

**MR. COVEY:** Thank you, Your Honor.

**THE COURT:** Be well.

(Proceedings concluded at 11:49 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, January 2, 2025

Stephen W. Franklin, RMR, CRR, CPE
Official Reporter, U.S. District Court