WILMER CUTLER PICKERING
 HALE AND DORR LLP
SONAL N. MEHTA (SBN 222086)
 Sonal.Mehta@wilmerhale.com
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6000

DAVID Z. GRINGER (*pro hac vice*)
 David.Gringer@wilmerhale.com
PAUL VANDERSLICE (*pro hac vice*)
 Paul.Vanderslice@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800

*Attorneys for Defendant Coinbase Global, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BIT GLOBAL DIGITAL LIMITED,<br><br>                              Plaintiff,<br><br>        v.<br><br>COINBASE GLOBAL, INC.,<br><br>                              Defendant. | Case No. 3:24-cv-09019-AMO<br><br>**DEFENDANT COINBASE GLOBAL, INC.'S MOTION TO DISMISS**<br><br>Hearing Date: April 3, 2025<br>Time: 2:00 p.m.<br>Judge: Hon. Araceli Martínez-Olguín |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..........................................................1

BACKGROUND ..........................................................................................................................2

ARGUMENT ................................................................................................................................4

I.    BiT'S SHERMAN ACT CLAIMS FAIL (COUNTS I-II) .....................................................4

      A.    BiT Fails To Allege Any Exclusionary Conduct ....................................................5

            1.    Introducing A Competing Product Is Not Exclusionary ....................5

            2.    Coinbase Does Not Have To Do Business With BiT .........................6

            3.    Coinbase's Statements About wBTC Cannot Be Exclusionary ..........8

            4.    BiT Has Not Alleged Any Harm To Competition ..........................10

      B.    BiT Fails To Plausibly Allege The Relevant Market ...........................................11

      C.    BiT Fails To Plausibly Allege Monopoly Power ................................................13

      D.    BiT Has Not Suffered An Antitrust Injury ........................................................15

II.   BiT'S LANHAM ACT CLAIM FAILS (COUNT III) .......................................................16

III.  BiT'S CALIFORNIA UNFAIR COMPETITION LAW CLAIMS FAIL (COUNTS IV-V)..............18

      A.    BiT Lacks Statutory Standing ..........................................................................18

      B.    BiT's Claim Under The UCL's Unfair Prong Fails ...........................................19

      C.    BiT's Claim Under The UCL's Unlawful Prong Fails .......................................20

      D.    BiT's Claim Under The UCL's Fraudulent Prong Fails ....................................22

IV.   BiT'S TORTIOUS INTERFERENCE CLAIMS FAIL (COUNTS VI-VII) ..........................23

V.    BiT'S TRADE LIBEL CLAIM FAILS (COUNT VIII) .....................................................24

VI.   AMENDMENT WOULD BE FUTILE ..............................................................................25

1

## **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

*Aerotec International, Inc. v. Honeywell International, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ..................................................................................15

5

*Africa v. Jianpu Technology Inc.*,
   2022 WL 4537973 (S.D.N.Y. Sept. 28, 2022)..........................................................9

6

7

*Ajzenman v. Office of Commissioner of Baseball*,
   2020 WL 6037140 (C.D. Cal. Sept. 14, 2020) .........................................................19

8

9

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991) ....................................................................................14

10

*AlterG, Inc. v. Boost Treadmills LLC*,
   388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...................................................................25

11

12

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) .....................................................................................2

13

14

*American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal*
   *& Professional Publications, Inc.*, 108 F.3d 1147 (9th Cir. 1997)....................8, 9

15

*Arminak & Associates, Inc. v. Saint-Gobain Calmar, Inc.*,
   789 F. Supp. 2d 1201 (C.D. Cal. 2011) .....................................................................5

16

17

*Becerra v. Dr Pepper/Seven Up, Inc.*,
   2018 WL 1569697 (N.D. Cal. Mar. 30, 2018).........................................................16

18

19

*Biddle v. Walt Disney Co.*,
   696 F. Supp. 3d 865 (N.D. Cal. 2023) .....................................................................11

20

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ............................................................................11, 13

21

22

*Boise Cascade Corp. v. FTC*,
   637 F.2d 573 (9th Cir. 1980) ....................................................................................21

23

24

*Buxton v. Eagle Test Systems, Inc.*,
   2010 WL 1240749 (N.D. Cal. Mar. 26, 2010)..........................................................23

25

*Cappello v. Walmart Inc.*,
   2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) ..........................................................18

26

27

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
   479 U.S. 104 (1986)..................................................................................................16

28

*Carlson v. Coca-Cola Co.*,
   483 F.2d 279 (9th Cir. 1973) ............................................................................21

*Carrea v. Dreyer's Grand Ice Cream, Inc.*,
   475 F. App'x 113 (9th Cir. 2012) ....................................................................17

*Cel-Tech Communications, Inc. v. L.A. Cellular Telephone Co.*,
   20 Cal. 4th 163 (1999) .............................................................................19, 20

*Cellars v. Pacific Coast Packaging, Inc.*,
   189 F.R.D. 575 (N.D. Cal. 1999)......................................................................24

*Chase Manufacturing, Inc. v. Johns Manville Corp.*,
   2019 WL 2866700 (D. Colo. July 3, 2019) ......................................................10

*Christy Sports, LLC v. Deer Valley Resort Co.*,
   555 F.3d 1188 (10th Cir. 2009) .........................................................................6

*In re Citigroup, Inc. Securities Litigation*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................9

*Clorox Co. v. Reckitt Benckiser Group PLC*,
   398 F. Supp. 3d 623 (N.D. Cal. 2019) ..............................................................17

*Coastal Abstract Service, Inc. v. First American Title Insurance Co.*,
   173 F.3d 725 (9th Cir. 1999) ...........................................................................17

*ComputerXpress, Inc. v. Jackson*,
   93 Cal. App. 4th 993 (2001) ............................................................................24

*Coronavirus Reporter v. Apple, Inc.*,
   85 F.4th 948 (9th Cir. 2023) .......................................................................5, 10

*Creative Mobile Technologies, LLC v. Flywheel Software, Inc.*,
   2017 WL 679496 (N.D. Cal. Feb. 21, 2017) ....................................................19

*Daugherty v. American Honda Motor Co.*,
   144 Cal. App. 4th 824 (2006) .....................................................................22, 23

*Drum v. San Fernando Valley Bar Ass'n*,
   182 Cal. App. 4th 247 (2010) ..........................................................................20

*E.I. du Pont de Nemours & Co. v. FTC*,
   729 F.2d 128 (2d Cir. 1984)........................................................................21, 22

*Emulex Corp. v. Broadcom Corp.*,
   2010 WL 11595718 (C.D. Cal. June 7, 2010) ..................................................10

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) ...............................................................13, 15, 19

*Films of Distinction, Inc. v. Allegro Film Products, Inc.*,
    12 F. Supp. 2d 1068 (C.D. Cal. 1998) ...................................................................25

*First Advantage Background Services Corp. v. Private Eyes, Inc.*,
    569 F. Supp. 2d 929 (N.D. Cal. 2008) ...................................................................23

*Flaa v. Hollywood Foreign Press Ass'n*,
    2020 WL 8256191 (C.D. Cal. Nov. 20, 2020)........................................................15

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*,
    703 F.2d 534 (9th Cir. 1983) ............................................................................5, 21

*FTC v. Cement Institute*,
    333 U.S. 683 (1948).................................................................................................21

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ...............................................................6, 7, 10, 11

*FTC v. Sperry & Hutchinson Co.*,
    405 U.S. 233 (1972).................................................................................................21

*Garnica v. HomeTeam Pest Defense, Inc.*,
    2015 WL 3766514 (N.D. Cal. June 16, 2015) ........................................................12

*Matter of General Foods Corp.*,
    103 F.T.C. 204 (1984)..............................................................................................21

*Genus Lifesciences Inc. v. Lannett Co.*,
    378 F. Supp. 3d 823 (N.D. Cal. 2019) ....................................................................10

*Heartland Payments Systems, Inc. v. Mercury Payments Systems, LLC*,
    2016 WL 304764 (N.D. Cal. Jan. 26, 2016) ...........................................................17

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ........................................................................11, 12

*Hodges v. Comcast Cable Communications, LLC*,
    21 F.4th 535 (9th Cir. 2021) ...................................................................................19

*Hodsdon v. Mars, Inc.*,
    891 F.3d 857 (9th Cir. 2018) ...................................................................................22

*Intuit Inc. v. HRB Tax Group, Inc.*,
    2024 WL 4093918 (N.D. Cal. Sept. 5, 2024) ..........................................................18

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
    12 F. Supp. 2d 1035 (C.D. Cal. 1998) ....................................................................25

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) .................................................................................22

*Kinderstart.com, LLC v. Google, Inc.*,
2007 WL 831806 (N.D. Cal. Mar. 16, 2007) ........................................................................10

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) ........................................................................................................24

*Lamontagne v. Tesla, Inc.*,
2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) ........................................................................3

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ...........................................................................................6

*Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*,
271 F.3d 825 (9th Cir. 2001) ................................................................................................24

*MetroNet Services Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) .......................................................................................4, 6, 8

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
924 F.2d 1484 (9th Cir. 1991) ..............................................................................................12

*Morris Communications Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ...............................................................................................7

*Morton v. Rank America, Inc.*,
812 F. Supp. 1062 (C.D. Cal. 1993) .......................................................................................5

*Muddy Waters, LLC v. Superior Court*,
62 Cal. App. 5th 905 (2021) .................................................................................................24

*National Rural Telecommunications Co-op. v. DIRECTV, Inc.*,
319 F. Supp. 2d 1059 (C.D. Cal. 2003) ................................................................................22

*Nestlé USA, Inc. v. Crest Foods, Inc.*,
2019 WL 2619635 (C.D. Cal. Mar. 8, 2019) ........................................................................25

*Nicolosi Distributing, Inc. v. FinishMaster, Inc.*,
2018 WL 4904918 (N.D. Cal. Oct. 9, 2018) .........................................................................13

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ...............................................................................................7

*NSS Labs, Inc. v. Symantec Corp.*,
2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ......................................................................12

*O'Donnell v. Bank of America, N.A.*,
504 F. App'x 566 (9th Cir. 2013) .........................................................................................21

*Oahu Gas Service, Inc. v. Pacific Resources, Inc.*,
838 F.2d 360 (9th Cir. 1988) ................................................................................................13

*Oracle USA, Inc. v. Rimini Street, Inc.*,
  2010 WL 4386957 (D. Nev. Oct. 29, 2010) ...................................................................17

*Pacific Bell Telephone Co. v. linkLine Communications, Inc.*,
  555 U.S. 438 (2009)...........................................................................................................6

*People's Choice Wireless, Inc. v. Verizon Wireless*,
  131 Cal. App. 4th 656 (2005) .......................................................................................19, 20

*Piping Rock Partners, Inc. v. David Lerner Associates*,
  946 F. Supp. 2d 957 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015) ..............24, 25

*Quick Dispense, Inc. v. Vitality Foodservice, Inc.*,
  2024 WL 2925589 (C.D. Cal. June 4, 2024) ...................................................................21

*R Power Biofuels, LLC v. Chemex LLC*,
  2016 WL 6663002 (N.D. Cal. Nov. 11, 2016) .................................................................23

*Rebel Oil Co, Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ...............................................................................5, 13, 14, 15

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979)..........................................................................................................15

*Reveal Chat Holdco LLC v. Facebook, Inc.*,
  2021 WL 1615349 (N.D. Cal. Apr. 26, 2021) ...................................................................4

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ..........................................................................8, 16

*SmileCare Dental Group v. Delta Dental Plan of California, Inc.*,
  88 F.3d 780 (9th Cir. 1996) ...............................................................................................7

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ......................................................................................17, 18

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)..........................................................................................................11

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir.),
  *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) .................................9, 18

*St. Luke's Hospital v. ProMedica Health System, Inc.*,
  8 F.4th 479 (6th Cir. 2021) ................................................................................................6

*Sybersound Records, Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ..........................................................................................23

*Tanaka v. University of Southern California*,
  252 F.3d 1059 (9th Cir. 2001) ..........................................................................................12

*Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.*,
   875 F.2d 1369 (9th Cir. 1989) ........................................................................14

*Tundra, Inc. v. Faire Wholesale, Inc.*,
   2024 WL 589097 (N.D. Cal. Feb. 13, 2024) ..................................................15

*United American Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) ...........................................................12

*United States v. Bentson*,
   947 F.2d 1353 (9th Cir. 1991) ..........................................................................2

*United States v. Oracle Corp.*,
   331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..........................................................14

*United Tactical System, LLC v. Real Action Paintball, Inc.*,
   143 F. Supp. 3d 982 (N.D. Cal. 2015) ........................................................23, 24

*Vascular Imaging Professionals, Inc. v. Digirad Corp.*,
   401 F. Supp. 3d 1005 (S.D. Cal. 2019)............................................................23

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004).......................................................................................6, 8

*Western Sugar Refinery Co. v. FTC*,
   275 F. 725 (9th Cir. 1921) ...............................................................................22

*Westlake Services, LLC v. Credit Acceptance Corp.*,
   2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ..............................................12, 15

*Woodside Investments, Inc. v. Complete Business Solutions Group, Inc.*,
   2020 WL 869206 (E.D. Cal. Feb. 21, 2020).......................................................3

*Zhang v. Superior Court*,
   57 Cal. 4th 364 (2013) .....................................................................................18

**Docketed Cases**

*SEC v. Justin Sun*,
   No. 23-cv-2433 (S.D.N.Y. 2024)....................................................................1, 4

**Statutes**

15 U.S.C.
   § 15...................................................................................................................15
   § 26...................................................................................................................16

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and
   their Applications* (4th ed. 2020) .......................................................................7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, on April 3, 2025 at 2 p.m. or as soon thereafter as the matter may be heard, in Courtroom 10 of the U.S. District Court for the Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, California, this Motion to Dismiss filed by defendant Coinbase Global, Inc. ("Coinbase") will be heard. Pursuant to Fed. R. Civ. P. 12(b)(6), Coinbase moves to dismiss the Complaint in the above-captioned action with prejudice.

## MEMORANDUM OF POINTS AND AUTHORITIES

When BiT decided to share control of wBTC with accused fraudster[1] Justin Sun, it ran the risk that responsible actors like Coinbase would stop doing business with it. And that is exactly what happened. Coinbase decided—based on a rigorous internal process—that wBTC should be delisted from its exchange due to the unacceptable risk that control of wBTC would fall into the hands of Mr. Sun. No law protects BiT from the consequences of its own decision or requires Coinbase to reverse course on judgments made to protect its customers and its platform.

It is no surprise then that BiT's Complaint not only fails to allege the most rudimentary elements of its myriad claims (nor so much as mention Justin Sun), but even manages to allege the very *opposite* of a violation on its core antitrust theory. The antitrust laws exist to preserve competition and condemn exclusionary conduct by dominant firms. But by its own admission, BiT—not Coinbase—is the dominant player in the alleged market. That alone dooms BiT's case. And that is hardly the only inconsistency between BiT's claims and basic antitrust principles. The Complaint does not even attempt to explain its choice of a product market or geographic market, the foundations of an antitrust claim. And the central theory of BiT's Complaint—that Coinbase had a legal obligation to continue dealing with BiT by listing wBTC on its exchange—contradicts the well-established principle that antitrust laws do not require firms to deal with one another, let alone on terms that a competitor (like BiT) prefers.

---

[1] *See, e.g.*, Am. Compl. ¶1, *SEC v. Justin Sun*, No. 23-cv-2433 (S.D.N.Y. Apr. 18, 2024), Dkt. 59 (alleging Justin Sun "orchestrat[ed] … the unregistered offer and sale, manipulative trading, and unlawful touting of crypto asset securities"); Declaration of Sonal N. Mehta Ex. A at 13 ("The prosecutor's office from the Southern District of New York, which normally handles financial crime on Wall Street, is searching for criminal evidence against Justin Sun."); *id.* (investigation into Sun and his firms "is being led by the FBI").

Ultimately, the legal problems with BiT's scattershot Complaint warrant dismissal for multiple reasons. ***First***, BiT fails to plausibly allege even the most basic requirements for an antitrust claim: the basis for its asserted market, that Coinbase possesses market or monopoly power in that market, that Coinbase engaged in exclusionary conduct, or that BiT suffered any kind of economic injury. Notably, BiT has not improved its theory of injury since its failed TRO bid—alleging no facts to support the notion that it was financially injured by the delisting. Those same failures require dismissal of BiT's claims of unfair and unlawful acts under the California Unfair Competition Law. ***Second***, BiT's Lanham Act, UCL fraud, and trade libel claims must be dismissed because BiT fails to allege that Coinbase made a false statement, let alone one likely to mislead consumers. The best BiT can do is allege that Coinbase does not have listing standards (an allegation defeated by judicially noticeable policies on Coinbase's website) and that any reference to those standards is pretextual, an allegation that is implausible in the face of sworn statements from Coinbase's declarants at the TRO stage that Coinbase made its delisting decision in compliance with its listing standards and process, and irrelevant if even credited. ***Finally***, BiT's claims of intentional and negligent interference are textbook examples of inadequate, conclusory pleading, relying on vague allegations of economic relationships with the market as a whole and asserting some nonspecific damage to those equally nonspecific relationships.

The Court should dismiss BiT's complaint in full. And it should do so with prejudice, as the most fundamental of these pleading failures—including Coinbase's lack of market power given BiT's conceded dominance, the lack of any exclusionary conduct, the absence of any false statement, and BiT's repeated inability to demonstrate injury—cannot possibly be cured.

## BACKGROUND

Plaintiff BiT Global is a "company incorporated in the British Virgin Islands" and based in China. Compl. ¶6; Dkt. 32 at 3:12.[2] Together with its "affiliates," BiT "manage[s] the minting

---

[2] BiT's representations during the TRO proceedings are binding judicial admissions that this Court can consider here. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226-27 (9th Cir. 1988) (statement in complaint is binding judicial admission); *United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991) (counsel's statements at hearing, if made as straightforward statements and not concessions for the sake of argument, are binding judicial admissions).

and redemption of wBTC," which is "**the most popular** wrapped Bitcoin product." Compl. ¶¶14, 32 (emphasis added). Wrapped Bitcoin is a digital asset—a "cryptocurrency"—that allows a consumer to "deposit[] their Bitcoin into the digital wallet of a trusted third party," who "issues a token or digital coin on another blockchain network" which "acts as a proxy for the Bitcoin asset" while the "custodian holds the Bitcoin in trust for the user." *Id.* ¶27. A "wrapped Bitcoin" refers to the proxy coin. Unsurprisingly, trust in the custodian is critical for a wrapped Bitcoin. BiT "earns a processing fee whenever a user mints or redeems wBTC," i.e., when a user exchanges Bitcoin to obtain wBTC, or redeems (or "burns") their wBTC for the underlying Bitcoin. *Id.* ¶¶30, 37.

Defendant Coinbase operates one of many online exchanges on which users can buy, sell, and trade digital assets. Compl. ¶38. Coinbase also operates token wrapping services, including the wrapping of Bitcoin to a token called "cbBTC." *Id.* ¶17. Coinbase's reputation for reliability and security is critical to its business. To ensure its exchange's integrity and protect its users, Coinbase monitors listed assets for ongoing compliance with its listing standards, which are publicly available on its website. *See* Declaration of Sonal N. Mehta ("Mehta Decl.") Exs. B, C, D.[3] Coinbase uses market intelligence alerts and updates from crypto research firms to detect events that could negatively impact a digital asset. Mehta Decl. Ex. D at 3. Events that trigger additional review of a digital asset include attacks on or newly discovered bugs in an asset's underlying software; major protocol changes for that asset; or changes to an asset issuer's strategy, leadership, or legal status. *Id*. One of Coinbase's listing standards "evaluate[s] a token's custody risks," which includes consideration of "how Coinbase can ensure protection of its users and ownership of assets." Mehta Decl. Ex. B at 4.

On August 9, 2024, BiT and its affiliates, BitGo and Justin Sun, announced " a joint venture relationship … to manage and operate the wBTC business" and custodianship of the Bitcoin

---

[3] Mehta Decl. Exs. B, C, and D are Coinbase's public listing standards, which BiT's Complaint discusses at length and which form the basis for nearly all of BiT's claims. They are incorporated by reference and may be considered on a motion to dismiss. *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *3 (N.D. Cal. Sept. 30, 2024). The fact that there are standards is judicially noticeable because they are available on Coinbase's public website, and the Court may take notice that a "website exists and makes certain representations about [a] company to the public." *Woodside Invs., Inc. v. Complete Bus. Sols. Grp., Inc.*, 2020 WL 869206, at *2 (E.D. Cal. Feb. 21, 2020).

underlying wBTC. Compl. ¶33; Mehta Decl. Ex. E. Justin Sun operates the TRON blockchain ecosystem, which issues the digital asset TRX. The SEC has alleged that Mr. Sun engaged in fraud and manipulated the price of TRX through wash trades. Am. Compl. ¶1, *SEC v. Justin Sun*, No. 23-cv-2433 (S.D.N.Y. Apr. 18, 2024), Dkt. 59. He has also been publicly accused by others in the industry of misappropriating cryptocurrency from users' accounts and is reportedly under investigation by the U.S. Attorney's Office for the Southern District of New York and the FBI for potential criminal activity. Mehta Decl. Ex. A at 13.[4]

On November 19, 2024, Coinbase announced that it planned to delist wBTC on December 19, 2024 for failing to meet its listing standards. Compl. ¶¶33, 55. Coinbase then reiterated substantially the same statement to two industry publications. *Id.* ¶¶93-96. On December 13, 2024, BiT filed its Complaint (Dkt. 1) and an accompanying motion for a TRO (Dkt. 3). The court denied the TRO on December 18, finding that BiT presented "no evidence … about what is to come," and that any impact on it from the delisting of wBTC "is mostly speculative." Dkt. 32 at 35:7-37:1.

## ARGUMENT

## I.    BiT's Sherman Act Claims Fail (Counts I-II)

To state a monopolization claim under Section 2 of the Sherman Act, BiT must sufficiently allege that Coinbase "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury." *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1130 (9th Cir. 2004). BiT's Sherman Act claims fail for four independently dispositive reasons. *First*, the Complaint's theory of exclusionary conduct is deficient as a matter of law and cannot be cured. *Second*, the Complaint does not plausibly allege that "wrapped Bitcoin in the United States" is a valid relevant antitrust market. *Third*, the Complaint fails to plausibly allege that Coinbase has monopoly power or any prospect of obtaining it in wrapped Bitcoin, even assuming that were a relevant market. And *fourth*, BiT has failed to allege that the challenged conduct caused it any economic injury and therefore has not

---

[4] The Court can take judicial notice of matters of public record, such as the contents of court filings, and the contents of news articles like Ex. A as an indication that the information therein was public. *Reveal Chat Holdco LLC v. Facebook, Inc.*, 2021 WL 1615349, at *4 (N.D. Cal. Apr. 26, 2021).

1  demonstrated an antitrust injury.

2       **A.    BiT Fails To Allege Any Exclusionary Conduct**

3       BiT remains as free to compete in the wrapped bitcoin market today as it was before the

4  conduct it complains of. That it faces more competition today than it did before is, in the eyes of

5  the antitrust laws, a good thing. Thus, it is hardly surprising that its theories of exclusionary

6  conduct, to the extent discernable at all, are nothing more than fanciful. To adequately plead

7  exclusionary conduct, BiT needed to allege that the supposed "anticompetitive conduct …

8  harm[ed] the competitive process as a whole, rather than the success or failure of individual

9  competitors." *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 954-55 (9th Cir. 2023). That is equally

10  true for its attempted monopolization claim. *See Rebel Oil Co, Inc. v. Atl. Richfield Co.*, 51 F.3d

11  1421, 1433 (9th Cir. 1995) (attempt requires "predatory or anticompetitive conduct"). Although

12  the Complaint never actually specifies what it is that Coinbase did that is exclusionary, it appears

13  to take issue with Coinbase (1) "creating its knock-off product, cbBTC"; (2) "delisting its

14  competitor" wBTC from Coinbase's exchange; and (3) "engaging in" an alleged "FUD [fear,

15  uncertainty, and doubt] campaign" targeting wBTC. Compl. ¶87. As a matter of law, none of these

16  actions are exclusionary and none can support BiT's Section 2 claims, whether considered

17  independently or together.

18       **1.    Introducing A Competing Product Is Not Exclusionary**

19       Coinbase's introduction of cbBTC cannot be exclusionary because creating a new product,

20  by definition, increases (rather than decreases) competition. Any firm, including a supposed

21  monopolist, may "'bring its products to market whenever and however it chooses.'" *Foremost Pro*

22  *Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir. 1983). Innovation and the

23  introduction of new and competing products were precisely the "the competitive forces that the

24  Sherman Act was intended to foster." *Id.* at 546. Actions that result in a firm's new "entry into the

25  relevant market increase[], rather than decrease[], competition" and therefore are not exclusionary.

26  *Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1068 (C.D. Cal. 1993); *see also Arminak & Assocs.,*

27  *Inc. v. Saint-Gobain Calmar, Inc.*, 789 F. Supp. 2d 1201, 1211 (C.D. Cal. 2011) (alleged

28  monopolist "did absolutely nothing anticompetitive by … designing a new product to meet

competition"). Thus, the antitrust laws presumptively support Coinbase's conduct.

### 2. Coinbase Does Not Have To Do Business With BiT

Coinbase's decision to delist wBTC also cannot be exclusionary. It is axiomatic that the antitrust laws impose "no duty to aid competitors." *MetroNet*, 383 F.3d at 1131. There is generally no limitation on a competitor's ability to "'exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). Instead, "[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

The Complaint alleges no facts establishing the applicability of "[t]he one, limited exception to this general rule." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020). That exception requires (1) the "'unilateral[] terminat[ion of] a voluntary and profitable course of dealing,' (2) 'the only conceivable rationale or purpose'" of which "'is to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition,' and (3) [that] the refusal to deal involves products that the defendant already sells in the existing market to other similarly situated customers.'" *Id.* (citations omitted). If any one of these factors is absent, the exception is inapplicable. *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 487 (6th Cir. 2021). The Complaint alleges none of these factors, and none apply.

***First***, there are no allegations that listing wBTC on its exchange was profitable for Coinbase. That alone is dispositive. *LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 556 (9th Cir. 2008) (affirming dismissal of refusal-to-deal claim where plaintiff "failed to allege" that terminated "arrangement was profitable to MySpace"). "The Sherman Act does not require [a firm] to assist a competitor … , especially when that competitor is offering [it] nothing in return." *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009).

***Second***, the Complaint does not allege irrational profit sacrifice resulting from the challenged refusal to deal. Instead, BiT alleges that Coinbase's "strategy" in connection with the challenged conduct is to "create its own payments infrastructure," "driv[e] transaction fees on the Coinbase platform," attract developers and users to "'bring more and more people onchain,'" and

use "'wrapped assets like cbBTC [to] help build a more efficient, interconnected and expansive financial ecosystem.'" Compl. ¶¶49-51. Even (incorrectly) assuming, as the Complaint alleges, that Coinbase's delisting of wBTC was in any way related to its launch of cbBTC, all these allegations establish is that Coinbase "cho[se] the path that was 'far more lucrative,' both in the short *and* the long term, regardless of any impacts on competition," so "the second required element of the … exception is not present in this case." *Qualcomm*, 969 F.3d at 994.

The Tenth Circuit's decision in *Novell, Inc. v. Microsoft Corp.* is instructive. 731 F.3d 1064 (10th Cir. 2013). There, Microsoft gave software vendors access to a pre-release version of Windows 95 so they could develop compatible programs, "increasing the utility of the operating system for users" and "sales for Microsoft." *Id.* at 1067. Microsoft later revoked this access and instead gave its proprietary applications the "competitive advantage" of "being the first applications useable on Windows 95." *Id.* at 1068-69. The Court found no unlawful refusal to deal because nothing about the "discontinuation of this arrangement suggested a willingness to sacrifice short-term profits." *Id.* at 1076. To the contrary, "all evidence suggest[ed] that Microsoft's decision came about as a result of a desire to maximize the company's immediate and overall profits." *Id.* The Complaint's allegations match the facts of *Novell* directly.

Indeed, it would have been manifestly rational—and in Coinbase's short- *and* long-term interest—to prevent wBTC from using Coinbase's platform (which Coinbase has devoted significant resources into developing and improving) to draw cbBTC investors away to a rival asset. *See Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) (recognizing prevention of freeriding as a rationale to preclude exception to no-duty-to-deal principle). This facially legitimate reason for Coinbase's conduct—again, assuming for the sake of argument that this was, as the Complaint alleges, its reason—is grounds for dismissal because "[a] legitimate purpose renders any accompanying purpose irrelevant, regardless of motive." Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and their Applications* ¶773e (4th ed. 2020); *id.* ¶773f ("any legitimate business purpose saves the monopolist"); *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (legitimacy of policies to prevent freeriding "is a foregone conclusion requiring no further

analysis"). Of course, the actual reason for wBTC's delisting—the unacceptable risk created by its association with Mr. Sun—is also rational and legitimate.

**Third**, BiT has not alleged that Coinbase offered listing services to similarly situated customers. BiT concedes, as it must, that Coinbase determined wBTC no longer met its listing standards after it entered a joint venture with Mr. Sun. The Complaint lodges a series of conclusory and speculative allegations that Coinbase's listing standards are vague and ill-defined, but does not allege—as it must—that Coinbase offers listing services to all digital asset issuers, or other services closely affiliated with Mr. Sun. *See Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (dismissing refusal-to-deal claim for failure to allege defendant "refused to provide products to its competitors that were already sold in a retail market to other customers"). One of "the reasons for a 'no duty to deal' rule is that enforced sharing" is not judicially administrable where "the defendant does not already provide the product in an existing market or otherwise make it available to the public." *MetroNet*, 383 F.3d at 1133. It would be entirely impractical for the Court to "identify[] the proper … terms of dealing" between Coinbase and assets that wish to be listed on its exchange—"a role for which [it is] particularly ill suited." *Trinko*, 540 U.S. at 408.

Because none of these factors are met, Coinbase had no legal obligation to continue dealing with BiT by listing wBTC on its exchange. The Complaint alleges nothing that would trigger an exception to the general rule that firms have no duty to deal with one another, which applies only where a firm's refusal to deal plainly indicates otherwise irrational profit sacrifice in the pursuit of long-term market dominance. Since the Complaint fails to allege that Coinbase's delisting involved *any* profit sacrifice, was even arguably irrational, or treated BiT differently from any similarly situated firm—any one of which would defeat BiT's claim—dismissal is required.

### 3.     Coinbase's Statements About wBTC Cannot Be Exclusionary

Antitrust claims predicated on alleged commercial disparagement and deception should "'presumptively be ignored.'" *Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Pubs., Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997). That is because the "effect on competition" from speech is typically "de minimis." *Id.* This case is a classic example of this principle. To

overcome this heavy presumption, a plaintiff must show "'that the representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged periods, and [6] not readily susceptible of neutralization or other offset by rivals.'" *Id.* BiT has not alleged facts supporting any of these factors, let alone all six.

To begin with, BiT has not plausibly alleged Coinbase's statements were false. The Complaint alleges in a conclusory fashion that Coinbase's delisting announcement and subsequent statements that wBTC did not meet its listing standards were false because Coinbase supposedly "has virtually no standards for what can be listed at all." Compl. ¶62. While implicitly conceding that Coinbase has at least *some* standards, the sole basis for even that conclusory statement is that Coinbase lists various "meme coins" (none alleged to be associated with accused fraudsters), which BiT claims demonstrates that Coinbase was "pretending that wBTC failed a listing standard that does not actually exist … and is not actually applied to other cryptocurrencies." *Id.* ¶¶62-72. Coinbase's listing standards themselves—publicly available on Coinbase's website and incorporated by reference into the Complaint—foreclose BiT's allegations that Coinbase "virtually" lacks listing standards. *See* Mehta Decl. Exs. B, C, D; *supra* n.3. The Court need not and should not "accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 990 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001). Even taken as true, BiT's allegations do not come close to establishing that the challenged statements are false. BiT offers no facts "showing that [Coinbase's] descriptions of [its listing] processes were false … nor facts showing that the processes were not followed." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 379 (S.D.N.Y. 2004); *see also Africa v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *6 (S.D.N.Y. Sept. 28, 2022) ("the fact that there were noncompliant providers on [platform] does not mean … statements regarding the Company's regulatory compliance measures were untrue when made").

Furthermore, the three challenged statements—a delisting announcement and two statements to media outlets, all within a three-day period, *see* Compl. ¶¶55-56, 93-96—hardly "continued for prolonged periods." *Harcourt*, 108 F.3d at 1152. Unsurprisingly, "three days is an

insufficient period to satisfy" the "prolonged period … element of the *Harcourt Brace* test." *Emulex Corp. v. Broadcom Corp.*, 2010 WL 11595718, at *6 (C.D. Cal. June 7, 2010); *see also Chase Mfg., Inc. v. Johns Manville Corp.*, 2019 WL 2866700, at *11 (D. Colo. July 3, 2019) (statements occurring "four times over several months" insufficient).

The supposed misrepresentations here are also reasonably susceptible to neutralization by rivals in obvious ways. Indeed, BiT itself could have called attention to the supposed defects in Coinbase's listing process or released information about itself and its own governance (including ultimate control over the custodianship of the underlying Bitcoin reserves) to dispel "fear, uncertainty, and doubt" about its own product. *See Genus Lifesciences Inc. v. Lannett Co.*, 378 F. Supp. 3d 823, 842 (N.D. Cal. 2019) (dismissing claims for failure to allege why it was incapable of "pushing back" on false statements); *Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at *8 (N.D. Cal. Mar. 16, 2007) (dismissing claim lacking allegations that competitors were unable to neutralize statements). The Complaint never alleges any obstacles to this kind of neutralization.

Finally, as discussed in further detail below in the context of BiT's Lanham Act claim, no allegations suggest that Coinbase's statements were "material" or "likely to induce reasonable reliance," let alone clearly so, as required under *Harcourt. See infra* pp.17-18. Instead, the Complaint simply repeats the legal standard for materiality—a quintessential example of conclusory pleading.

### 4.    BiT Has Not Alleged Any Harm To Competition

BiT's own allegations confirm that, even if the challenged conduct could be exclusionary in theory (it cannot), it was not exclusionary here. To show that the challenged conduct was exclusionary, BiT needed to allege it had a "substantial anticompetitive effect" that resulted in a "less competitive market"—that is, that Coinbase's actions harmed competition in the market as a whole. *Qualcomm*, 969 F.3d at 990-91. Harm to a single competitor is not enough, and that is all BiT has even purported to allege. *Id.* at 990; *see also Coronavirus Rep.*, 85 F.4th at 954-55. The Complaint makes clear that competition in wrapped Bitcoin continues unimpeded. BiT has alleged that, at most, Coinbase's actions resulted in a 5% reduction wBTC supply, Compl. ¶61, and even that allegation ignores that wBTC circulation started to drop after Mr. Sun got involved but before

the delisting. Even taking BiT's allegations as true, the remaining 95% of wBTC remains freely circulating, and competition has not been harmed. *See Qualcomm*, 969 F.3d at 991.

### B.    BiT Fails To Plausibly Allege The Relevant Market

BiT's antitrust claims separately fail because it has not plausibly alleged a relevant market. That is a "threshold step in any antitrust case." *Qualcomm*, 969 F.3d at 992. Otherwise, "there is no way to measure [the defendant's] ability to lessen or destroy competition" or assess the challenged conduct's competitive effects. *Id.* (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 (2018)). Both monopolization and attempted monopolization claims require "properly defined geographic and product markets." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993). An antitrust complaint that lacks allegations comporting with the "legal principles that govern the definition of an antitrust 'relevant market'" is "'facially unsustainable'" and must be dismissed. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). BiT's antitrust claims turn on supposed harms in a market for "wrapped Bitcoin in the United States," Compl. ¶¶73-89, so those are the relevant product and geographic markets that must be plausibly alleged with facts, *Biddle v. Walt Disney Co.*, 696 F. Supp. 3d 865, 882 (N.D. Cal. 2023) ("When assessing the relevant market, courts must focus on anticompetitive effects 'in the market where competition is [allegedly] being restrained.'"). BiT has failed on both fronts.

***First***, BiT has not alleged a valid product market for "wrapped Bitcoin." A product market must include both "the product at issue as well as all economic substitutes for the product." *Hicks*, 897 F.3d at 1120. Dismissal is required where the plaintiff simply points to a product but fails to plausibly allege "that there are no other goods or services that are reasonably interchangeable with" it. *Big Bear*, 182 F.3d at 1105. That is all BiT has done. The Complaint does not contain a single allegation—even a conclusory one—that "wrapped Bitcoin" meets any of the criteria for a product market. There are no allegations that wrapped Bitcoin lacks economic substitutes. Nor are there allegations that wrapped Bitcoin is not reasonably interchangeable with, for example, other digital assets. And while the Complaint never clearly identifies any distinctive characteristic of wrapped Bitcoin, it would not matter if it had. The "fact that 'each form of cryptocurrency has distinctive

characteristics' says little." *United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1269 (S.D. Fla. 2021). The same is "true for many products that compete in a market," and tells the court "nothing that would allow [it] to discern the extent to which consumers prefer [wrapped Bitcoin] over the multitude of other cryptocurrencies." *Id.* (dismissing alleged market for single form of cryptocurrency); *see also Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063-64 (9th Cir. 2001) (allegation that "UCLA women's soccer program" is "'unique' … is insufficient" to establish that it is a relevant product market). Courts routinely dismiss antitrust claims where, as here, a complaint is devoid of allegations supporting a relevant product market, and this Court should do the same. *See, e.g.*, *Tanaka*, 252 F.3d at 1063-64; *NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing complaint that "fail[ed] to identify the economic substitutes for the product markets" or "plead any facts regarding the cross-elasticity of demand between the Relevant Product Markets and their substitutes").

> **Second**, BiT fails to adequately plead a geographic market. The relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991) (cleaned up). BiT's limitation of the geographic market to the U.S. is unsupported. BiT "does not indicate 'why U.S. customers wishing to purchase [wrapped Bitcoin] could not turn to foreign … suppliers,'" *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015), and "provides no details about whether customers" outside the U.S. "'can practicably turn' to" U.S.-based sellers to purchase wrapped Bitcoin, *Garnica v. HomeTeam Pest Def., Inc.*, 2015 WL 3766514, at *2 (N.D. Cal. June 16, 2015). That alone is dispositive. And indeed, "judicial experience and common sense" show that effective competition in wrapped Bitcoin transcends national borders. *Hicks*, 897 F.3d at 1121. Wrapped Bitcoin is a digital asset transacted on the internet, and wrapped Bitcoin purchasers can and do purchase it from suppliers around the world. BiT—the dominant seller of wrapped Bitcoin, *see* Compl. ¶¶31-32—is itself a Chinese firm, Dkt. 32 at 3:12 ("it's a Hong Kong company"). BiT surely considers itself a participant in the relevant market, so a U.S. market cannot be correct. BiT has thus failed to plausibly allege a relevant geographic market—and did not even try—which requires dismissal.

*Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, 2018 WL 4904918, at *4 (N.D. Cal. Oct. 9, 2018) (dismissing proposed market of "the nine-county Bay Area" because plaintiff "d[id] not allege that" customers "do not and cannot purchase" product "in other parts of the country"); *Big Bear*, 182 F.3d at 1105 (affirming dismissal where "[p]laintiffs d[id] not … allege that" proposed geographic market was "the area of effective competition").

### C.    BiT Fails To Plausibly Allege Monopoly Power

Even assuming "wrapped Bitcoin in the United States" were a well-defined relevant market, the Complaint fails to allege that Coinbase has monopoly power. Nor does it allege, as required for an attempt claim, that Coinbase has a "dangerous probability of achieving" such power. *Rebel Oil*, 51 F.3d at 1433. "[M]onopoly power … is the substantial ability 'to control prices or exclude competition.'" *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023). It can be shown through either direct or indirect evidence. BiT plausibly alleges neither.

There are no allegations pointing to direct evidence of Coinbase's monopoly power in wrapped Bitcoin, which requires both "restricted output and supracompetitive prices." *Rebel Oil*, 51 F.3d at 1434. All BiT purports to allege is harm to itself. But harm to a single competitor is not direct evidence of monopoly power because the antitrust laws are designed to "safeguard general competitive conditions, rather than to protect specific competitors." *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988). Nor does BiT allege indirect evidence of monopoly power. Coinbase's share of the supposed market is unstated and there are no allegations about barriers to entry at all. *Rebel Oil*, 51 F.3d at 1434 ("To demonstrate market power circumstantially, a plaintiff must … show that the defendant owns a dominant share of that market, and … show that there are substantially barriers to entry and that existing competitors lack the capacity to increase their output in the short run."). Given BiT's dominance, any allegation that Coinbase has power in wrapped Bitcoin would be especially implausible.

Nor has BiT alleged that Coinbase has a dangerous probability of succeeding in obtaining monopoly power in wrapped bitcoin. In limited circumstances, "[a] dangerous probability of success" can be "inferred from" either (a) "conduct [that] is predatory or clearly in restraint of competition such as a per se violation under section 1" of the Sherman Act—which BiT has not

even attempted to allege—or (b) "direct evidence of specific intent" to monopolize "plus proof of conduct directed toward accomplishing the unlawful goal." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1378 (9th Cir. 1989).

BiT has not alleged any direct evidence of Coinbase's intent to monopolize wrapped Bitcoin. All BiT points to is a single X post copied onto Coinbase's website "predict[ing]" that cbBTC would "[p]ass[] WBTC in supply within 6 months of launch." Compl. ¶¶48-49, 75, 77. Predictions about the future success of one's product do not reveal an intent to monopolize. Indeed, even "verbal threats … to 'run [a competitor] out of business'"—which this isolated statement, by a non-Coinbase employee, is not—"cannot be equated with intent to monopolize." *Thurman*, 875 F.2d at 1379. Without "the type of conduct from which specific intent or a dangerous probability of success may be inferred," a plaintiff in an attempted monopolization case "must establish the relevant market and the defendant's market power." *Id.* at 1378. BiT fails to allege Coinbase has market power in wrapped Bitcoin for the same reasons it failed to allege monopoly power, and has therefore failed to allege a dangerous probability of success. *See Rebel Oil*, 51 F.3d at 1433-34.

BiT instead alleges that Coinbase "has used its dominant power in … the market for centralized cryptocurrency exchanges in the United States … to attempt to exclude wBTC from" the wrapped Bitcoin market. Compl. ¶76. This conclusory allegation fixes nothing.

***First***, "in [a] two-market situation" like BiT alleges here, "a plaintiff cannot establish a violation of Section 2 without proving that the defendant used its monopoly power in one market to obtain, or attempt to obtain, a monopoly in the downstream, or leveraged, market." *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 547 (9th Cir. 1991). This type of claim requires showing that Coinbase possesses "[m]onopoly control of the upstream market." *Id.* at 545 n.12. But the Complaint does not plausibly allege the existence of the posited upstream market— "centralized cryptocurrency exchanges in the United States"—either. Compl. ¶76. As an initial matter, BiT does not even explain what it means by a "*centralized* cryptocurrency exchange." *Id.* This "[a]ttempt[] to create defensible market boundaries" based on undefined "product characteristics … do[es] not meet" the antitrust laws' "requirement that the relevant market be 'well-defined.'" *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1120-21 (N.D. Cal. 2004);

1  *Flaa v. Hollywood Foreign Press Ass'n*, 2020 WL 8256191, at *7 (C.D. Cal. Nov. 20, 2020)

2  (dismissing claim where "product description" of "'entertainment news'" was "ambiguous"). In

3  any event, as with the supposed wrapped Bitcoin market, the Complaint does not contain a single

4  allegation that consumers lack substitutes for centralized cryptocurrency exchanges or why such

5  exchanges are not reasonably interchangeable with, for example, peer-to-peer platforms that

6  facilitate digital asset trading. Instead, this proposed market is "artificially contour[ed]" and

7  "facially pare[d] down … to attribute a greater share to" Coinbase. *Tundra, Inc. v. Faire*

8  *Wholesale, Inc.*, 2024 WL 589097, at *1 (N.D. Cal. Feb. 13, 2024) (Martínez-Olguín, J.).[5]

9      ***Second***, even assuming centralized cryptocurrency exchanges were a valid relevant market

10  over which Coinbase possessed monopoly power, BiT offers no explanation whatsoever of how

11  that would confer Coinbase with monopoly power or the dangerous probability thereof in wrapped

12  Bitcoin. Nor could it. For example, as BiT concedes, Coinbase's exchange faces competition from

13  other exchanges, Compl. ¶41—so it cannot be an essential facility necessary to compete in the

14  wrapped Bitcoin market (and BiT never alleges that it is). *See Aerotec Int'l, Inc. v. Honeywell Int'l,*

15  *Inc.*, 836 F.3d 1171, 1185 (9th Cir. 2016) ("a facility is only 'essential' where it is otherwise

16  unavailable"). Nor is "demand for [wrapped Bitcoin] … entirely dependent on" the use of

17  Coinbase's exchange. *Epic*, 67 F.4th at 976-77. Again, it could not be, and BiT never alleges

18  otherwise. The Complaint thus provides no plausible explanation of how Coinbase's supposed

19  power in the exchange market gives it power in the wrapped Bitcoin market, so the "leveraging"

20  theory fails as a matter of law.

21      **D.    BiT Has Not Suffered An Antitrust Injury**

22      To establish antitrust injury, BiT must show a financial injury to its "business or property."

23  15 U.S.C. § 15; *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). This requirement applies to

24  BiT's monopolization and attempted monopolization claims alike. *See Rebel Oil*, 51 F.3d at 1433

25  (attempt requires "causal antitrust injury"). And BiT must show a threatened loss of this same kind

26

27  _____

[5] BiT also entirely fails to justify its limitation of this market to the United States. For example, it
28  provides no explanation of why U.S.-based consumers could not turn to foreign "centralized
cryptocurrency exchanges." *See Westlake Servs.*, 2015 WL 9948723, at *5.

to seek injunctive relief. 15 U.S.C. § 26; *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 112 (1986). BiT fails this basic requirement. BiT asserts that the challenged conduct decreased the supply of wBTC by 5%, implying a "loss of market share" and potential future "liquidations of the positions individual users hold in wBTC." Compl. ¶¶61, 78. These conclusory allegations do not establish that BiT suffered a financial injury caused by the challenged conduct.

BiT alleges no facts plausibly linking the asserted reduction in wBTC supply to Coinbase's delisting decision (as opposed to, say, its widely criticized association with Mr. Sun). While a plaintiff "need not scientifically prove causation at the pleading stage, [it] must nonetheless *plausibly* allege it." *Becerra v. Dr Pepper/Seven Up, Inc.*, 2018 WL 1569697, at *6 (N.D. Cal. Mar. 30, 2018). BiT's Complaint "do[es] not allege causation at all—at best, [it] support[s] merely a correlation" between Coinbase's announcement and changes in the wBTC supply. *Id.* But "correlation is not causation, neither for purposes of science nor the law." *Id.*

Moreover, the Complaint alleges no facts suggesting that a reduction in the supply of wBTC (if that reduction in fact flowed from Coinbase's actions) has any negative economic impact on BiT. If BiT has some explanation for how it is injured by a reduction in the wBTC supply, it is not in the Complaint. BiT does not, for example, allege that reduced wBTC supply reduces the fees BiT earns from the minting and burning—i.e., the creation and destruction—of wBTC, which is BiT's only alleged source of revenue. Compl. ¶37. Tellingly, BiT could not articulate a theory of injury in its TRO motion or at the hearing on that motion. Only BiT knows and can explain how Coinbase's actions supposedly injured it. *See Reveal Chat Holdco*, 471 F. Supp. at 997-98 (dismissing complaint where plaintiffs "failed to plausibly allege in a non-conclusory manner that they themselves have been injured"). Despite multiple opportunities, BiT has never done so.

To the extent BiT claims that supposed reputational harms flowed from Coinbase's actions, *see* Compl. ¶¶104, 165, that claim would fail as well. As discussed *infra* in the context of BiT's Lanham Act claim, *infra* p.18, the reputational harms alleged are implausible, and BiT provides no facts connecting the supposed reputational harms to any lost revenues.

## II.    BiT's Lanham Act Claim Fails (Count III)

To state a Lanham Act claim, BiT must allege that Coinbase made "a false statement of

fact … in a commercial advertisement." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). It has not done so. Courts dismiss deceptive-advertising claims where the pleadings do not "plausibly suggest a likelihood to mislead." *Clorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 636 (N.D. Cal. 2019). That occurs if it is "implausible that a reasonable consumer would interpret" the ad as alleged, *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 F. App'x 113, 115 (9th Cir. 2012), or if the plaintiff "does not state any facts to support its allegation" that the ad conveyed the implied claim asserted, *Heartland Payments Systems, Inc. v. Mercury Payments Systems, LLC*, 2016 WL 304764, at *5 (N.D. Cal. Jan. 26, 2016).

As explained, the challenged statements are not plausibly alleged to be false on their face, but instead—by BiT's admission—are only *possibly* false "by implication." *See* Compl. ¶¶97, 101; *supra* p.9. The implied messages Coinbase's statements allegedly conveyed are that wBTC is "unreliable or unsafe to invest in or transact business in" and "there was negative information in Coinbase's possession which made wBTC no longer a safe or reliable product." Compl. ¶97. To begin with, those supposed messages are nonactionable opinions. *See Oracle USA, Inc. v. Rimini St., Inc.*, 2010 WL 4386957, at *3 (D. Nev. Oct. 29, 2010) ("statements concerning the future financial stability of a business [are] nonactionable statement[s] of opinion"); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999) (same, for the Lanham Act). But beyond that, BiT has not plausibly alleged the statements were false. BiT alleges only that Coinbase "did not actually" "perform[] a rigorous analysis of" wBTC against "a listing standard." Compl. ¶97. BiT's implied assertion theory is circular: it is predicated entirely on the allegation that Coinbase's descriptions of its listing standards are false, which, as explained above, is implausible. *See supra* p.9.

BiT also must show that the challenged statements were "material, in that [they are] likely to influence the purchasing decision." *Southland Sod*, 108 F.3d at 1139. There are no factual allegations supporting this contention either. The Complaint alleges only the element itself: "Defendant's false statements are deceptive and material because the statements will influence purchasing decisions or decisions about whether to liquidate wBTC and switch to cbBTC." Compl. ¶102. As explained, the Complaint includes no allegations establishing a causal relationship

between Coinbase's statements and changes in the supply of wBTC. *See supra* pp.15-16. "[R]egurgitat[ing] the legal standard for materiality" is not sufficient to plausibly state a Lanham Act claim. *Intuit Inc. v. HRB Tax Grp., Inc.*, 2024 WL 4093918, at *5 (N.D. Cal. Sept. 5, 2024).

Finally, BiT has not adequately pleaded that the challenged statements injured it. To do so, BiT needed to allege that it "has been or is likely to be injured … either by direct diversion of sales from itself to [Coinbase] or by lessening of the goodwill associated with its products." *Southland Sod*, 108 F.3d at 1139. The Complaint claims that the decrease in circulation of wBTC after Coinbase's delisting announcement "demonstrate[s]" a diversion from wBTC to cbBTC, Compl. ¶104, but that allegation is speculative because no facts suggest that users who burned their wBTC switched to cbBTC. And the allegation of reputational harm is based entirely on "the implication that [BiT's] product warranted delisting for reasons that relate to its trustworthiness." *Id.* As explained, that implication is likewise wholly speculative, an implausible interpretation of Coinbase's statements, and not supported by any facts in the Complaint. *See supra* p.9.

At bottom, BiT's Lanham Act claim rests on a series of assumptions for which there is no factual support articulated in the Complaint: that Coinbase's delisting impliedly communicated a message; that this secret, implied message was a statement of fact; that this implied statement of fact was false; that consumers actually understood this implied message; that consumers actually relied on it; and that this reliance injured BiT. Rather than present factual allegations supporting any of these pleading requirements, BiT improperly asks this Court to rely on "unwarranted deductions of fact" and "unreasonable inferences" to piece together a valid Lanham Act claim. *Sprewell*, 266 F.3d at 988. The Court should decline. *Id.*

## III.    BiT's California Unfair Competition Law Claims Fail (Counts IV-V)

### A.    BiT Lacks Statutory Standing

To have standing to sue under the UCL, "a private plaintiff must be able to show economic injury caused by unfair competition." *Zhang v. Super. Ct.*, 57 Cal. 4th 364, 372 (2013); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *4 (N.D. Cal. Apr. 5, 2019). Without a plausible allegation of economic injury based on the challenged conduct, BiT lacks standing to pursue any of its UCL claims. *See supra* pp.15-16. The Complaint's threadbare characterization of the relief requested as

1    "public injunctive relief," Compl. Prayer for Relief (C), does not remedy this. BiT is not in fact

2    seeking public injunctive relief. Public injunctive relief "is limited to forward-looking injunctions

3    that seek to prevent future violations of law for the benefit of the general public as a whole, as

4    opposed to a particular class of persons." *Hodges v. Comcast Cable Commc'ns, LLC*, 21 F.4th 535,

5    542 (9th Cir. 2021). Merely "requesting relief which would generally enjoin a defendant from

6    wrongdoing," which is all BiT is seeking here, "does not elevate requests for injunctive relief to

7    requests for <u>public</u> injunctive relief." *Ajzenman v. Office of Comm'r of Baseball*, 2020 WL

8    6037140, at *6 (C.D. Cal. Sept. 14, 2020) (emphasis in original).

9    **B.    BiT's Claim Under The UCL's Unfair Prong Fails**

10   BiT's claim under the UCL's unfair prong fails for much the same reasons as its antitrust

11   claims. Here, the word "unfair" means "conduct that threatens an incipient violation of an antitrust

12   law, or violates the policy or spirit of one of those laws because its effects are comparable to or

13   the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-*

14   *Tech Commc'ns, Inc. v. L.A. Cellular Telephone Co.*, 20 Cal. 4th 163, 186-87 (1999). Thus, a

15   supposed competitor's claim under the UCL's "unfair" prong must hew closely to "cognizable

16   antitrust evils." *People's Choice Wireless, Inc. v. Verizon Wireless*, 131 Cal. App. 4th 656, 668

17   (2005). A UCL plaintiff who cannot state an antitrust claim must identify an "unusual aspect of

18   the alleged conduct that would make that conduct something that violates the 'policy and spirit' of

19   the antitrust laws without violating the actual laws themselves." *Creative Mobile Techs., LLC v.*

20   *Flywheel Software, Inc.*, 2017 WL 679496, at *6 (N.D. Cal. Feb. 21, 2017). BiT fails to do so.

21   The introduction of cbBTC promoted competition and could not threaten an incipient

22   violation of the antitrust laws or "otherwise significantly threaten[] or harm[] competition." *Cel-*

23   *Tech*, 20 Cal. 4th at 186-87. Similarly, BiT has not alleged that the competitive effect of Coinbase's

24   statements about wBTC—even assuming BiT alleged such effects at all—was more than de

25   minimis, so its UCL unfairness claim based on this conduct likewise fails. *Id.*

26   Additionally, the California Court of Appeal has held that "the mere refusal to deal does

27   not violate the spirit or policy of antitrust law." *People's Choice Wireless*, 131 Cal. App. 4th at

28   667; *Epic*, 67 F.4th at 1001. Instead, a plaintiff alleging a refusal to deal under the UCL must

establish that (1) the defendant has committed "an abuse of monopoly power in a relevant market" and (2) an "exception" to the "sacrosanct" right to refuse to deal applies. *People's Choice Wireless*, 131 Cal. App. 4th at 667. BiT has not done so and the claim accordingly fails. *See supra* pp.6-7, 11-15.

If BiT claims that it is a quasi-customer of Coinbase's exchange and its unfairness claim should be evaluated under the "balancing" test, *see* Compl. ¶132, that claim fails too. The balancing test requires the Court to weigh "the utility of the defendant's conduct against the gravity of the harm" to consumers. *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010). BiT has not plausibly alleged any consumer harm. The only fact about market impact BiT alleges is that the supply of wBTC decreased. Compl. ¶61. That does not show consumer harm— it shows consumers freely exiting their wBTC positions. There are no factual allegations supporting the claim that users were forced to do so, or that the wBTC remaining in circulation somehow lost value, particularly in view of the fact that wBTC's value is pegged to Bitcoin's by design. *See id.* ¶29 (wBTC "very closely mirror[s] the price of the underlying" Bitcoin).

### C.    BiT's Claim Under The UCL's Unlawful Prong Fails

BiT's failure to state a claim under either the Sherman Act or the Lanham Act, *see supra* pp.4-18, means that its claims under the UCL's unlawful prong predicated on violations of those statutes fail as well. Compl. ¶121.

BiT's UCL claim based on the FTC Act fares no better. BiT cannot escape its failure to state a claim under the UCL's unfair prong by shoehorning a claim based on the FTC Act's nearly identical unfairness standard into the UCL's unlawful prong. As *Cel-Tech* explains, the FTC Act and the UCL are close parallels. 20 Cal. 4th at 185 ("In view of the similarity of language and obvious identity of purpose of the two statutes, decisions of the federal court on the subject are more than ordinarily persuasive."). *Cel-Tech*'s limits on "unfairness" claims come directly from case law interpreting the FTC Act. For the same reasons the Complaint fails the UCL's unfairness standard, it likewise fails the FTC Act's nearly identical standard. A claim that cannot satisfy the UCL's "unfair" prong because it is vague does not suddenly become concrete and cognizable when accompanied by a citation to the FTC Act's materially identical "unfair" standard.

1    Allowing such a claim would judicially expand the FTC Act far beyond Congressional

2 intent. Where the FTC Act's unfairness prong reaches beyond express violations of the antitrust

3 laws, it does so *only* because the FTC—an expert agency—is charged with adjudicating those

4 claims in the first instance and deciding the proper contours of "unfair" activity. Deciding to "label

5 a practice 'unfair'" is "a determination of policy or judgment which the agency alone is authorized

6 to make" in its administrative forum. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 249 (1972);

7 *Carlson v. Coca-Cola Co.*, 483 F.2d 279, 280 (9th Cir. 1973) ("The protection against unfair trade

8 practices afforded by the Act vests initial remedial power solely in the Federal Trade

9 Commission."). There is no private cause of action under the FTC Act, and BiT "can't use

10 California law to engineer one" here. *O'Donnell v. Bank of Am., N.A.*, 504 F. App'x 566, 568 (9th

11 Cir. 2013). Given the FTC's exclusive role in defining the FTC Act's scope, courts have repeatedly

12 rejected attempts to assert a Section 5 violation "as a predicate for a UCL claim." *E.g.*, *Quick*

13 *Dispense, Inc. v. Vitality Foodservice, Inc.*, 2024 WL 2925589, at *13 (C.D. Cal. June 4, 2024).

14    Even if BiT could bring such a claim under the UCL, it has not alleged a predicate FTC

15 Act violation. The substantive scope of Section 5's prohibition on "unfair methods of competition"

16 is materially identical to the UCL's: it includes "violations of the Sherman Act," *FTC v. Cement*

17 *Institute*, 333 U.S. 683, 691 (1948), "incipient violations of [the Sherman Act], and conduct which,

18 although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to

19 their spirit," *E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 136-37 (2d Cir. 1984).

20    Coinbase's introduction of cbBTC was not a violation of the FTC Act. Section 5 does not

21 reach conduct that is affirmatively permitted or encouraged by the antitrust laws, which the

22 introduction of a competing product unquestionably is. *See Matter of Gen. Foods Corp.*, 103

23 F.T.C. 204 (1984) ("While Section 5 may empower the Commission to pursue those activities

24 which offend the 'basic policies' of the antitrust laws, we do not believe that power should be used

25 to reshape those policies when they have been clearly expressed and circumscribed."); *Foremost*

26 *Pro Color*, 703 F.2d at 546. Nor could Coinbase's public statements about wBTC violate the FTC

27 Act. Section 5, like the Sherman Act, requires some showing of harm to competition. *See Boise*

28 *Cascade Corp. v. FTC*, 637 F.2d 573, 577 (9th Cir. 1980); *E.I. du Pont*, 729 F.2d at 142. As

1   explained, BiT has failed to allege that this conduct harmed competition.

2       Coinbase's delisting decision cannot violate Section 5 either. It is long "settled law" that a

3   firm does not violate the FTC Act simply by choosing with whom it will do business. *See W. Sugar*

4   *Refin. Co. v. FTC*, 275 F. 725, 733 (9th Cir. 1921) ("the individual dealer may … refuse to deal

5   with a proposed customer who he thinks is acting unfairly and is trying to undermine his trade");

6   *E.I. du Pont*, 729 F.2d at 138 (even a monopolist, "'as long as he has no purpose to restrain

7   competition or to enhance or expand his monopoly, and does not act coercively, retains [the right

8   to trade with whom he wishes]'" (alteration in original)). Coinbase cannot have violated Section 5

9   by declining to do business with BiT and Justin Sun.

10       **D.    BiT's Claim Under The UCL's Fraudulent Prong Fails**

11       To state a claim under the UCL's fraudulent prong, BiT needed to allege that "members of

12   the public are likely deceived" by Coinbase's actions. *Nat'l Rural Telecommc'ns Co-op. v.*

13   *DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1077 (C.D. Cal. 2003). And it needed to meet the

14   heightened pleading standards of Rule 9 in doing so. *See Kearns v. Ford Motor Co.*, 567 F.3d

15   1120, 1125 (9th Cir. 2009). BiT comes nowhere close. As explained, BiT has not plausibly alleged

16   that any of Coinbase's public statements about wBTC were false, *see supra* p.9, meaning that BiT

17   must proceed under its theory that Coinbase deceptively omitted information about the reasons for

18   its delisting decision. *See* Compl. ¶¶137-38. The Complaint fails to explain why Coinbase had a

19   duty to disclose that information. Failing "to disclose a fact one has no affirmative duty to disclose

20   is [not] likely to deceive anyone within the meaning of the [fraudulent prong of the] UCL."

21   *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 865 (9th Cir. 2018). The proffered bases for Coinbase's

22   supposed duty are either entirely conclusory (the assertion that Coinbase is a "fiduciary" of users

23   on its exchange), circular (the allegation that Coinbase "had a duty to disclose because" it "never

24   provided an explanation for the delisting"), or irrelevant to the existence of a duty (that Coinbase's

25   delisting was supposedly "part of an effort to crush the competing wBTC product"). Compl. ¶137.

26   To be deceived, "'members of the public must have had an expectation or an assumption about'

27   the matter in question." *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 838 (2006)

28   (quoting *Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (2006)). Aside from the

fact that Coinbase applied its listing criteria and delisted wBTC—which, again, BiT has failed to plausibly allege were false—BiT alleges no such expectation or assumption, nor "any facts showing [Coinbase] had 'made any … misrepresentation … regarding'" wBTC. *Id.* BiT's claim under the UCL's fraudulent prong thus fails.

## IV.    BiT's Tortious Interference Claims Fail (Counts VI-VII)

BiT's intentional and negligent interference claims fail for multiple reasons. ***First***, both claims require that BiT allege it suffered economic harm. *First Advantage Background Servs. Corp. v. Priv. Eyes, Inc.*, 569 F. Supp. 2d 929, 934 (N.D. Cal. 2008) (intentional interference); *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 143 F. Supp. 3d 982, 1013 (N.D. Cal. 2015) (negligent interference). As explained, BiT has not done so. *See supra* pp.15-16.

***Second***, BiT failed to properly identify the relationship with which Coinbase supposedly interfered. An interference claim requires "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff." *First Advantage*, 569 F. Supp. 2d at 934; *United Tactical*, 143 F. Supp. 3d at 1013. That necessitates "factual allegations about … specific economic relationships with identifiable third parties." *Buxton v. Eagle Test Sys., Inc.*, 2010 WL 1240749, at *2 (N.D. Cal. Mar. 26, 2010). BiT may not "merely state[] in a conclusory manner that [it] 'has been harmed because its ongoing business and economic relationships with [c]ustomers have been disrupted," without, for example, alleging "that it lost a contract [or] that a negotiation with a [c]ustomer failed." *Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008). BiT's complaint alleges only that it had economic relationships with "third parties [that] mint and burn wBTC" and "third party approved merchants who interact with the end-users of wBTC." Compl. ¶143. This lacks the required specificity; "'merely referring to customers in general is not sufficient.'" *Vascular Imaging Pros., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1013 (S.D. Cal. 2019). Because BiT makes no attempt to identify third parties whose relationships were supposedly impacted by Coinbase's conduct, BiT "failed to satisfy the substantive pleading requirements" for an interference claim. *R Power Biofuels, LLC v. Chemex LLC*, 2016 WL 6663002, at *17 (N.D. Cal. Nov. 11, 2016).

***Third***, BiT has failed to plead that Coinbase "engaged in conduct that was wrongful by

some legal measure other than the fact of interference itself." *Marin Tug & Barge, Inc. v. Westport Petrol., Inc.*, 271 F.3d 825, 831 (9th Cir. 2001) (citing *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal. 4th 376, 380 n.1 & 392-93 (1995)). An "act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1159 (2003). Because BiT's other claims fail, it fails to satisfy this element too.

**Fourth**, with respect to negligent interference, BiT has failed to establish that Coinbase owed it any duty of care. *See United Tactical*, 143 F. Supp. 3d at 1013. BiT's principal allegations purporting to establish a duty of care cast Coinbase as "morally blameworthy" and claim that the imposition of such a duty is necessary to "prevent[] future harm" by baselessly casting Coinbase as "a goliath in the cryptocurrency injury [sic]" engaged in "Microsoft-style kneecapping of its competitors." Compl. ¶¶152-53. These conclusory (and puzzling) assertions do no more than mimic BiT's antitrust claims, for which BiT has failed to allege market power or actionable exclusionary conduct. They fail to establish a common law duty of care for the same reasons. *See Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 582 (N.D. Cal. 1999) (a party "cannot be held liable for negligent interference when it was merely engaging in legitimate business").

## V.    BiT's Trade Libel Claim Fails (Count VIII)

BiT's trade libel claim also fails for multiple, independent reasons. **First**, "[t]o constitute trade libel, a statement must be false." *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1010 (2001). BiT has failed to show that any of the statements it challenges were false. *See supra* p.9.

**Second**, "statements of opinion alone will not support a cause of action for trade libel." *Piping Rock Partners, Inc. v. David Lerner Assocs.*, 946 F. Supp. 2d 957, 981 (N.D. Cal. 2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015). Because BiT's claim turns on statements of opinion—or, to be more precise, *implied* statements of opinion—it must be dismissed. *Supra* p.17.

**Third**, BiT has not plausibly alleged it suffered special damages. An "essential element" of trade libel is "that the plaintiff suffered direct financial harm because someone else acted in reliance on the defendant's statement." *Muddy Waters, LLC v. Super. Ct.*, 62 Cal. App. 5th 905,

925 (2021). Under Rule 9, "the pleader must state special damages with specificity." *Piping Rock*, 946 F. Supp. 2d at 981. A plaintiff "may not rely on a general decline in business arising from the [alleged] falsehood, and must instead identify particular customers and transactions of which it was deprived as a result of the libel." *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1154-55 (N.D. Cal. 2019) (alteration in original) (quoting *Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 109 (2004)). Here, the Complaint points only to a supposed generalized decrease in the supply of wBTC—which, as explained, does not show a financial loss to BiT at all, *see supra* pp.15-16—and makes no attempt to identify customers or transactions it supposedly lost. *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1047 (C.D. Cal. 1998) (a "bare allegation of the amount of pecuniary loss alleged is insufficient" for trade libel).

*Fourth*, BiT's claim "rests on the alleged falsity of [Coinbase]'s overall message rather than its individual statements." *Films of Distinction, Inc. v. Allegro Film Prods., Inc.*, 12 F. Supp. 2d 1068, 1081 n.8 (C.D. Cal. 1998). But for a trade libel claim to proceed, "'[t]he defamatory character of the language must be apparent from the words themselves.'" *Id.* (quoting *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 822 (9th Cir. 1995)). Such a claim cannot be based on the purported falsity of some "implied message." *Id.*; *see also Nestlé USA, Inc. v. Crest Foods, Inc.*, 2019 WL 2619635, at *9 (C.D. Cal. Mar. 8, 2019) (dismissing claim because alleged communications at most "presented subtle, implied comments that were not clearly disparaging"). Because BiT itself concedes that its claim turns on "*implied* false assertions of fact," rather than the falsity of the words themselves, that claim must be dismissed. Compl. ¶160 (emphasis added).

## VI.    AMENDMENT WOULD BE FUTILE

BiT has known of its claims' principal defects since Coinbase opposed BiT's TRO motion, yet made no move to cure them. That is because they are incurable. BiT has alleged it is the dominant player in wrapped Bitcoin; it cannot plead the opposite to salvage an antitrust or UCL claim. Nor can BiT plead around the legal principle that no law requires Coinbase to continue listing wBTC on its exchange or the sworn declarations confirming that Coinbase's statements related to the delisting announcement were truthful and make BiT's conclusory contrary allegations implausible. The Court should grant Coinbase's motion to dismiss with prejudice.

Dated: January 21, 2025                          Respectfully submitted,

                                                 By: */s/ Sonal N. Mehta*
                                                 SONAL N. MEHTA

                                                 *Attorney for Defendant Coinbase Global, Inc.*

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on this 21st day of January, 2025, I electronically transmitted the

3  foregoing document to the Clerk's Office using the CM/ECF System, which will send notification

4  of such filing to all counsel of record.

5

6                                        By:    */s/ Sonal N. Mehta*

7                                               Sonal N. Mehta

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28