# Exhibit A

**Policy Statement Regarding the Scope of Unfair Methods of Competition
Under Section 5 of the Federal Trade Commission Act
Commission File No. P221202**

**November 10, 2022**

Section 5 of the Federal Trade Commission Act (FTC Act) prohibits "unfair methods of competition in or affecting commerce."[1] On July 1, 2021, the Federal Trade Commission (FTC) rescinded its 2015 Statement of Enforcement Principles Regarding "Unfair Methods of Competition" under Section 5 of the FTC Act.[2] This statement supersedes all prior FTC policy statements and advisory guidance on the scope and meaning of unfair methods of competition under Section 5 of the FTC Act.

### I.  Introduction

Pursuant to the FTC's analysis of the decided cases and prior enforcement actions, this policy statement describes the key principles of general applicability concerning whether conduct is an unfair method of competition. Consistent with the Supreme Court's interpretation of the FTC Act in at least twelve decisions, this statement makes clear that Section 5 reaches beyond the Sherman and Clayton Acts to encompass various types of unfair conduct that tend to negatively affect competitive conditions.[3]

---

[1] Pub. L. No. 63-203, 38 Stat. 717; 15 U.S.C. § 45(a)(1).

[2] Fed. Trade Comm'n, Statement of the Commission on the Withdrawal of the Statement of Enforcement Principles Regarding "Unfair Methods of Competition" Under Section 5 of the FTC Act (July 9, 2021), https://www.ftc.gov/legal-library/browse/statement-commission-withdrawal-statement-enforcement-principles-regarding-unfair-methods.

[3] *See, e.g. Fed. Trade Comm'n v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986) (holding that "[t]he standard of "unfairness" under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws"); *Fed. Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233, 242 (1972) (holding that "the Commission has broad powers to declare trade practices unfair."); *Fed. Trade Comm'n v. Texaco*, 393 U.S. 223, 262 (1968) (holding that "[i]n large measure the task of defining "unfair methods of competition" was left to the [FTC]. . . and that the legislative history shows that Congress concluded that the best check on unfair competition would be [a practical and expert administrative body] . . . [that applies] the rule enacted by Congress to particular business situations"); *Fed. Trade Comm'n v. Brown Shoe*, 384 U.S. 316, 321 (1966) (holding that the FTC "has broad powers to declare trade practices unfair[,] particularly . . . with regard to trade practices which conflict with the basic policies of the Sherman and Clayton Acts"); *Atlantic Refining Co. v. Fed. Trade Comm'n,* 381 U.S. 357, 369 (1965) (holding that all that is necessary is to discover conduct that runs counter to the public policy declared in the Act. . ." and that "there are many unfair methods of competition that do not assume the proportions of antitrust violations"); *Fed. Trade Comm'n v. Colgate-Palmolive et al.*, 380 U.S. 377, 384-85 (1965) (noting that the proscriptions in section 5 are flexible); *PAN AM v. United States*, 371 U.S. 296, 306 -308 (1963) ("[Section 5] was designed to bolster and strengthen antitrust enforcement[,] and the definitions are not limited to precise practices that can readily be catalogued. They take their meaning from the facts of each case and the impact of particular practices on competition and monopoly"); *Fed. Trade Comm'n v. Nat'l Lead Co*., 352 U.S. 419, 428-29 (1957) (affirming past rulings finding that the commission is clothed with "wide discretion in. . . [bringing] an end to the unfair practices found to exist[;]. . . [is] 'the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed[;] . . .  has wide latitude for

This statement is intended to assist the public, business community, and antitrust practitioners by laying out the key general principles that apply to whether business practices constitute unfair methods of competition under Section 5 of the FTC Act. In considering whether conduct, either in a specific instance or as a category, constitutes an unfair method of competition, the Commission will directly consult applicable law. This statement does not pertain to any other statutory provision within the FTC's jurisdiction.[4]

##    II.   Background and Legislative History of Section 5 of the FTC Act

##    A.   The text, structure, and legislative history of Section 5 show that its mandate extends beyond the Sherman and Clayton Acts and reaches unfair conduct with a tendency to negatively affect competitive conditions

As the Commission explained in its July 2021 withdrawal of the previous policy statement, the text, structure, and history of Section 5 reaches more broadly than the antitrust laws.[5] Congress passed the FTC Act to push back against the judiciary's adoption and use of the open-ended rule of reason for analyzing Sherman Act claims,[6] which it feared would deliver inconsistent and unpredictable results and "substitute the court in the place of Congress."[7]

---

judgment and[;]. . . [that] to attain the objectives Congress envisioned, [the FTC] cannot be required to confine its road block to the narrow lane the transgressor has traveled"); *American Airlines, Inc. v. North American Airlines, Inc.*, 351 U.S. 79, 85 (1956) (finding that "[u]nfair or deceptive practices or unfair methods of competition". . . are broader concepts than the common-law idea of unfair competition"); *Fed. Trade Comm'n v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 394-95 (1953) (noting that "Congress advisedly left the concept [of unfair methods of competition] flexible . . . [and] designed it to supplement and bolster the Sherman Act and the Clayton Act[,] [so as] to stop . . . acts and practices [in their incipiency] which, when full blown, would violate those Acts[,]. . . . as well as to condemn as "unfair methods of competition" existing violations of them"); *Fed. Trade Comm'n v. Cement Institute*, 333 U.S. 683, 708 (1948) (holding that conduct that falls short of violating the Sherman Act may violate Section 5); *Fed. Trade Comm'n v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 310 (1934) (finding that unfair methods of competition not limited to those "which are forbidden at common law or which are likely to grow into violations of the Sherman Act").

[4] This statement does not address the Commission's authority to prevent unfair or deceptive acts or practices in 15 U.S.C. §§ 45(a),(n). This statement is limited to the scope of standalone unfair methods of competition Section 5 violations. Such standalone unfair methods of competition Section 5 claims may be brought under one or more of the theories set forth in this policy statement and combined with claims under other parts of the FTC Act or other statutes enforced by the Commission as warranted.

This statement does not address the language of 15 U.S.C. § 45(b), which states that the Commission will act when it has reason to believe such action is in the public interest. *See generally Hills Bros. v. Fed. Trade Comm'n*, 9 F.2d 481, 483–84 (9th Cir. 1926) ("the interest of the public, like the question whether the commission has reason to believe that any person, partnership, or corporation has been or is using any unfair method of competition in commerce, is committed to the discretion of the commission, is to be determined by the commission before proceedings are instituted, and is not thereafter a subject of controversy either before the commission or before the court, except in so far as the question of public interest is necessarily involved in the merits of the case, and, if the commission finds that the method of competition in question is prohibited by the act, no other or further finding on the question of public interest is required."); *see also Parke, Austin & Lipscomb, Inc., et al. v. Fed. Trade Comm'n*, 142 F.2d 437, 441 (2d Cir. 1944).

[5] Statement of Commission, *supra* note 2.
[6] *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 60 (1911).
[7] S. REP. NO. 62-1326, at 10 (1913) ("Cummins Report"). Senator Francis Newlands, one of the chief sponsors of the bill that became the FTC Act, expressed concern that *Standard Oil* left antitrust regulation "to the varying judgments of different courts." 47 CONG. REC. 1225 (1911). After analyzing a series of Supreme Court decisions

Congress therefore determined it would "establish[ ] a commission for the better administration of the law and to aid in its enforcement."[8] This led to the creation of the FTC in 1914 and to the enactment of a prohibition of "unfair methods of competition," a new standard in federal competition law.[9]

In enacting Section 5, Congress's aim was to create a new prohibition broader than, and different from, the Sherman and Clayton Acts. Congress purposely introduced the phrase, "unfair methods of competition," in the FTC Act to distinguish the FTC's authority from the definition of "unfair competition" at common law.[10] It also made clear that Section 5 was designed to extend beyond the reach of the antitrust laws.[11] Concluding that a static definition would soon become outdated,[12] Congress wanted to give the Commission flexibility to adapt to changing circumstances.[13]

The key function of the FTC in applying its mandate to combat unfair methods of competition, according to Congress, would be to identify *unfair* forms of competition.[14] The legislative record demonstrates that Congress enacted Section 5 to protect against various types of unfair or oppressive conduct in the marketplace.[15] During debates over the meaning of unfair

---

interpreting the Sherman Act, a Senate committee feared that the rule of reason resulted in a situation where, "in each instance it [would be] for the court to determine whether the established restraint of trade is a due restraint or an undue restraint." Cummins Report, at 10. It lamented that the rule of reason had made it "impossible to predict with any certainty" whether courts would condemn the many "practices that seriously interfere with competition" and found it inconceivable that "the courts . . . be permitted to test each restraint of trade by the economic standard which the individual members of the court may happen to approve." *Id*. at 10, 12. The committee believed this would result in a loss of confidence by the public in the courts and eventually lead to a "repudiat[ion] [of] the fundamental principles of representative government." *Id*. at 11.

[8] *Id*. at 12.
[9] Federal Trade Commission Act of 1914, Pub. L. No. 63-203, 38 Stat. 717 (codified as amended at 15 U.S.C. § 41–58). *See* 51 CONG. REC. 12146 (1914) (statement of Sen. Hollis) ("The Sherman Act is adequate for the abolition of monopoly; it is, however, but imperfectly adequate for the regulation of competition. The present Congress is charged with the duty of supplying the defect in the law").
[10] *See* 51 CONG. REC. 12936 (1914) (statement of Sen. Reed) ("It is my opinion that if we employ the term "unfair competition" as it is employed in this bill, without adding anything to it, the courts will adopt as the meaning of Congress that meaning which has been affixed to the term by all of the law dictionaries and by a great many legal authorities."). *See also* 51 CONG. REC. 12814 (1914) (statement of Sen. George Sutherland).
[11] *See E.I. du Pont de Nemours v. Fed. Trade Comm'n* (*Ethyl*), 729 F.2d 128, 136 (2d Cir. 1984) ("Congress' aim was to protect society against oppressive anti-competitive conduct and thus assure that the conduct prohibited by the Sherman and Clayton Acts would be supplemented as necessary and any interstices filled") (citing H.R. REP. NO. 63-1142, at 19 (1914) (Conf. Rep.)); 51 CONG. REC. 11236 (1914) (statement of Sen. Cummins) (stating that the purpose of Section 5 was "to make some things punishable, to prevent some things, that cannot be punished or prevented under the antitrust law").
[12] H.R. REP. NO. 63-1142, at 19.
[13] *See id.* at 18–19.
[14] *Id*. at 19.
[15] *Id*. at 2 (declaring "unfair and oppressive competition to be unlawful"); S. REP. NO. 63-597, at 17 (1914) (citing a previous version of the bill, S. 2941, which would allow the commission to revoke the registration of any corporation using "materially unfair or oppressive methods of competition"); 51 CONG. REC. 8861 (1914) (statement of Rep. Hinebaugh) (seeking to prevent "unfair or oppressive competition" and proceeding to list examples); *id*. at 8979 (statement of Rep. Murdock) (seeking to protect to protect "smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"); *id*. at 13117 (statement of Sen. Reed) ("intended to reach unfair, dishonest, crooked, oppressive, coercive acts. It is not intended to cover mere mistakes").

3

methods of competition, members of Congress had no difficulty identifying concrete examples.[16] One congressman noted that when it comes to unfair methods of competition, "[t]here is that in the common sense of fairness and right dealing which indicates plainly the distinction between close bargaining and oppression."[17] Both the House and Senate also expressed a common understanding that unfair methods of competition encompassed conduct that tended to undermine "competitive conditions" in the marketplace.[18]

Congress evinced a clear aim that "unfair methods of competition" need not require a showing of current anticompetitive harm or anticompetitive intent in every case. First, the legislative history is replete with statements to the effect that Congress wanted the FTC to stop monopolies in their "incipiency."[19] Requiring the FTC to show current anticompetitive effects,

---

[16] For instance, a Senate report referenced practices "such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition." S. REP. NO. 63-597, at 13. In considering what conduct should be prohibited, the House distinguished between "artificial bases" of monopolistic power and "natural bases." *See* H.R. REP. NO. 63-533, at 23–25. The House viewed artificial bases of monopolistic power to include, for instance, the acceptance of rates or terms of service from common carriers not granted to other shippers; price discrimination not justified by differences in cost or distribution; procuring the secrets of competitors by bribery or any illegal means; procuring conduct on the part of employees of competitors inconsistent with their duties to their employers; making oppressive exclusive contracts; the maintenance of secret subsidiaries or secretly controlled agencies held out as independent; the destruction or material lessening of competition through the use of interlocking directorates; and the charging of exorbitant prices where the seller has a substantial monopoly. *Id*. Natural bases included control of natural resources, transportation facilities, financial resources, or any other economic condition inherent in the character of the industry, such as patent rights. *Id*. *See also* 51 CONG. REC. 11084–86 (1914) (statement of Sen. Newlands) (discussing jurisprudence on unfair competition); *id*. at 14928-14931 (statement of Rep. Covington) (discussing jurisprudence on unfair competition); *id*. at 11108 (statement of Sen. Newlands) (providing specific examples of unfair competition, such as local price cutting and organizing "bogus independent concerns . . . for the purpose of entering the field of the adversary and cutting prices with a view to his destruction[,]" among other things); *id*. at 11230 (statement of Sen. Robinson) (providing examples of unfair competition).

[17] 51 CONG. REC. 8979 (statement of Sen. Murdock).

[18] *See* S. REP. NO. 1326, at 3–4 (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"); *id.* at 2, 3-4, 11, & 13; S. REP. NO. 63-597, at 10 ("a commission is a necessary adjunct to the preservation of competition and to the practical enforcement of the law"); H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) ("The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce."). The FTC Act's legislative history makes it clear that Congress intended the statute to protect a broad array of market participants including workers and rival businesses. *See* 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); *id*. (statement of Sen. White) ("one of the main objects of this legislation is to prevent a rival in business from using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed"); 51 CONG. REC. 8979 (1914) (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals"). The goals of "protecting consumers against the high prices and [guarding] the interests of employees" were expressed by the House. *See* H.R. REP. NO. 533, 63d Cong., 2d Sess. 14 (1914) (quoting from the Preliminary Report of the Industrial Commission, submitted to Congress in 1900). *See also* 51 CONG. REC. 8854 (1914) (statement of Rep. Morgan) (among goals of Section 5 "to secure labor the highest wage, the largest amount of employment under the most favorable conditions and circumstances").

[19] H.R. REP. NO. 63-1142, at 19 ("[t]he most certain way to stop monopoly at the threshold is to prevent unfair competition"); 51 CONG. REC. 13118 (1914) (statement of Sen. Reed) ("the same class of conspiracies exactly as the Sherman Antitrust Act deals with, except that we propose to strike those acts in their incipiency instead of after

4

which are typically seen only after the monopoly has passed the "embryonic" stage, would undercut Congress's hope to prohibit unfair business practices prior to, or near, monopoly power.[20] In addition, many of the practices listed by Congress as patently unfair do not automatically carry with them measurable effects.[21] Second, in considering and rejecting a definition of "unfair methods of competition" that would have required a showing of intent, legislators noted that such a requirement would inappropriately restrict the new provision to the metes and bounds of the antitrust laws and place an undue burden on the Commission in proving its cases.[22]

Congress struck an intentional balance when it enacted the FTC Act. It allowed the Commission to proceed against a broader range of anticompetitive conduct than can be reached under the Clayton and Sherman Acts, but it did not establish a private right of action under Section 5, and it limited the preclusive effects of the FTC's enforcement actions in private antitrust cases under the Sherman and Clayton Acts.[23]

---

they have been actually worked out into a complete system of monopoly or restraint of trade"); *id*. at 14941 (statement of Rep. Stevens) (noting that section five "[would] give to this commission the power of preventing in their conception and in their beginning some of these unfair processes in competition which have been the chief source of monopoly"); *id*. at 12030 (statement of Sen. Newlands) (remarking that a commission would "check monopoly in the embryo"); *id*. at 11455 (statement of Sen. Cummins) (stating that the new law would "seize the offender before his ravages have gone to the length necessary in order to bring him within the law that we already have"); *id*. at 11087 (statement of Sen. Newlands) (citing the Cummins Report, which anticipated that a commission "could be vastly more effectual than through the courts alone, which in most cases will take no cognizance of violations of the law for months or years after the violation occurred, and when the difficulty of awarding reparation for the wrong is almost insurmountable").

[20] 51 CONG. REC. 13118 (statement of Sen. Reed) (declaring that Congress intended "to do something that will strike a death blow to monopoly. . . to arrest it in its infancy . . . [and] to strike those acts in their incipiency instead of after they have been actually worked out into a complete system of monopoly or restraint of trade."); *id*. at 14927 (statement of Rep. Covington) ("the best and most, effective way to deal with the various practices of unfair or destructive competition which, if permitted to go on unchecked and uncontrolled, become potential for restraint of trade or monopoly"); *id*. at 14929 (statement of Rep. Covington) ("We are seeking . . . to deal, with those practices of unfair trade in their incipient stages which if left untrammeled and uncontrolled become the acts which constitute in their culmination restraint of trade and monopoly and the groundwork of the trusts which have menaced us industrially").

[21] 51 CONG. REC. 12217 (statement of Sen. Newlands) ("all you would have to prove would be an unfair method whose tendency was to stifle competition."); 51 CONG. REC. 13312 (statement of Sen. White) (stating that "one of the main objects of this legislation is to prevent a rival in business from using unfair competition to drive his competitor out of business and to prevent this before the business is destroyed" and that "the unfair acts and practices had to have the effect to destroy or unreasonably hinder the business of another would neutralize this useful feature of the enactment"); 51 CONG. REC. 13311 (statement of Sen. Cummins) ("if the effect is to restrain trade or to create a monopoly[,] we have a complete and perfect prohibition in the antitrust law"); 51 CONG. REC. 13312 (1914) (statement of Sen. Reed) ("it is not required to show restraint of trade or monopoly, but that the acts complained of hinder the business of another, or prohibit another from engaging in business, or restrain trade"); 51 CONG. REC. 8979 (statement of Rep. Murdock) (purpose of new Commission "is to protect the smaller, weaker business organizations from the oppressive and unfair competition of their more powerful rivals.").

[22] 51 CONG. REC. 13311 (1914) (statement of Sen. Cummins) ("[t]here can be unfair competition in which the public is interested without any intent as described in the amendment"); *id*. ("[i]f the effect is to restrain trade or to create a monopoly we have a complete and perfect prohibition in the antitrust law"); *id*. at 13312 (statement of Sen. White) ("but we will have to carry the additional burden of proving the specific intent . . . [t]he proof of the specific intent with which an act was done is, as all lawyers know difficult to make").

[23] Treble damages are not available under the FTC Act. Civil penalties and Section 19's monetary remedies are limited to unfair and deceptive acts or practices. *See* 15 U.S.C. § 45(m)(1)(A); 15 U.S.C. § 57b. A finding that

The Supreme Court has affirmed this same broad view of the scope of Section 5 on numerous occasions.[24] It has condemned coercive and otherwise facially unfair practices that have a tendency to stifle or impair competition.[25] The federal circuit courts have likewise consistently held that the FTC's authority extends not only to "the letter," but also to "the spirit" of the antitrust laws.[26]

### B. Congress created the FTC as an expert body charged with elucidating the meaning of Section 5

Congress was careful and deliberate when it created the FTC, an independent agency. The five Commissioners would serve for terms of seven years, which would "give them an opportunity to acquire the expertness" needed to determine what constitutes an unfair method of competition.[27] The Commission would provide guidance to the business community on the legality of business practices (including by issuing advisory opinions),[28] serve as an aid to the courts,[29] and act as an enforcer against unfair methods of competition.[30] Congress gave the Commission powers to conduct quasi-judicial hearings,[31] directly seek injunctive relief in federal court,[32] pursue investigations, prepare reports, and make rules.[33] To balance the Commission's powers, Congress created checks to ensure that the FTC would be accountable to it[34] and that the

---

conduct is an unfair method of competition under Section 5 is not given collateral estoppel effect in subsequent private antitrust actions. *Holloway v. Bristol-Myers Corp.*, 485 F.2d 986 (D.C. Cir. 1973) (holding that private litigants cannot sue for violations of the FTC Act). *See also* 51 CONG. REC. 13115 (1914) (statement of Sen. Newlands) ("I do not believe in the principle, of assessing threefold damages."); *id*. at 11317 (statement of Sen. McCumber) (moving to strike treble damages provision).
[24] *See supra*, note 3.
[25] *Texaco*, 393 U.S. at 225–26 (citing *Atlantic Refining Co.,* 381 U.S. at 376).
[26] *Ethyl*, 729 F.2d at 136–37 (citing *Sperry & Hutchinson*, 405 U.S. at 239); *Grand Union Co. v. Fed. Trade Comm'n,* 300 F.2d 92, 98–99 (2d Cir. 1962)). *Cf*., *Chuck's Feed & Seed Co. v. Ralston Purina Co*., 810 F.2d 1289, 1292–93 (4th Cir. 1987) (describing Section 5 "as a kind of penumbra around the federal antitrust statutes").
[27] S. REP. NO. 63-597 at 11. *See also id*. at 11 (anticipating that the Commission would "build up a comprehensive body of information for the use and advantage of the Government and the business world"); *id*. at 22 ("we want trained experts; we want precedents; we want a body of administrative law built up.").
[28] *See id*. at 6–7 (citing an address by President Wilson, stating that "the business men of the country . . . desire the advice, the definite guidance and information which can be supplied by an administrative body."); *id*. at 10 (anticipating that the Commission would "aid the business public.").
[29] *See* H.R. REP. NO. 63-533, at 8 (anticipating that the commission would use its investigatory powers in "aid of the courts.").
[30] S. REP. NO. 63-597, at 10 (anticipating that the Commission would have "sufficient power ancillary to the Department of Justice to aid materially and practically in the enforcement of the Sherman law and to aid the business public as well, and, incidentally, to build up a comprehensive body of information for the use and advantage of the Government and the business world"). *See also* H.R. REP. NO. 63-533, at 9.
[31] 15 U.S.C. § 45(b) (providing for adjudicatory hearings).
[32] 15 U.S.C. § 53(b).
[33] *Id*. § 46(a),(b) (authorizing the Commission to investigate corporations and require reports); *id*. § 46(g) (authorizing the Commission to "make rules and regulations for the purpose of carrying out the provisions of this subchapter"); *Nat'l Petroleum Refiners Ass'n v. Fed. Trade Comm'n*, 482 F.2d 672, 673 (D.C. Cir. 1973) (holding that "the Federal Trade Commission is authorized to promulgate rules defining the meaning of the statutory standards of the illegality the Commission is empowered to prevent").
[34] *See, e.g*., 15 U.S.C. § 46(d),(f),(h) (requiring reports to Congress); *Id*. § 57a(f)(7) (requiring annual reports to Congress); *Id*. § 57b-2(d)(1)(A) (providing for disclosure of protected information to Congress). Congress also holds

FTC's decisions would be reviewable by federal courts of appeal.[35] In the ensuing years, Congress has conducted vigorous oversight of the FTC and the courts have not hesitated to review Commission decisions.[36]

Congress intended for the FTC to be entitled to deference from the courts as an independent, expert agency.[37] Over the years, courts have consistently held that FTC determinations as to what practices constitute an unfair method of competition deserve "great weight,"[38] recognizing that the Commission is an expert agency, rather than "a carbon copy of the Department of Justice."[39]

Even when courts have rejected the Commission's factual conclusions, they have consistently reaffirmed the scope of its Section 5 authority.[40] For example, *Ethyl*, *Boise*, and *OAG* cited prior decisions of the Supreme Court that affirm the distinctive scope of Section 5,[41] but ultimately found that the particular facts at issue lacked evidence of unfairness, either "some indicia of oppressiveness"[42] or some evidence that the conduct tended to negatively affect the market.[43] All three appellate decisions reiterated the well-accepted principle that the Commission "is not confined to [the] letter" of the antitrust laws, and that "[i]t may bar incipient violations of

---

the FTC accountable though the budgetary, appointment, and oversight processes, and through numerous statutory enactments and amendments relating to the FTC's powers over the course of the hundred-plus years since the passage of the Federal Trade Commission Act.

[35] 15 U.S.C. § 45(b). Respondents in adjudicative proceedings may receive judicial review of the Commission's decision in their circuit of residence or any circuit where they committed the conduct underlying the alleged violation: an unusually expansive form of judicial oversight. *See, e.g.,* J. Thomas Rosch Commissioner, Fed. Trade Comm'n, Three Questions About Part Three: Administrative Proceedings at the FTC, Remarks Before the American Bar Association Section of Antitrust Law Fall Forum, Washington, D.C. 18 (Nov. 8, 2012), https://www.ftc.gov/sites/default/files/documents/public_statements/three-questions-about-part-three-administrative-proceedings-ftc/121108fallforum.pdf.

[36] *See* William E. Kovacic, *The Federal Trade Commission and Congressional Oversight of Antitrust Enforcement*, 17 TULSA L.J. 587, 623–27 (1982). *See also Ethyl*, 729 F.2d at 137; *Boise Cascade Corp. v. Fed. Trade Comm'n*, 637 F.2d 573, 581–82 (9th Cir. 1980); *Official Airline Guides, Inc. v. Fed. Trade Comm'n (OAG)*, 630 F.2d 920, 927 (2d Cir. 1980).

[37] S. REP. NO. 63-597 at 11, 22.

[38] *OAG*, 630 F.2d at 927 (quoting *Cement Inst*itute, 333 U.S. at 720); *Atlantic Refining Co.*, 381 U.S. at 368; *Fed. Trade Comm'n v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 314 (1934). *See also Ind. Fed'n of Dentists*, 476 U.S. at 455; *Texaco,* 393 U.S. at 226; *Motion Picture Advert. Serv. Co*., 344 U.S. at 396.

[39] *Fed. Trade Comm'n v. Dean Foods Co*., 384 U.S. 597, 618–19 (1966) (Fortas, J., dissenting). *See also* 51 CONG. REC. 12146 (statement of Sen. Henry Hollis) (observing that the DOJ would be able to focus on "the great task of prosecuting suits for the dissolution of monopolies, leaving to the trade commission the important service of policing competition, so as to protect small business men, keep an open field for new enterprise, and prevent the development of trusts").

[40] *See, e.g., Ethyl*, 729 F.2d at 128; *Boise*, 637 F.2d at 573; *OAG*, 630 F.2d at 920.

[41] *Boise,* 637 F.2d at 581; *Ethyl,* 729 F.2d at 136–37; *OAG,* 630 F.2d at 927.

[42] *Ethyl*, 729 F.2d at 139 (holding that "before business conduct in an oligopolistic industry may be labelled "unfair" within the meaning of § 5 a minimum standard demands that, absent a tacit agreement, at least some indicia of oppressiveness must exist"); *OAG,* 630 F.2d at 927–28 (finding that the monopolist had "no purpose to restrain competition or to enhance or expand his monopoly, and [did] not act coercively").

[43] *Boise*, 637 F.2d at 581 (finding that "without proof of anticompetitive effects" it could not assume that there was a "deliberate restraint on competition"). *Boise*'s applicability to cases outside the realm of delivered pricing is limited – the court's decision was driven by the Commission's inconsistent position on delivered pricing practices in prior statements, its shifting litigation strategy, and the Commission's failure to meets its own standard. *Id*. at 575–77, 582.

those statutes."[44] They also agreed that Section 5 reaches "conduct which, although not a violation of the letter of the antitrust laws, is close to a violation or is contrary to their spirit,"[45] and further recognized the importance of deference to the Commission where it acts against conduct that is unfair.[46]

### III.    Unfair Methods of Competition

Relying on the text, structure, legislative history of Section 5, precedent, and the FTC's experience applying the law, this statement describes the most significant general principles concerning whether conduct is an unfair method of competition under Section 5 of the FTC Act.[47]

#### 1.    The conduct must be a method of competition

Conduct must be a "method of competition" to violate Section 5. A method of competition is conduct undertaken by an actor in the marketplace—as opposed to merely a condition of the marketplace, not of the respondent's making, such as high concentration or barriers to entry.[48] The conduct must implicate competition, but the relationship can be indirect. For example, misuse of regulatory processes that can create or exploit impediments to competition (such as those related to licensing, patents, or standard setting) constitutes a method of competition.[49] Conversely, violations of generally applicable laws by themselves, such as environmental or tax laws, that merely give an actor a cost advantage would be unlikely to constitute a method of competition.

#### 2.    That is unfair

The method of competition must be unfair, meaning that the conduct goes beyond competition on the merits. Competition on the merits may include, for example, superior products or services, superior business acumen, truthful marketing and advertising practices,

---

[44] *Ethyl,* 729 F.2d at 136. *See also Boise,* 637 F.2d at 581.
[45] *Ethyl,* 729 F.2d at 136–37.
[46] *Ind. Fed'n Dentists*, 476 U.S. at 454.
[47] Whether the conduct violates accepted norms of unfairness derived from external standards expressed in statutes, common law, and regulations outside of the federal antitrust laws may also be relevant to whether the conduct is an unfair method competition. *See Ind. Fed'n of Dentists*, 476 U.S. at 454 ("The standard of "unfairness" under the FTC Act …encompass[es] not only practices that violate the Sherman Act and the other antitrust laws. . . but also practices that the Commission determines are against public policy for other reasons."). *See also Sperry & Hutchinson*, 405 U.S. at 244; *Motion Picture Advertising Co.,* 344 U.S. at 395; *R.F. Keppel & Bro.*, 291 U.S. at 313. This framework will not be used to analyze matters that constitute a violation of the letter of the antitrust laws.
[48] *See Ethyl*, 729 F.2d at139.
[49] Statement of the Federal Trade Commission Regarding Google's Search Practices, In the Matter of Google, Inc., FTC File No. 111-0163 (Jan. 3, 2013), https://www.ftc.gov/legal-library/browse/cases-proceedings/public-statements/statement-federal-trade-commission-regarding-googles-search-practices-matter-google-inc; Statement of the Federal Trade Commission In the Matter of Robert Bosch GmbH, FTC. File No. 121-0081 (Apr. 24. 2013); Analysis of Proposed Consent Decree to Aid in Public Comment: In the Matter of Negotiated Data Solutions, LLC, FTC File No. 051-0094 (Jan. 23, 2008); *In re Dell Computer Corp.*, 121 F.T.C. 616 (1996) (consent order). *Cf.*, *Walker Process Eqpt., Inc. v. Food Machinery Corp.*, 382 U.S. 172 (1965) (fraud on the patent office may constitute antitrust violation).


investment in research and development that leads to innovative outputs, or attracting employees and workers through the offering of better employment terms.[50]

There are two key criteria to consider when evaluating whether conduct goes beyond competition on the merits. First, the conduct may be coercive, exploitative, collusive, abusive, deceptive, predatory, or involve the use of economic power of a similar nature.[51] It may also be otherwise restrictive or exclusionary, depending on the circumstances, as discussed below. Second, the conduct must tend to negatively affect competitive conditions.[52] This may include, for example, conduct that tends to foreclose or impair the opportunities of market participants, reduce competition between rivals, limit choice, or otherwise harm consumers.

These two principles are weighed according to a sliding scale. Where the indicia of unfairness are clear, less may be necessary to show a tendency to negatively affect competitive conditions.[53] Even when conduct is not facially unfair, it may violate Section 5.[54] In these circumstances, more information about the nature of the commercial setting may be necessary to determine whether there is a tendency to negatively affect competitive conditions. The size, power, and purpose of the respondent may be relevant, as are the current and potential future effects of the conduct.

The second principle addresses the tendency of the conduct to negatively affect competitive conditions—whether by affecting consumers, workers, or other market participants. In crafting Section 5, Congress recognized that unfair methods of competition may take myriad forms and hence that different types of evidence can demonstrate a tendency to interfere with competitive conditions. Because the Section 5 analysis is purposely focused on incipient threats to competitive conditions,[55] this inquiry does not turn to whether the conduct directly caused

---

[50] *See generally U.S. v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) *(*distinguishing unlawful acquisition or maintenance of monopoly power from consequences of "a superior product, business acumen, or historic accident"); *U.S. v. Alum. Co. of America,* 148 F.2d 416, 430 (2d Cir. 1945) (distinguishing conduct based on "superior skill, foresight and industry.").

[51] *See e.g., Sperry & Hutchinson*, 405 U.S. at 905 (construing Section 5 to reach conduct shown to exploit consumers, citing *R.F. Keppel & Bro.*, 291 U.S. at 313); *Atlantic Refining Co.*, 381 U.S. at 369 (finding an unfair method of competition where the defendant "utilize[ed] … economic power in one market to curtail competition in another," which was "bolstered by actual threats and coercive practices")*; Texaco*, 393 U.S. at 228-29 (finding an unfair method of competition where the defendant used its "dominant economic power … in a manner which tended to foreclose competition")*; Ethyl, 729 F.2d* at 140 (finding that unfair methods of competition includes practices that are "collusive, coercive, predatory, restrictive, or deceitful" as well as "exclusionary").

[52] *See, e.g.,* S. REP. NO. 1326, at 3–4 (1913) (stating that "Congress should maintain the policy established by the anti-trust law" to "'maintain[ ] competitive conditions," and that "every possible effort to create and preserve competitive conditions should be made"). *Id.* at 2, 3-4, 11, & 13; *see also* H.R. Rep. No. 63-533, at 2 (1914) (reported by Rep. Covington) (The administration idea and the idea of business men generally, is for the preservation of proper competitive conditions in our great interstate commerce").

[53] *Ethyl*, 729 F.2d at 137-39.

[54] *Hastings Mfg. Co. v. Fed. Trade Comm'n*, 153 F.2d 253, 257 (6th Cir. 1946).

[55] *See generally supra* notes 11 & 18. *See also Fashion Originators' Guild Am. v. Fed. Trade Comm'n (FOGA)*, 312 U.S. 457, 466 (1941) (holding that it was not determinative that petitioners had not yet "achieved a complete monopoly"; rather it was "sufficient if it really tends to that end, and to deprive the public of the advantages which flow from free competition").

*actual* harm in the specific instance at issue.[56] Instead, the second part of the principle examines whether the respondent's conduct has a tendency to generate negative consequences; for instance, raising prices, reducing output, limiting choice, lowering quality, reducing innovation, impairing other market participants, or reducing the likelihood of potential or nascent competition. These consequences may arise when the conduct is examined in the aggregate along with the conduct of others engaging in the same or similar conduct,[57] or when the conduct is examined as part of the cumulative effect of a variety of different practices by the respondent.[58] Moreover, Section 5 does not require a separate showing of market power or market definition when the evidence indicates that such conduct tends to negatively affect competitive conditions.[59] Given the distinctive goals of Section 5, the inquiry will not focus on the "rule of reason" inquiries more common in cases under the Sherman Act, but will instead focus on stopping unfair methods of competition in their incipiency based on their tendency to harm competitive conditions.

### IV.     Potential Cognizable Justifications

In the event that conduct *prima facie* constitutes an unfair method of competition, liability normally ensues under Section 5 absent additional evidence. There is limited caselaw on what, if any, justifications may be cognizable in a standalone Section 5 unfair methods of competition case, and some courts have declined to consider justifications altogether.[60] In instances where a party chooses to assert justifications as an affirmative defense, the FTC can

---

[56] *See Sperry & Hutchinson*, 405 U.S. at 244 (explaining that "unfair competitive practices [are] not limited to those likely to have anticompetitive consequences after the manner of the antitrust laws"); *Ethyl*, 729 F.2d at 138 (finding that evidence of actual harm can be "a relevant factor in determining whether the challenged conduct is unfair" but is not required); *Boise*, 637 F.2d at 581-82. *In re Coca-Cola Co.*, 117 F.T.C. 795, 915 (1994) (rejecting argument that Section 5 violation requires showing "anticompetitive effects"). *See also supra* notes 19-21 and accompanying text (explaining that a showing of an actual anticompetitive injury is unnecessary to prove a violation of Section 5 because that section was designed to stop in their incipiency acts and practices that could lead to violations of the Sherman and Clayton Acts).

[57] *Motion Picture Advertising*, 344 U.S. at 395.

[58] Consent Order, Statement in Support of Consent, *In the Matter of Intel Corp.*, File No. 061-0247 (Dkt. 9341) (July 28, 2010); *The Vons Co.*, FTC Complaints and Order, 1987-1993 Transfer Binder, Trade Reg. Rep. (CCH) ¶ 23,200 (Aug. 7, 1992).

[59] *Atlantic Refining Co.,* 381 U.S. at 371 ("unnecessary to embark upon a full scale economic analysis of competitive effects."); *Texaco*, 393 U.S. at 230 (holding that "[i]t is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *L.G. Balfour Co. v. Fed. Trade Comm'n*, 442 F.2d 1, 19-20 (7th Cir. 1971) (No proof of foreclosure necessary in an exclusive dealing contract case under Section 5 (citing *Brown Shoe*).

[60] *Atlantic Refining Co.*, 381 U.S. at 371 (considering the defendant's argument that the distribution contracts at issue "may well provide Atlantic with an economical method of assuring efficient product distribution among its dealers" and nonetheless holding that the "Commission was clearly justified in refusing the participants an opportunity to offset these evils by a showing of economic benefit to themselves"); *Texaco*, 393 U.S. at 230 (following the same reasoning as *Atlantic Refining* and finding that the "anticompetitive tendencies of such system [were] clear")*; Balfour*, 442 F.2d at 15 (while relevant to consider the advantages of a trade practice on individual companies in the market, this cannot excuse an otherwise illegal business practice). For provisions of the antitrust laws where courts have not accepted justifications as part of the legal analysis, the Commission will similarly not accept justifications when these claims are pursued through Section 5.

draw on the Commission's long experience evaluating asserted justifications when enforcing Section 5, as well as its review of decided cases and past enforcement actions.[61]

First, it would be contrary to the text, meaning, and case law of Section 5 to justify facially unfair conduct on the grounds that the conduct provides the respondent with some pecuniary benefits.[62] At the same time, some practices may impact competitive conditions in a manner that both harms and benefits market participants other than the party; at times, the harms and benefits may redound to the same participants, and at times they may be disparately distributed – that is, a practice may harm some market participants while simultaneously providing legitimate benefits to others.

If parties in these cases choose to assert a justification, the subsequent inquiry would not be a net efficiencies test or a numerical cost-benefit analysis. The unfair methods of competition framework explicitly contemplates a variety of non-quantifiable harms, and justifications and purported benefits may be unquantifiable as well. The nature of the harm is highly relevant to the inquiry; the more facially unfair and injurious the harm, the less likely it is to be overcome by a countervailing justification of any kind.[63] In addition, whether harmed parties share in the purported benefits of the practice may be relevant to the inquiry.

Some well-established limitations on what defenses are permissible in an antitrust case apply in the Section 5 context as well. It is the party's burden to show that the asserted justification for the conduct is legally cognizable,[64] non-pretextual,[65] and that any restriction used to bring about the benefit is narrowly tailored to limit any adverse impact on competitive

---

[61] *See supra* § II (B) (discussing Congressional intent to create an expert Commission entitled to deference for its determinations).
[62] *Supra* note 51.
[63] *See FOGA*, 312 U.S. at 467-68 (finding the Commission did not need to hear evidence of justifications where "[t]he purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts").
[64] *See, e.g. Ind. Fed. Dentists*, 476 U.S. at 463 (making clear that justifications that run directly counter to the "basic policy of the Sherman Act," in this instance, limiting consumer access to relevant information because "an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise, and even dangerous, choices" are not cognizable); *id.* at 464 (affirming Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all). *See also Fed. Trade Comm'n v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 423-24 (1990); *NCAA v. Board of Regents*, 468 U.S. 85, 113-15 (1984); *United States v. Addyston Pipe Steel Co.* 85 F. 271 (6th Cir. 1898), *aff'd* 175 U.S. 211 (1899).
[65] Pretextual justifications include those that are not set forth in documents prior to, or contemporaneous with, the introduction of the conduct, or not plausibly based on the known facts. *See, e.g. Ind. Fed'n of Dentists*, 476 U.S. at 464 (affirming the Commission's finding that there was insufficient evidence that the restraint conferred the claimed benefit at all).  *See also United States v. Microsoft Corp.*, 253 F.3d 35, 62-64, 72, 74, 76-77 (D.C. Cir. 2001); *Eastman Kodak Co. v. Image Technical Tech. Svcs*, 504 U.S. 541, 472, 484-85 (1992); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608-10 (1985); *Texas Specialty Physicians v. Fed. Trade Comm'n*, 528 F.3d 346, 368-70 (5th Cir. 2008); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196-97 (3d Cir. 2005).  *See also* Fed. Trade Comm'n & U.S. Dep't of Justice, Antitrust Guidelines for Collaboration Among Competitors §3.36a (2000) (2000 Collaboration Guidelines) ("Efficiency claims are not considered if they are vague or speculative or otherwise cannot be verified by reasonable means").

11

conditions.[66] In addition, the asserted benefits must not be outside the market where the harm occurs.[67] Finally, it is the party's burden to show that, given all the circumstances, the asserted benefits outweigh the harm and are of the kind that courts have recognized as cognizable in standalone Section 5 cases.[68]

### V.   Historical Examples of Unfair Methods of Competition

For the purpose of providing further guidance, the FTC lists here a non-exclusive set of examples and citations of past decisions and consent decrees based on Section 5, and, where applicable, other antitrust laws, focusing on conduct that constitutes an incipient violation of the antitrust laws or that violates the spirit of the antitrust laws. These illustrative examples are drawn from case law and from FTC experience.

A non-exclusive set of examples of conduct that have been found to violate Section 5 include:

- Practices deemed to violate Sections 1 and 2 of the Sherman Act or the provisions of the Clayton Act, as amended (the antitrust laws).[69]

- Conduct deemed to be an incipient violation of the antitrust laws. Incipient violations include conduct by respondents who have not gained full-fledged monopoly or market power, or by conduct that has the tendency to ripen into violations of the antitrust laws.[70] Past examples of such use of Section 5 of the FTC Act include:

    o   invitations to collude,[71]

---

[66] *NCAA v. Alston*, 141 S. Ct. 2141, 2162-64 (2021); *Polygram Holding, Inc. v. Fed. Trade Comm'n*, 416 F.3d 29, 38 (D.C. Cir. 2005); 2000 Collaboration Guidelines § 3.36b.

[67] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 370-71 (1963); 2000 Collaboration Guidelines § 3.36a.

[68] At all times, the burden of persuasion would remain with the Commission in administrative proceedings pursuant to 5 U.S.C. §556(d).

[69] *Motion Picture Advertising*, 344 U.S. at 395 (conduct fell "within the prohibitions of the Sherman Act and is therefore an unfair method of competition within the meaning of s. 5(a)."); *Cement Institute*, 333 U.S. at 683; *FOGA*, 312 U.S. at 463; *Fed. Trade Comm'n v. Pacific States Paper Trade Ass'n*, 273 U.S. 52 (1926).

[70] *FOGA*, 312 U.S. at 466 (FTC may challenge combinations "not merely in their fruition, but also in their incipiency combinations which could lead to . . .trade restraints and practices deemed undesirable"); *Motion Picture Advertising*, 344 U.S. at 394-95 ("[i]t is also clear that the Federal Trade Commission Act was designed to supplement and bolster the Sherman and the Clayton Act. . . to stop in their incipiency acts and practices which, when full blown, would violate those Acts."); *Cement Institute*, 333 U.S. at 708; *Triangle Conduit & Cable Co. v. Fed. Trade Comm'n*, 168 F.2d 175, 181 (7th Cir. 1948).

[71] The Commission has challenged both public and private invitations to collude as unfair methods of competition. This type of conduct, if consummated would constitute a per se violation of the antitrust laws. Invitations to collude, even if unaccepted, represent both an incipient violation as well as a violation of the spirit of the antitrust laws within the meaning of the 2022 Section 5 policy statement. Under either theory, an invitation to collude constitutes an unfair method of competition under Section 5. *In Re Quality Trailer Products Corp.,* 115 F.T.C. 944 (1992) (consent); *In re Valassis Communs.*, Dkt. C-4160, 2006 FTC LEXIS 25 (2006) (consent); *In re A.E. Clevite*, 116 F.T.C. 389 (1993) (consent); *In re YKK (USA)*, 108 F.T.C. 628 (1993) (consent); *In re Precision Moulding Co.*, 122 F.T.C. 104 (1996) (consent); *In re Stone Container Corp.*, 125 F.T.C. 853 (1998) (consent); *In re U-Haul Int'l, Inc.*, File No. 081-0157, 6 (2010) (consent); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 245 F.Supp. 2d 1343,

- - mergers, acquisitions, or joint ventures that have the tendency to ripen into violations of the antitrust laws,[72]

  - a series of mergers, acquisitions, or joint ventures that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[73] and

  - loyalty rebates, tying, bundling, and exclusive dealing arrangements that have the tendency to ripen into violations of the antitrust laws by virtue of industry conditions and the respondent's position within the industry.[74]

- Conduct that violates the spirit of the antitrust laws. This includes conduct that tends to cause potential harm similar to an antitrust violation, but that may or may not be covered by the literal language of the antitrust laws or that may or may not fall into a "gap" in those laws.[75] As such, the analysis may depart from prior precedent based on the provisions of the Sherman and Clayton Acts. Examples of such violations, to the extent not covered by the antitrust laws, include:

  - practices that facilitate tacit coordination,[76]

  - parallel exclusionary conduct that may cause aggregate harm,[77]

---

1369-70 (N.D. Ga. 2017), *aff'd sub. Nom.*, *Siegel v. Delta Air Lines, Inc.*, 714 F. App'x 986 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 827 (2019). Depending on the circumstances, an invitation to collude may also constitute attempted monopolization under Section 2 of the Sherman Act, *United States v. American Airlines*, 743 F.2d 1114 (5th Cir. 1984), or wire fraud, *United States v. Ames Sintering*, 927 F.2d 232 (6th Cir. 1990).
Under appropriate circumstances, the Commission will refer evidence of per se illegal cartel agreements to the Department of Justice for criminal prosecution. *See* Commission Statement Regarding Criminal Referral and Partnership Process, File No. P094207 (Nov. 18, 2021), https://www.ftc.gov/system/files/documents/public_statements/1598439/commission_statement_regarding_criminal_referrals_and_partnership_process_updated_p094207.pdf.
[72] *Yamaha Motor Co. v. Fed. Trade Comm'n*, 657 F.2d 971 (8th Cir. 1981), *cert. denied*, 456 U.S. 915 (1982).
[73] *Vons*, 1987-1993 Transfer Binder ¶ 23,200. Such series of acquisitions or related conduct may also constitute an unfair method competition as a violation of the spirit of the antitrust laws. *See infra* note 83 and cases cited therein.
[74] *Luria Bros. v. Fed. Trade Comm'n*, 389 F.2d 847, 864 (3d Cir. 1968), *cert. denied*, 393 U.S. 829 (1968).
[75] Remarks of Jon Leibowitz, Comm'r, Fed. Trade Comm'n, "Tales from the Crypt" Episodes '08 and '09: The Return of Section 5 ("Unfair Methods of Competition in Commerce are Hereby Declared Unlawful"), Section 5 Workshop, at 4 (Oct. 17, 2008), https://www.ftc.gov/sites/default/files/documents/public_events/section-5-ftc-act-competition-statute/jleibowitz.pdf ("Simply put, consumers can still suffer plenty of harm for reasons not encompassed by the Sherman Act as it is currently enforced in the federal courts.").
[76] *Cement Institute*, 333 U.S. at 709-21 (multiple basing point pricing system contributed to unlawful coordinated pricing); Analysis to Aid Public Comment, *In re BMG Music et. al*, 65 Fed. Reg. 31,319 (2000), Docket No. C-3973 (2000) (Decision & Order) (distributors of pre-recorded music, acting in parallel but without agreement, impose identical coercive limits on retailer advertising of discounts). *See generally* William E. Kovacic, *Antitrust Policy and Horizontal Collusion in the 21st Century*, 9 LOY. CONSUMER L. REV. 97, 107 (1997) ("[T]he FTC remains perhaps the best vehicle for articulating standards designed to discourage anticompetitive coordination among competitors.").
[77] *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 897 (2007) (holding that the extent of adoption of resale price maintenance across the industry is relevant to legality); *Motion Picture Advertising*, 344 U.S. at 395

- conduct by a respondent that is undertaken with other acts and practices that cumulatively may tend to undermine competitive conditions in the market,[78]

- fraudulent and inequitable practices that undermine the standard-setting process or that interfere with the Patent Office's full examination of patent applications,[79]

- price discrimination claims such as knowingly inducing and receiving disproportionate promotional allowances against buyers not covered by Clayton Act,[80]

- de facto tying, bundling, exclusive dealing, or loyalty rebates that use market power in one market to entrench that power or impede competition in the same or a related market,[81]

- a series of mergers or acquisitions that tend to bring about the harms that the antitrust laws were designed to prevent, but individually may not have violated the antitrust laws,[82]

- mergers or acquisitions of a potential or nascent competitor that may tend to lessen current or future competition,[83]

---

("respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets."); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 309, 314 (1949) (taking into account extent of industry use of similar practices). *See also* C. Scott Hemphill & Tim Wu, *Parallel Exclusion*, 122 YALE L.J. 1182, 1243-45 (2012) ("parallel exclusion is a suitable subject for FTC enforcement under Section 5 of the FTC Act.").

[78] Intel Consent Order at 9341; *Vons*, 1987-1993 Transfer Binder ¶ 23,200.

[79] U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST GUIDELINES FOR THE LICENSING OF INTELLECTUAL PROPERTY § 6 (2017); *In re American Cyanamid Co.*, 72 F.T.C. 623, 684-85, *aff'd sub nom*, *Charles Pfizer & Co.*, 401 F.2d 574 (6th Cir. 1968), *cert. denied*, 394 U.S. 920 (1969) (actual or attempted enforcement of patents obtained by inequitable conduct falling short of fraud).

[80] *Alterman Foods v. Fed. Trade Comm'n*, 497 F.2d 993 (5th Cir. 1974); *Colonial Stores v. Fed. Trade Comm'n*, 450 F.2d 733 (5th Cir. 1971); R.H. *Macy & Co. v. Fed. Trade Comm'n*, 326 F.2d 445 (2d Cir. 1964); *American News Co. v. Fed. Trade Comm'n*, 300 F.2d 104 (2d Cir. 1962); *Grand Union Co. v. Fed. Trade Comm'n*, 300 F.2d 92 (2d Cir. 1962); *In re Foremost-McKesson, Inc.*, 109 F.T.C. 127 (1987).

[81] *Atlantic Refining Co.*, 381 U.S. at 357; *Texaco, Inc.*, 393 U.S. at 223; *Shell Oil Co. v. Fed. Trade Comm'n,* 360 F.2d 470 (5th Cir. 1966); *Brown Shoe*, 384 U.S. at 316.

[82] *The Vons Cos.,* 1987-1993 Transfer Binder ¶ 23,200. Section 5 has also been used to challenge individual transactions that do not meet the technical requirements of Section 7. *In re Beatrice Foods*, 67 F.T.C. 473 (1965), supplemented, 68 F.T.C. 1003 (1965), modified, 71 F.T.C. 797 (1967); *In re Dean Foods, Co.*, 70 F.T.C. 1146 (1966); *In re Foremost Dairies, Inc.*, 60 F.T.C. 944 (1962).

[83] *See, e.g., Fed. Trade Comm'n v. Facebook*, 581 F.Supp. 3d 34 (D.D.C. 2022) (denying motion to dismiss challenging acquisition of WhatsApp and Instagram); Analysis of Agreement Containing Consent Orders to Aid Public Comment, In the Matter of Novartis AG, File No. 141-0141 (consent decree requiring divestiture in transaction eliminating future competition in oncology compounds); Analysis of Agreement Containing Consent Orders to Aid Public Comment, *In the Matter of Össur Americas Holdings, Inc*., File No. 191-0177 (consent decree requiring divestiture in transaction eliminating future competition in myoelectric elbows). *See also Fed. Trade Comm'n v. Procter & Gamble Co*., 386 U.S. 568 (1967) (barring acquisition of leading firm where acquirer was most likely potential entrant). *See generally* PHILIP AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 701 at p. 200 (4th ed. 2015) (acquisition of "an

14

- using market power in one market to gain a competitive advantage in an adjacent market by, for example, utilizing technological incompatibilities to negatively impact competition in adjacent markets,[84]

- conduct resulting in direct evidence of harm, or likely harm to competition, that does not rely upon market definition,[85]

- interlocking directors and officers of competing firms not covered by the literal language of the Clayton Act,[86]

- commercial bribery and corporate espionage that tends to create or maintain market power,[87]

- false or deceptive advertising or marketing which tends to create or maintain market power,[88] or

---

actual or likely potential competitor is properly classified, for it tends to augment or reinforce the monopoly by means other than competition on the merits."); C. Scott Hemphill & Tim Wu, *Nascent Competitors*, 168 U. PA. L. REV. 1879 (2020).

[84] *Eastman Kodak*, 504 U.S. at 451; *Newcal Industries v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978); *LePage's v. 3M Co.*, 324 F.3d 141 (3d Cir. 2003) (en banc).

[85] *Ind. Fed'n of Dentists*, 476 U.S. at 460-61 (finding of sustained effects legally sufficient even in absence of elaborate market analysis); *Toy's "R" Us v. Fed. Trade Comm'n*, 221 F.3d 928, 937 (7th Cir. 2000) (finding "sufficient proof of anticompetitive effects [such] that no more elaborate market analysis was necessary"). *Cf.*, *Fed. Trade Comm'n v. Staples, Inc.*, 970 F.Supp. 1066, 1075-6 (D.D.C. 1997) (relying in part on direct evidence that pricing for key products from office superstores lower where three such stores exist in same metropolitan area and higher where only one or two such stores present).

[86] *Perpetual Federal Savings & Loan*, 90 F.T.C. 608 (1977) (complaint dismissed due to subsequent legislation). *Cf.*, *TRW, Inc. v. FTC,* 647 F.2d 942 (9th Cir. 1981) (noting automatic nature of liability under Clayton §8 when prerequisites of statute established).

[87] *See* Policy Statement of the Federal Trade Commission on Rebates and Fees in Exchange for Excluding Lower-Cost Drug Products (2022), at 6 n. 27 ("The Commission has a long history of addressing commercial bribery and will continue to do so."), https://www.ftc.gov/legal-library/browse/policy-statement-federal-trade-commission-rebates-fees-exchange-excluding-lower-cost-drug-products; See Hon. Garland S. Ferguson, Jr., Chairman, Fed. Trade Comm'n, Commercial Bribery: An Address to the Conf. on Com. Bribery to the Comm. Standards Council and the Better Bus. Bureau of N.Y. (Oct. 17, 1930) (explaining the Commission's focus on commercial bribery as an unfair method of competition even before it gained authority under the Robinson-Patman Act); *see also* Donald S. Clark, Sec'y, Fed. Trade Comm'n, Remarks Regarding The Robinson-Patman Act: Annual Update, Before the Robinson Patman Act Comm., Section of Antitrust Law, 46th Annual Spring Meeting (Apr. 2, 1998), *See e.g.*, *In re Lockheed Corp.*, 92 F.T.C. 968 (1978) (commercial bribery).

[88] *In re Coleco Industries*, 111 F.T.C. 651 (1989) *(*consent decree barring claims of product availability unless actually available or company has reasonable basis for such claim*); In re Xerox Corp.*, 86 F.T.C. 364 (1975) (repeated publicizing release date of new products with knowledge that products would not be available by that date); Analysis of Proposed Consent Order to Aid Public Comment: *In the Matter of Intel Corp.*, Dkt No. 9341 at 5-6 (describing acts of deception in Commission complaint). *Cf, Microsoft*, 253 F.3d at 76-77 (acts of deception relating to compatibility of Microsoft version of Java with competing software applications as unlawful monopoly maintenance under the Sherman Act). *See generally* Maurice E. Stucke, *When a Monopolist Deceives*, 76 ANTITRUST L.J. 823 (2010). *See also* DANIEL A. CRANE, THE INSTITUTIONAL STRUCTURE OF ANTITRUST ENFORCEMENT 138 (2011) (The Commission is on strongest ground when challenging market power created by fraud or deception).

- - discriminatory refusals to deal which tend to create or maintain market power.[89]

## VI. The Path Forward

The FTC is committed to faithfully discharging its statutory obligations, including through enforcing and administering the prohibition against "unfair methods of competition" on a standalone basis, as laid out in Section 5 of the FTC Act, or in conjunction with its other statutory authorities.

---

[89] *Aspen*, 472 U.S. at 610-11 (affirming antitrust liability for termination of joint venture where no legitimate business justification present for such conduct); *Eastman Kodak*, 504 U.S. at 483-85 (denying summary judgment where defendant manufacturer of copiers refused to deal with third party service providers); *In re Grand Caillou Packing Co.*, 65 F.T.C. 799 (1964), *aff'd in part and rev'd in part sub nom.*, *LaPeyre v. Fed. Trade Comm'n*, 366 F.2d 117 (5th Cir. 1966) (violation of Section 5 for monopoly manufacturer of shrimp peeling machines to lease machines at substantially different rates in different regions of the US); Analysis of Proposed Consent Order to Aid Public Comment: In the Matter of Intel Corp., Dkt No. 9341 at 4 (describing alleged threatens of refusal to deal with customers who purchased non-Intel CPUs). *See generally* Brett Frischmann & Spencer Weber Waller, *Revitalizing Essential Facilities*, 75 ANTITRUST L.J. 1 (2008).