Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Araceli Martínez-Olguín, Judge

| | |
|---|---|
| BIT GLOBAL DIGITAL LIMITED, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | )    NO. 3:24-CV-09019-AMO |
| | ) |
| COINBASE GLOBAL, INC., | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Thursday, May 15, 2025

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:
                    KNEUPPER & COVEY, PC
                    17011 Beach Boulevard, Suite 900
                    Huntington Beach, CA 92647
          **BY:  KEVIN M. KNEUPPER**
               **JACOB BENDER**
               **ATTORNEYS AT LAW**

For Defendant:
                    WILMER, CUTLER, PICKERING, HALE & DORR, LLP
                    2600 El Camino Real, Suite 400
                    Palo Alto, California 94304
          **BY:  SONAL N. MEHTA**
               **PAUL T. VANDERSLICE**
               **ATTORNEYS AT LAW**

Also Present:   David Shieh, Coinbase

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                       Official United States Reporter

**Thursday - May 15, 2025**                    **11:05 a.m.**

**P R O C E E D I N G S**

**---o0o---**

**THE COURT:**  You may be seated.

**THE COURTROOM DEPUTY:**  Calling civil action C-24-9019,
BiT Global Digital Limited versus Coinbase Global, Inc.
Counsel, can you please come up to the podium and state your
appearances?  The court reporter is remote, so he will need to
look at your face.

**MR. KNEUPPER:**  Kevin Kneupper appearing for plaintiff
BiT Global.

**THE COURT:**  Good morning.

**MS. MEHTA:**  Good morning, Your Honor.  Sonal Mehta
from Wilmer Hale for Coinbase, and with me today is my
colleague, Paul Vanderslice and then we have David Shieh,
associate general counsel at Coinbase, with us, as well.

**THE COURT:**  Thank you.  Good morning.

So we're here on defendant's motion to dismiss, and while
it's customary for that reason to have defendant present
argument first and then ask plaintiff to rebut and sort of go
back and forth, I want to take a slightly different approach
with you all today, because I want -- I just want to start by
commenting that at this -- from reviewing the papers, from
thinking on it, my inclination at this point is to grant the
motion to dismiss.  And so I want to walk you through, I want

1    to walk plaintiff through my thinking and have you tell me

2    where you think I have it wrong, and then I want to talk very

3    specifically about leave to amend.  So I think I just want to

4    under' -- here's how I'm thinking or how I'm cognizing your

5    complaint right now.

6        Many of those claims, many of those claims are based --

7    require you pleading plausibly the falsity of Coinbase's

8    statements, and my list includes the Sherman Act disparaging

9    statements, theory like that, both of the Sherman Act claims,

10   the Lanham Act claim, the UCL fraud claim and the trade liable

11   claim, I think all of those require that you have plausibly --

12   that you can plausibly plead that those statements are false.

13       At this point, based on the statements themselves I'm not

14   convinced they are.  So I'm curious what you could possibly

15   add, how you could amend.  If I think that as a legal matter

16   those aren't false, is there anything to be gained through

17   leave to amend?

18       **MR. KNEUPPER:**  I think, Your Honor, I think at the

19   outset we disagree at least on some aspect of that.  And this

20   is argued in the brief on Lanham Act as to whether falsity is

21   required or whether there can be an implication that is false.

22   And I think that that's an important distinction for these

23   claims and these theories is the question of not just whether

24   these words are literally false as they are uttered, or was

25   there an implication that there was something, some hidden

1    information, things that are alleged in the complaint and

2    outlined in our opposition that we allege are implications that

3    were being made.

4        And in terms of plausibility, as to that aspect, I think

5    Coinbase's own motion really reveals how plausible this is,

6    because if you even just go to the introduction and start

7    reading what Coinbase starts their first motion out with --

8        **THE COURT:**  Okay.  No, no, no.  I'm not -- we're not

9    going there, because I'm asking you about the statements they

10   have made, not their arguments.  I'm looking at their

11   statements, I'm looking at your theories about their

12   statements, and I take your point that you think that the

13   Lanham Act claim doesn't require falsity.  I'll take that

14   point from you.  But talk to me then about the others, because

15   I also take from you -- I followed the thread in your brief

16   about the implication of what one could conceivably have

17   understood from reading that statement.  Okay.  I understand

18   that's your position.  I'm asking you that if I disagree

19   with you -- and that's the point.  I get that you disagree with

20   me, but the point is I'm the one writing something ostensibly

21   here.

22       So, okay.  You -- I want you to walk me down the path of

23   if I've already concluded, if I conclude that those statements

24   are not false, what -- which of these claims, if any -- well,

25   you can -- I do appreciate you telling me why you think -- if

1    you want to tell me why you think that's wrong, great.  I

2    invited you to do that.  I asked you to tell me why that's

3    wrong in the first place.  Fine.  But beyond that, what, if

4    anything, could you add on leave to amend?

5            **MR. KNEUPPER:**  Once you get past the implication, the

6    separate aspect that Your Honor's pointing to is is this

7    statement literally false when they say that they had conducted

8    this sort of neutral review process in getting to their

9    decision to delist wBTC.  And I think what's important for the

10   Court to consider on this is the plausibility standard and how

11   low that is in terms of when they've offered this alternate

12   explanation, and that's what they've done is said, no, we just

13   followed this, you know, they don't provide you any e-mails,

14   internal documents, any details on this.

15           **THE COURT:**  This is the motion to dismiss stage.  I

16   couldn't consider any of that even if they did give it to me.

17           **MR. KNEUPPER:**  But I think on whether that's -- if

18   you're just asking is this a plausible explanation that right

19   after the -- they decide to launch this, their competing

20   product, they do this delisting.  So that's something that even

21   just from temporal proximity does suggest that there could be

22   other motivations behind this, that this is not really what

23   happened was a neutral delisting process.  And some of this is

24   stuff that's in the complaint.  I think that, you know, we have

25   many of these facts in there that I think support this under

1    this low plausibility standard.

2         After, and continuing --

3         **THE COURT:**  Can I just say, this is the first time

4    I've ever heard plausibility under *Iqbal* or *Twombly* referred to

5    as a low standard.  That's not how I'm used to cognizing it, so

6    keep -- but tell me.  Right?  I guess I'm curious, then,

7    because I don't think there's any case from you about -- I

8    don't think I have any cases from you about pretext serving as

9    a method to prove up or even plead some of these causes of

10   action.  Am I wrong about that?

11        **MR. KNEUPPER:**  I don't recall if we have a specific

12   case on pretext, Your Honor.  I don't think that we do.  But I

13   think what it comes to, and I do view the standard as, you

14   know, it's a raising of the old standard, which, if we were

15   talking about relative lack of standard, and it certainly

16   pre-*Twombly* was much lower.  But I think still when you're

17   considering -- you're not considering which is the most

18   reasonable explanation.  You're not considering is their

19   explanation better, is their explanation reasonable.  You're

20   asking could a reasonable juror agree with our explanation of

21   the facts that this statement was literally false, and I think

22   that what we've pled in there is more than sufficient to get

23   over that hurdle.

24        When you're looking at these two explanations, once

25   they've proffered this ultimate explanation you have to look is

1    this -- can a reasonable juror agree with what we're saying.

2    And when you have this -- there's these temporal facts that

3    we're pleading about the differences in time.  I think some of

4    the stuff that we likely could add on leave to amend is some of

5    the things that have happened after the complaint and the

6    things that have happened since then.  And that is the reason I

7    was suggesting looking to the opening of the brief, the just

8    really what they're saying in there and even saying in their

9    declaration is you can see it's sort of this -- they're saying

10   the quiet part out loud is the way I would put it, the things

11   when they're saying that, oh, we just did -- their version to

12   you is we just did this because we were following a neutral

13   standard and we thought this was risky, but you see that

14   their whole brief is sort of a launching into implications

15   and innuendo and the exact same things we were saying that

16   they were trying to imply to the public in the first place in

17   this.

18        And when you look at what they say they were relying on,

19   some of this, when you're asking like is it reasonable for the

20   plaintiff to suggest this, could a jury believe that they're

21   not telling the truth when they say this, we could plead

22   additional facts.  And as you say, it's not part of the

23   complaint now, but could it be added?  Look at the declaration

24   that they cite.  It's talking about a blog article from 2018

25   and saying this is the reason why we did this.  There are

1    additional e-mails that are back and forth between the parties

2    that we certainly disagree with their characterization about

3    what they were -- what happened when they say, oh, BiT Global

4    didn't respond to our request for information.  We don't think

5    that's correct.

6         We think we could add facts on that that suggest that that

7    is not a true description of what happened.

8         And if the Court is given additional facts that say, look,

9    this -- the way that they came in with this, again, yes, a

10   post-complaint declaration, but they're telling you that this

11   is this certain alternate explanation, and it doesn't really

12   fit with the facts, I don't think.

13        **THE COURT:**  All right.  But what I hear you positing

14   are additional facts to bolster your existing contentions that

15   these statements imply, that there is something by implication

16   that makes them false.  I don't -- I just want to try asking

17   this one more time in order to have you redirect me a bit here,

18   but I don't necessarily hear you saying that there's more

19   you -- you're resting on the idea that it's all pretextual and

20   that that is why those statements are false, because their

21   assertions, they acted for different reasons than the ones

22   stated in the -- they're very short statements.  I don't know

23   that they're ...

24        All right.  What am I missing?  I just want to ask that

25   one more time before I move on, but what have I missed about

 1   your argument?

 2        MR. KNEUPPER:  I think you're correct, Your Honor,

 3   that it kind of blends a little together in terms of the

 4   literal falsity versus implications just because it's a common

 5   core facts.  But I think if you -- if you're isolating to

 6   literal falsity, it's the statement, we did this neutral

 7   review, and based on that review we have decided, based on it

 8   not meeting our listing standards, we have decided to delist

 9   it.  That is a factual statement.  So regardless of

10   implications, if that factual statement is not true, then

11   it's -- I think, you know, certainly even regardless of the

12   disagreement on whether some of these laws allow statements by

13   implication, that is a literal factual implication and one that

14   has consequences for a competitor.

15        If you're making a statement, we've looked at your

16   cryptocurrency, we do not think it meets these listing

17   standards and thus we are removing it, they didn't have to make

18   a statement at all.  They didn't have to say any of this.  They

19   could have -- or they could have narrowed their statement to

20   where they just said, we're delisting this.  They didn't have

21   to say, we went through these standards and we've decided that

22   it doesn't meet the standards for our cryptocurrency.  And when

23   you look at them they're like, you're making a factual

24   statement, not just an implication when doing that.

25        And I think if Your Honor narrows it just to that it does

narrow somewhat, and it is still kind of a blob, but I think there is still a factual statement left there that does still have an impact on a competitor and according to the pleadings has had an impact on a competitor.

**THE COURT:** All right. Ms. Mehta, can I ask you to address to this?

**MS. MEHTA:** Yes, Your Honor. Just I think three points I want to make in response, and then obviously I'm happy to answer any questions you have.

The first is to focus on the question of what it means to plausibly allege falsity under any of the causes of action Your Honor identified. Whether we want to call it a low standard or a high standard, what the standard requires is that they plead facts that make their allegation plausible, and then the Ninth Circuit, what that means is not it's a toss-up between two alternative explanations. In fact, what the Ninth Circuit requires for something to be plausibly alleged is that they have to allege facts that tend to exclude the possibility that the alternative explanation is true.

There is an obvious alternative explanation here. It's actually the one in the statements, which is that, we made a judgment applying our listing standards, that we no longer were going to list this asset because of concerns that arose after Mr. Sun's involvement, and that is the obvious alternative explanation for everything that happened here. And under Ninth

1    Circuit law, they have to plead facts that would tend to

2    exclude that obvious alternative, and Your Honor can look at

3    your experience and common sense in judging that question.

4    That's the legal standard.

5         The second question is whether they have alleged falsity

6    either literally or by implication.  And if we look at the

7    statements that they have alleged, those statements state facts

8    that they're not alleging are false except for pretext, which

9    I'll get to in a minute.  The statement is, we looked at this

10   asset; we've decided to delist it.  There's no factual

11   allegation that would tend to exclude the possibility that

12   that's exactly what happened, and that's the obvious

13   explanation that Your Honor can infer from the facts that are

14   alleged, including the text of the statements themselves.  And

15   you don't even have to go back and look at, for example, the

16   evidence we submitted on the TRO, which showed all of the back

17   and forth of how that happened.  Even setting that aside, just

18   the statements themselves offer that obvious alternative

19   explanation.

20        So then all we're left with is pretext, and the argument

21   is you should just ignore the obvious alternative explanation,

22   you should ignore what's in the statements themselves and just

23   take our word for it that this is pretext because some jury

24   might ultimately agree that this could be pretext.  That's not

25   the standard for plausibility.  And as Your Honor just found

1    when you asked the pointed question to counsel, they don't have

2    a single case in which a claim of falsity has been made and

3    gotten even past the pleading standard, let alone proved, where

4    all that you have is a bald assertion of pretext with no actual

5    evidence or facts to suggest falsity.  And that applies to all

6    of the claims.

7         And insofar as they're relying on -- just briefly on the

8    Lanham Act claim.  Insofar as they're relying on the

9    implication, the implication that they're asserting is that

10   there was something -- that we thought there was something

11   risky about the asset.  At best that's a nonactionable opinion.

12   So even the implication claim under the Lanham Act fails.

13        **THE COURT:**  You want to say anything?

14        **MR. SIRONSKI-WHITE:**  Sure, Your Honor.

15        **THE COURT:**  Go ahead.

16        **MR. KNEUPPER:**  I think it was telling that the

17   omission of the full statement, you were told in response that

18   all that they said was that they decided to delist it and they

19   looked at it, but that omits the last part of what they were

20   saying, which is it is because it didn't meet their listing

21   standards.  So that is I think the key part in terms of the

22   literal falsity.

23        I think on the Lanham Act issue in terms of whether --

24   whether this is opinion or not, I think looking to the -- it is

25   the *Deerpoint Group* case that we cited in response to their

1    *Oracle* case, they have said, oh, this is opinion, but I think

2    it's clear under the Lanham Act that that doesn't save you.

3    Just because opinion is mixed in, if there were these

4    implications, we've cited law on that as well, that are

5    nonobvious, then that -- or if the statement is literally true

6    or is opinion, but suggests implications, then it is still

7    actionable.

8         **MS. MEHTA:**  Your Honor, may I just very briefly

9    respond to that?

10        **THE COURT:**  Go ahead.

11        **MS. MEHTA:**  On the point about the listing standards

12   and the suggestion that that's what makes the statements false,

13   I think, one, that's inconsistent with our own allegations,

14   which are that we don't have listing standards, which I think

15   are obviously not true because there's judicially noticeable

16   listing standards on our website.  But the listing standards on

17   their face include subjective judgments that Coinbase gets to

18   make as an exchange as to what assets it chooses to list and

19   does not list on its exchange because of the role that it plays

20   in ensuring and protecting its customers.

21        And the suggestion that Coinbase isn't allowed to say, we

22   looked at our standards and we've made the judgment to delist

23   an asset, or that there's something false about that, it just,

24   it proves the point.  There's nothing false about that.  The

25   obvious explanation which they've pled no facts to undermine is

1    they looked at the standards that are subjective on the

2    website, and it made a judgment based on its own experience and

3    expertise not to list the standard anymore.

4        And Mr. Kneupper made a point of saying, well, they didn't

5    have to say any of this.  The reason Coinbase made the

6    announcement it did is because it wanted to give notice to

7    customers that it was no longer going to list the asset.

8    That's why it made that.  It didn't give details about what

9    concerns or what risks they were having, all of the types of

10   inferences that Mr. Kneupper is saying that people might draw,

11   that he's speculating people might draw, those aren't in the

12   statement.  The statement says, we have listing standards, we

13   continue to evaluate assets across those listing standards,

14   we've made the decision to delist this asset, and it gave the

15   customers notice of that decision.  There's nothing about that

16   that's false, and there's no fact that Mr. Kneupper has

17   identified that would allow the Court to find or disregard the

18   obvious explanation, which is that was exactly what happened,

19   and infer some sort of falsity, literal or inferred.

20           **THE COURT:**  All right.  Folks, I want to move on for a

21   moment to the intentional and negligent interference with

22   perspective economic advantage claims.  So Mr. Kneupper, from

23   reviewing your complaint and your papers, right, there's no

24   third party alleged.  Where is the third party with whom you

25   had -- with whom your client already had a relationship?

1          **MR. KNEUPPER:**  I think it's correct that we would have

2    to amend to make that claim viable.  I think we would admit

3    that.

4          **THE COURT:**  Can you?

5          **MR. KNEUPPER:**  At -- I think we'd like to discuss that

6    with the client.  I think it is possible, and it's something

7    that we -- if we didn't think we could, we would inform the

8    Court of that for sure.

9          **THE COURT:**  All right.  Let's talk --

10         **MS. MEHTA:**  Sorry, Your Honor.  May I just be heard on

11   that very briefly?

12         **THE COURT:**  By all means.

13         **MS. MEHTA:**  We went through a TRO process.  We filed a

14   motion to dismiss.  They chose not to amend as a right, which

15   they could have.  We went all the way through briefing, and

16   we're now here on a hearing.  And at every one of those points

17   we told them that the law -- we didn't need to tell them, but

18   we did, that the law requires, in order to adequately plead an

19   interference claim, that they need to have identifiable third

20   parties.  And we are now here at this hearing.  Everyone flew

21   in, or we flew in to be here, and still can't identify a third

22   party.  If they had a third party, surely by now they would be

23   able to tell us who it is.

24         **THE COURT:**  I think the piece, though -- to

25   Ms. Mehta's point, Mr. Kneupper, right, under Rule 15, right,

1  leave to amend is supposed to be granted, but I'm supposed to
2  understand that it isn't futile to give it to you.  So I'm not
3  sure.  I didn't push it, because if you're telling me that you
4  need to talk to your client, that tells me that you didn't walk
5  in today knowing that you have allegations that you could add
6  to a complaint.
7      Is that -- tell me why that's not the right reading of
8  your remark.
9          MR. KNEUPPER:  I would like to make sure that we
10  confirm that we'd want to do that, and there are strategic
11  choices relating to -- it could be do we want to continue it --
12  for example, if Your Honor dismisses everything else, the
13  client may decide we just don't want to do this.  And so it's
14  less a is this impossible and more of a is this a choice the
15  client wants to make, and I think that this process is not
16  designed for this to be shut off.  It's supposed to give us
17  that chance.
18          THE COURT:  But let's be clear.  I'm asking you if
19  it's -- I'm asking you if you -- I'm asking you if leave to
20  amend is merited.  Whether you choose to make use of it is a
21  thing -- is a decision you can make separately later with your
22  client.  I'm asking you if it isn't futile, if it -- I'm asking
23  you to help me apply Rule 15 on whether you actually just don't
24  have anything.
25      And part of what I take Ms. Mehta's point to be is that I

```
 1    let you dodge it.  So ...

 2              MR. KNEUPPER:  I think what I would point out to the

 3    Court is we've -- what we have failed to do is identify names,

 4    but we have not failed to identify categories.  But part of the

 5    problem that goes to -- which is the business partners who are

 6    custodians, who are -- but there are strategic and business

 7    questions of do we want to proceed down that route.

 8              THE COURT:  Okay.  So let me try this one more time.

 9         My question to you is not if you want to.  My question to

10    you is if you can.

11              MR. KNEUPPER:  I do not believe it would be futile.

12              THE COURT:  Okay.  Because you think you can identify

13    third parties.  Whether or not you or your client choose to do

14    so is a different matter.

15              MR. KNEUPPER:  Yes.

16              THE COURT:  But you think you can.  You are capable of

17    it.

18              MR. KNEUPPER:  We've already received the discovery

19    requests as to these third parties, so I don't think it's

20    something where it's unknown.  We've received long letters

21    saying preserve what these -- not by name, but these categories

22    of people.  Because they're aware of the categories of people

23    that we've said are customers or involved in this process, and

24    I don't think it would be futile.

25              THE COURT:  You want to be heard further?
```

```
 1          MS. MEHTA:  Just very briefly, Your Honor.

 2       Again, I don't know what they -- what categories he's

 3   alluding to, but we're what, five, six months into this

 4   litigation.  They knew this was an issue.  If they had an

 5   identifiable third party with whom they had an existing

 6   business relationship, with whom they could plead that there

 7   was some sort of wrongful conduct that interfered with the

 8   relationship, I am sure that he would be able to identify that

 9   party for you today.  And if we're going to go through a whole

10   amendment and then find that all they have is vague categories,

11   that is a waste of the Court's time and of our time and money,

12   and by now they should know if they have such a third party.

13          THE COURT:  I'm going to move us on for a moment on

14   the other two theories of the UCL, of the 1720 claim.  We

15   talked a little bit about the fraud theory of it.  I just want

16   to talk for a moment about the unfair and unlawful, because

17   again, my sense is that you all haven't -- there isn't yet in

18   your complaint -- you have to show pecuniary losses, and you

19   don't have that yet.

20       So I just want -- or tell me, if I'm wrong, where it is in

21   your complaint.

22          MR. KNEUPPER:  I think -- well, we've identified

23   there's the allegation that there's a billion dollars in --

24   that there will be a billion dollars in losses.

25          THE COURT:  No, no, not will be.  You have to show
```

1    that it's happened already, right?  So not will be.

2         Uh-huh.

3         **MR. KNEUPPER:**  Some of this -- and some loops into

4    like the reputational harm, but that may loop into what Your

5    Honor's already --

6         **THE COURT:**  But reputational harm isn't pecuniary

7    harm.

8         **MR. KNEUPPER:**  I think that the -- we have not

9    specified a number of harm, but we have outlined why the

10   company is harmed by having wBTC kicked off this platform by no

11   longer having access to it by the -- I mean ...

12        **THE COURT:**  I follow all of that, but the 17200

13   claims, that statutory standing requires that you show me

14   monetary harm to your client, and I don't think you've done

15   that.

16        Is that in your complaint somewhere?

17        **MR. KNEUPPER:**  A specific number is not in the

18   complaint.

19        **THE COURT:**  Okay.  So I'm pointing it out to you as a

20   reason, as a separate independent reason that those -- that you

21   haven't shown that your client has statutory standing to bring

22   those claims.

23        **MR. KNEUPPER:**  May I say one thing on it?

24        **THE COURT:**  Yes.

25        **MR. KNEUPPER:**  The one thing I would point out is that

```
 1   the UCL claims have both a restitution aspect and an injunctive

 2   relief aspect.  And for injunctive relief, one case on page 19

 3   of our brief is Spice Jazz, LLC, versus Youngevity

 4   International, which says that we have a right to seek

 5   injunctive relief if we're -- if we've been injured or even if

 6   we will be injured in the future.

 7         THE COURT:  And your position is that that is separate

 8   and apart from having to show standing in the first place; is

 9   that right?

10         MR. KNEUPPER:  That -- standing for an injunction is

11   different from standing for seeking restitution.  I think that

12   those are two different remedies.  And when you're asking for

13   an injunction, and kind of even the whole TRO issue, has it

14   happened already or will it happen for a temporary restraining

15   order, but if you're facing something that you believe that

16   conduct should be enjoined or seek that sort of relief, I don't

17   think that you have to show monetary harm to seek the

18   injunction.

19         THE COURT:  Ms. Mehta?

20         MS. MEHTA:  No, Your Honor.

21      So what they're describing is a potential future cause of

22   action that's not ripe yet.  If they're going to assert a claim

23   under the UCL to have UCL standing, they have to show an

24   economic injury that's caused by unfair competition.  That's

25   the Zhang case from 2013.  And they have to show -- let me say
```

1    it this way just to directly quote the next case:  "The

2    availability of an injunction depends on standing to sue."

3    That's the *Kwikset versus Superior Court*, 51 Cal.4th 310 case

4    from 2011.  You can't just say, well, I might someday in the

5    future suffer some sort of injury, and therefore I'm going to

6    have standing under the UCL.  That's not how it works.

7            **MR. KNEUPPER:**  May I briefly respond to the *Zhang*

8    case, Your Honor?

9            **THE COURT:**  Uh-huh.

10           **MR. KNEUPPER:**  I think the *Zhang* case, the interesting

11   thing as a factual background about the UCL in general and as

12   to the specific issue that is discussed in *Zhang*, is

13   Proposition 64, and it's way back when now, I think more than

14   25 years out, I think, from it.  But the UCL originally allowed

15   literally anyone in the state to sue.  Like it didn't matter.

16   I could go sue for BiT Global, having no interest at all in the

17   case.  And a proposition went on the ballot to restrict that,

18   because it kind of became something where a lot of people were

19   getting sued by random -- you know, that happens sometimes.

20   You get these career plaintiffs, or whatever.  And it was~--

21   the UCL's standing requirement was restricted by a proposition.

22       When they're using this language, they're specifically

23   talking about this old versions of it where the UCL was just

24   somebody who's a California resident walks in the door, and now

25   they can sue.  I don't think that when you're looking at those

cases, that they're discussing raising this to some higher

standard than you would normally have for just claims in

general.

THE COURT:  All right.  Let me move us on.

All right.  I want to talk, then, about the other piece of

the Sherman Act we haven't talked about yet, which is the

refusal to deal claim, or a theory of it.  It's two claims, and

I understand it's monopolization or attempt to monopolize, and

we've talked a little bit about the discharging statements

there.  Let's talk about refusal to deal.

So Mr. Kneupper, in your complaint I'm -- I guess as I

understand it, right, no one, neither of you, no one disputes

that a competitor doesn't have to do business with you, right?

*Brown Shoe*, right?  They don't have to.  But there's an

exception, right?  So you're trying to get -- you're arguing

that you were in the *Aspen Skiing* exception to *Brown Shoe*,

right?

But part of that, right, you have to show that there is no

other reason other than to exclude you for them, for your

competitor to have engaged in the conduct that you challenge.

But your complaint itself shows other reasons that they might

have -- and I want to note, right, I think that in various

points in your -- and my sense so far is that at various points

you're challenging either the creation of their own wrapped

Bitcoin or the delisting, it sort of shifts, I thought.  You

can correct me if I'm wrong.  Tell me if I should just be
focused -- most of it I think is about the delisting.  So, but
if as I understand it, right, you've alleged that in the
complaint that there are other reasons beyond -- that there are
other reasons that they might have delisted you.

You are not able to now amend your complaint and
contradict your previous allegations, right?  That's not a
thing that's open to you.  So I think you've already conceded
that you don't fit neatly into *Aspen Skiing* because you list --
they've listed -- you list for them reasons other than for
competitive advantage that they would delist BiT Global.

So help me.  Tell me whatever you want to about that, but
that's my reading of it so far.

MR. KNEUPPER:  I guess some -- if I'm permitted to ask
would be what specific other reasons you think exclude the
*Aspen*, just to focus the argument on?

THE COURT:  Well, so the reason they've given, which I
understand you think is pretextual, but is -- because Coinbase
concluded that BiT Global doesn't meet their standards, right?
Like, it may be pretextual, but that's another reason.

MR. KNEUPPER:  I think the first thing I would point
out, Your Honor, is I think the parties are actually in
agreement that this cannot be decided, or this particular
aspect that you're pointing to, on a motion to dismiss.  If I'm
reading their reply brief correctly, they -- in order to make a

1    distinction on the factors that they were arguing -- and let me

2    see if I can find the page number on this.  I believe it's

3    page 4 of their reply brief they actually start citing cases to

4    the Court saying, look, as to the portion of this that Your

5    Honor's asking about now, this is the element that says the

6    only conceivable rationale or purpose is to sacrifice

7    short-term benefits in order to obtain higher profits.

8         And so if that's the part Your Honor's asking about, I

9    think the parties have both agreed that has to be at summary

10   judgment because it's so evidence focused in order to actually

11   decide whether these purposes are rational or not.  Because

12   while Your Honor is pointing out that we're listing these

13   purposes, we're alleging that they are not real, they are

14   pretexts.  This is stuff that is being said but is not --

15        **THE COURT:**  Okay.  But we're back -- no, no, no,

16   you're fine.  But we're back to I don't know that I have from

17   you a case where pretext suffices, right?  Like, I mean ...

18   okay.  Finish your thought, and then I'll ask Ms. Mehta if she

19   agrees you with that the parties agree that this can't be

20   resolved now.

21        **MR. KNEUPPER:**  Thank you, Your Honor.

22        I think that is -- that it's -- what you're asking is, or

23   what the factor is asking is whether that's the only

24   conceivable rationale or purpose to sacrifice these four in the

25   long run for profits from this.  I think we've alleged that

1    that has happened.  We've alleged that this is the reason for

2    it, it is the only reason for it given the facts, given the

3    context, and I do think this comes down to can you decide it

4    now.  Because many of these issues are the kind of things that

5    are routinely found by courts to be appropriate at summary

6    judgment, and I think this factor in particular is one that is,

7    from my reading of it, always kicked off to summary judgment.

8            **THE COURT:**  What say you, Ms. Mehta?

9            **MS. MEHTA:**  Your Honor, we do not agree that this is

10   an issue that gets resolved at summary judgment.  They have to

11   plead, in order to plead this very narrow exception to the

12   refusal to deal or the freedom that Coinbase has to deal with

13   who it chooses to deal with, they have to prove that there was

14   no conceivable motivation other than the long run exclusion of

15   competition, and they have to plausibly allege that with facts

16   in the complaint.  And I think there's actual two problems

17   here.  There's the problem that you identified, Your Honor,

18   which is that their own allegations about what we said about

19   our rationale identify a conceivable rationale.  But even if

20   they could dismiss that by just asserting that that's pretext,

21   which they have no support for, they've also pled other

22   rationales that are economic rationales that have nothing to do

23   with excluding competition.

24           And what I'm pointing to specifically are their

25   allegations that Coinbase did this as part of a strategy to

create a payment infrastructure and a financial ecosystem on

the platform with the goal of driving more revenues to

Coinbase, which they allege at paragraphs 49 through 51 of

their complaint.  That's not -- there's no pretext associated

with that.  That's a motive that they have -- they've put on

us.  We don't agree that that's true, but let's accept for

purposes of this motion that that's true.  That itself is a

conceivable, economically justifiable rationale for the

decisions that were made, and that the decisions are being

challenged here, that is not the long-run exclusion of

competition.

And so that itself precludes them from being able to plead

now or in an amendment the refusal to deal, the very narrow

exception to the refusal to deal doctrine that they would need

to plead.  And that's apart from the issues with respect to

market definition and --

(Simultaneous crosstalk.)

I know you'll get to that, but those would be independent,

of course, of this.  And this they can't plead around because

of what they've already said.

**THE COURT:**  You want to respond?

**MR. KNEUPPER:**  I think what we've said, Your Honor, is

in order to even plead it at all, we have to say that they are

sacrificing short-term benefits to obtaining higher profits.

So part of that has to be saying, look, you have this strategy

1    that will make money in the long run and to explain it.  But

2    what we're explaining and what we're showing and one thing I

3    point out is on their own web page they are bragging, and this

4    is the compliant that they're quoting tweets and bragging that

5    they're going to displace wBTC as part of that strategy, and

6    it's a necessary part of that strategy, because if wBTC keeps

7    the market share, their whole flywheel strategy that we

8    discussed, it doesn't exist and it doesn't function.

9         It only functions if they get rid of the competitor,

10   because the more people they -- it causes this flywheel they're

11   talking about where it on-boards people as they get control of

12   the market share.  That allows them to sort of get users into

13   the ecosystem, which creates network effects, and that's a

14   whole -- that would go into expert reports and economic theory.

15   But it is -- the allegation is not that they're just doing

16   this, it's we alleged it that this was being touted as it's

17   going to be -- we're going to replace wBTC by doing this.

18        **MS. MEHTA:**  Your Honor, I just, I realize that I

19   forgot to mention one thing, which is specifically to address

20   the case law question as to whether this is something that can

21   and needs to be resolved at the motion to dismiss stage.  It

22   is.  They rely on a case called *Subspace Omega* from the Western

23   District of Washington which specifically applies this

24   principle at the pleading stage.

25        Last month in the *Yelp versus Google* case, Judge van

1    Keulen issued on a motion to dismiss an order dismissing a

2    refusal to deal claim because they had not adequately -- Yelp

3    had not adequately alleged that the only conceivable rationale

4    was to exclude competition.  And again, that was at the motion

5    to dismiss stage.  There has to be that allegation plausibly

6    made at this stage of the case.

7              **THE COURT:**  Well, folks, the last piece that I just

8    said to Ms. Mehta I would get -- yes, that I said to Ms. Mehta

9    that I would get to is just I want to -- I want -- we've been

10   walking through all the places where I'm having trouble with

11   the complaint, and I -- and the other piece I just wanted to

12   add was this, right, that frankly I think that there's problems

13   with the refusal to deal allegations because I don't think that

14   you have enough.  I think your facts -- I think you've actually

15   pled yourself out of the *Aspen Skiing* exception, which means I

16   would never -- I don't see myself necessarily getting into some

17   of the rest of the substance of it, but I wanted to comment.

18   To the extent that you should, I guess all of this is to say

19   I'll keep noodling on it.  You're not getting a ruling from me

20   on the bench today, but I stand by my initial, so far my

21   initial inclination to grant the motion to dismiss in its

22   entirety.

23        To the extent that you do amend, I wanted to make sure to

24   comment to you that I do think that your market definition is

25   problematic both in terms of geography and even just the

1    product market as you have it.  I can't understand any

2    plausible reason for limiting this to the United States.  Just

3    I don't -- you're welcome to talk with me about it now.  It's

4    not a thing I'm planning to get into.  It's just both the idea

5    that you would somehow limit it to the United States seems --

6    this is one of those, this is a product that just you can't

7    limit it geographically in that way to my mind, because

8    presumably it is Bitcoin and wrapped Bitcoin are the sorts of

9    things that's available anywhere in the world.  So that is my

10   first thought just in terms of geography.

11        And even the product, I got the sense both in your

12   complaint and in your papers that the product -- in different

13   places you seem to either make the product wrapped Bitcoin and

14   in other places it's about the exchange.  So I can't even tell

15   exactly what your product market is.  And to the extent that

16   you're trying to make it about wrapped Bitcoin, I mean, that

17   sounds like you're making a market for chocolate doughnuts,

18   right?  Like, you have nothing about the cross-elasticity or

19   other things that might belong in that market, right, in a way

20   that a chocolate chip cookie makes its way into the market for

21   chocolate doughnuts or even doughnuts of other flavors.

22        So I'm just telling you at this point based on what you've

23   alleged your market doesn't seem right to me.  It seems much

24   too narrow and that you are trying to make it this -- right,

25   as -- I'm still relatively new to antitrust, and the broad

1  strokes that I've been told are, right, plaintiffs like little

2  markets, defendants like big markets, right, because in the end

3  the fight is about power.  But this looks really little.  So

4  I'm not -- any order you get from me isn't gonna dive into

5  either -- anything about the market definition, because based

6  on what's in front of me so far I don't need to get there.  But

7  if you do choose to amend, I just want to flag that for you now

8  so that we aren't later talking about it.  And it may be that

9  you think those are the right ones, and, you know, do what you

10  will, you're the master of your claim, but those sort of stood

11  out at me.

12      So, folks, that is -- I think that's everything I came out

13  with, but I do like to give you all an opportunity to tell me

14  anything else that you want to either about anything we've

15  already talked about, anything we've already talked about, or

16  anything that I am not -- that I haven't focused on but that

17  you would like me to focus on.

18      I do have one final question just before I hand the floor

19  over to you all about whether, Mr. Kneupper, whether you object

20  to the request for judicial notice.

21      **MR. KNEUPPER:**  I don't think that we object to the --

22  I think we already have passed the period for doing that.

23      **THE COURT:**  I thought so, too.  So we'll go ahead and

24  just I'm going to grant that now to save myself some paper

25  later.  Really, I'm saving others, but I'm happy, too.

1    So on that note, it's your motion, Ms. Mehta, so now we'll

2    go back to that.  If there's anything you want to add, please

3    do.

4         **MS. MEHTA:**  Thank you, Your Honor.

5         Just one thing briefly, which is to address the question

6    of amendment.  And I understand the amendment standards, and I

7    understand that typically courts are inclined to grant

8    amendment, but it has to be where there is some hope of a

9    non-futile amendment.  And here I think it, as was highlighted

10   not only in the briefing, but frankly just over the last 30

11   minutes, for each of the claims where you identified potential

12   problems with their allegations and asked what facts could be

13   added to amend into a claim, we heard a complete absence of any

14   factual allegation that would address the problem that Your

15   Honor identified.  And that is not a function of Mr. Kneupper

16   being put on the spot by some new theory, or new argument, or

17   new, you know, missing allegation.  These are issues that have

18   been ventilated not only in the context of the TRO, but in our

19   motion over the last several months.  And if there were a way

20   to plead facts to actually plead a viable claim, I am confident

21   that qualified counsel, such as Mr. Kneupper, would have come

22   to court today and told you what those facts are, and the fact

23   that he hasn't I think confirms that there is no plausible

24   allegation that could be made.

25        And to your point earlier, Your Honor.  In fact, in many

1    instances, the allegations that have already been made,

2    including the allegations about why we did what we did, what we

3    said when we did it, preclude an amendment that would allow for

4    a viable claim.  And notwithstanding the standards relating to

5    amendment, the reason that we have the requirement that the

6    amendment needs to be not futile and needs to be consistent

7    with prior allegations is so that we don't have the Court and

8    the parties burdened with months and months of litigation for a

9    claim that is a nonstarter.

10         And I think with all respect to BiT Global that's what we

11   have here, and it will only continue to take unnecessary time

12   from Your Honor and from us to litigate that.  And if they had

13   facts that they could identify that would actually get them to

14   a viable claim, I am sure we would have heard them.

15         That's all, Your Honor.

16              **THE COURT:**  Thank you, Ms. Mehta.

17        Mr. Kneupper?

18              **MR. KNEUPPER:**  I'll just say, and I'll stick to that

19   one argument rather than -- we've had much argument on this.

20   But I don't think that's correct in terms of -- you know, I've

21   tried to follow Your Honor's questioning and whenever Your

22   Honor's moving in different directions, I want to follow where

23   Your Honor wants to go.  But when it's being suggested we don't

24   have facts, I think one of the things that I started talking

25   about in terms of when we were talking about the -- one, the

implication issue, and I guess at a broader level *Twombly* and

these *Iqbal* changes to pleading, one of the practical things

that you've had happen because of this is the same -- we see

this in every case.  You make your pleading and you start

seeing the plausible alternative offered, but you don't know

what it's going to be when you are filing your complaint.

        And we're seeing, you know, at post-complaint for the

first time these declarations saying, here's what we did,

here's what we communicated to BiT Global about, we asked them

for information.  Something I was getting into earlier that we

could plead, that they are alleging in that declaration that

they sent an e-mail to BiT Global and just didn't get a

response and information.  And I think our client would be able

to plead that that's not true, that there was information

provided back, and that's when ... the way that the declaration

is describing what happened we don't think fits with the facts.

We think there are additional -- there's additional factual

background about what was going on in this time period in terms

of other people making statements about BiT Global in the sort

of public discussion about the -- wBTC I suppose is the way to

put it.

        **THE COURT:**  Let me ask you this question,

Mr. Kneupper, because part of the timeline I just heard laid

out is you had the TRO, the motion to dismiss is filed.  The

declarations you're talking about accompanied the motion to

1    dismiss, yes?

2         **MR. KNEUPPER:**  I believe both.  I believe it was

3    attached to the TRO, if I'm -- this is from memory, but I think

4    it was attached to the TRO and then reattached to the motion to

5    dismiss, but I could be corrected if I'm wrong.

6         **THE COURT:**  No, no, no.

7         And I think part of what -- part of what I'm hearing from

8    Ms. Mehta is that at that point you had an opportunity.  You

9    could have amended at that point instead of -- instead of --

10   usually sometimes plaintiffs see the motion to -- if you had

11   them at the TRO, even, you could have made the amendments and

12   made the changes.  And not uncommon.  I see amendments and

13   then, you know, sometimes it's a nice thing, because we see the

14   amendment and we're like, aha, we don't have to deal with that

15   motion to dismiss, new amended complaint.  I'm sure a new

16   motion to dismiss is coming, but, right, that's the point.  It

17   starts to refine.

18        So at least part of what I'm hearing is -- I guess tell me

19   why those facts aren't already in your complaint now, or --

20        **MR. KNEUPPER:**  So I'll actually just say this is just

21   a law firm strategic decision we make.  We never do that.  And

22   I think most plaintiffs -- I know the rule's been changed.

23   There's a recent change that you can -- the timing used to be I

24   think you would just do it -- I forget what it was, but now

25   it's within a certain number of days after you get the motion

1    to dismiss and certain number of days after you file.  As a

2    plaintiff's attorney you're making strategic decisions, but

3    there are counter things that you're weighing.

4         One of them is, yes, we could go add in new facts and try

5    to do an amended complaint that addresses -- you could do it

6    after the motion to dismiss.  The problem is if you do it that

7    way strategically, you are now creating a second round of

8    motions to dismiss where things haven't been waived.  If you go

9    in and fight it, you come in with a second motion to dismiss,

10   which you're probably going to face anyway no matter what,

11   where issues are narrowed and there is a waiver issue for

12   anything that the Court decided.  They can only raise on their

13   second motion to dismiss arguments that were unavailable in the

14   first one or that they made in the first one.

15        So we faced strategic choices.  This is a litigation

16   strategy.  But I don't think it can be implied or inferred that

17   this was made because we didn't think we had enough.  We just

18   always do that.  I mean ...

19        **THE COURT:**  All right.  Strategic decision aside, tell

20   me now how those facts cure any of the deficiencies we've been

21   discussing for the last few minutes.

22        **MR. KNEUPPER:**  We're talking about plausibility.

23   We're talking about is it explanation plausible.  And now we

24   don't just have -- we have a internal declaration saying this

25   is what happened.  This is what we did, this is what we looked

at, this was the decision.  And things about that I don't think
are plausible.  And some of this is stuff that I do think at
summary judgment we got into about the statements that Coinbase
has made about the SEC.  That's in the briefs, and I don't need
to belabor it, but I think that from a plausibility perspective
when you're coming in saying, I was worried that this guy got
sued by the Biden administration's SEC, a reasonable juror
could look at that and go, your CEO is saying some stuff that
is -- and was sued by the SEC.  So is it really true that
Coinbase looked at an SEC lawsuit and goes, wow, I mean, we
trust the Biden administration, so, I mean ... they can have
their opinions.  I'm not saying they can't have their opinions,
but I am saying that their explanation does not make sense with
their public statements.

The explanation does not match what BiT Global believed is
what actually happened.  And when you have submitted this
explanation, and that is their plausible alternative, I think
if we started pleading those facts in there about what the CEO
of Coinbase has said about the SEC, what has been said, those
now become things that you can consider, whereas right now
they're not part of the complaint, and it does start to make
this explanation sound like they didn't really do what they're
saying they did.  And if it doesn't have credibility, that's
what the jury's there to decide:  Are you telling the truth
when you say this.  And to me it just, I think a jury would not

```
 1   believe this.

 2            THE COURT:  All right.  So if I'm following you, if

 3   granted leave to amend, what you would amend, what you would

 4   add in, the facts you would add in are the facts that are made

 5   that are put forward in the declarations that were part of the

 6   TRO and possibly part of the motion to dismiss.  Is there

 7   some -- is that correct?

 8            MR. KNEUPPER:  I think, I think, and I believe this is

 9   correct that there are additional e-mails back and forth

10   between Coinbase and BiT Global that were not part of their

11   declaration.  So when they cut -- we -- I believe that -- and I

12   have to confirm this, but I -- that is my memory is that they

13   have cut this off, this chain, and said this is what we looked

14   at, and there's additional e-mails that do give them the

15   information that they claimed that they were not given.  And I

16   think that their -- I do think we can add additional facts

17   about sort of the timing of all this and this, you know.

18            THE COURT:  No, that's what I'm asking.  What I'm

19   asking is what are the additional facts.  And so just to

20   restate it so that I have it in my head, it is what is in those

21   declarations and things that you think were left out of those

22   declarations related at least to some e-mails.

23            MR. KNEUPPER:  I think that is ...

24            THE COURT:  All right.  Anything else?

25            MR. KNEUPPER:  I think that there -- there is some
```

1  general discussion in the marketplace sort of out there as

2  these -- in the timing of this happening, where it -- I think

3  Coinbase's statements in the context of some of the news

4  articles, it makes it more likely those implications are what

5  Coinbase was trying to get people to think, that those are just

6  statements about Mr. Sun about, oh, he's come on.  You know,

7  some of their suggestion is, oh, you know, this all happened

8  when he came on.  I think there's a time period that we could

9  address about when he had come on and there was not any effort

10 to delist, then the product comes out, then there is an effort

11 to delist, and that is happening as people -- sort of novice

12 people are making things, but they're getting into the

13 cryptocurrency -- they sort of have their own journalism

14 ecosphere I guess that you only read if you're in the crypto

15 space, but that people making decisions about this would be

16 reading where they're talking about this and where I think some

17 of the Coinbase implications are being discussed by other

18 people.  What's kinda clear, the reaction I think of people to

19 what Coinbase said is exactly what we allege they intended, and

20 I think that that's information we could be adding in, as well.

21      **THE COURT:**  Anything else that you want to sort of

22 bring up to my attention?

23      So I realize I stopped you earlier when you were -- so

24 this is your time to tell me the things you wanted to tell me

25 then, but I'm like, no, no, please answer my question.  So

1   we're past my questions; this is your time.  Is there anything

2   else you want to --

3          **MR. KNEUPPER:**  I cannot promise that I will not come

4   up with a brilliant idea later, but at this time that is what I

5   believe we would add.

6          **THE COURT:**  All right.

7          **MS. MEHTA:**  Your Honor, may I just have one minute?

8      So I want to address those proposed amendments, because I

9   think what we just heard confirms precisely why an amendment

10  would be futile.  So let's focus first on the declarations and

11  the e-mail exchanges.

12     What counsel is referring to are declarations we submitted

13  in the context of the TRO, which Your Honor obviously has,

14  which describe the decision-making process that went into the

15  delisting, and then the e-mails he's referring to are e-mails

16  between the two parties, where Coinbase requested certain

17  information in order to confirm or address its concerns and

18  which BiT Global declined to provide that information.  There's

19  nothing in what -- how he described the e-mails or that I can

20  think of based on having read those e-mails and those

21  declarations that would in any way touch on the issues that

22  Your Honor identified as being lacking.  Nothing about any of

23  that, even if you give him full credit for everything he just

24  said and take it all at face value, changes the facts that

25  we've been talking about, which is that the statements aren't

1    false and haven't been pled to be false aside from pretext,

2    which I'll get to in a minute; the problems with the antitrust

3    claims; the standing problems with respect to the UCL.  None of

4    those things that he just mentioned even touch on that.

5         The only thing they could even conceivably go to is the

6    pretext argument.  But as Your Honor learned when you asked the

7    question earlier, they have no case law support to suggest that

8    you can plead your way into these claims, which requires them

9    to plead facts that would tend to eliminate the obvious

10   alternative explanations, no support that you can plead your

11   way into the claims by just asserting pretext.  And that is all

12   they would be able to do even if you gave them full credit for

13   everything he just identified.

14        And then with respect to the articles, I'm not exactly

15   sure what he's referring to, but again, I don't know how any of

16   that could give rise to claims of falsity or address any of the

17   other problems with their claims.  That's precisely what I was

18   talking about earlier when I said if there were facts that

19   would allow them to plead these claims, we would have heard

20   them.  We didn't hear them.

21        **THE COURT:**  Counsel, I thank you both.  I will take it

22   under submission, and you'll get an order in due course.

23        **MR. KNEUPPER:**  Thank you, Your Honor.

24        **MS. MEHTA:**  Thank you, Your Honor.

25        **THE COURT:**  Thank you all for coming in person.  Safe

1    travels.

2            **MS. MEHTA:**  Thank you.

3        (Proceedings concluded at 11:57 a.m.)

4                    ---o0o---

5            <u>**CERTIFICATE OF REPORTER**</u>

6        I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8    DATE:  Saturday, May 31, 2025

9

10

11    _____

12    Stephen W. Franklin, RMR, CRR, CPE
      Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25